James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
(206) 623-7292

*Plaintiffs Co-Lead Counsel*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE INSULIN PRICING LITIGATION** | Civil Action No. 17-699(BRM)(LHG) <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   PARTIES .................................................................................................................11

      A.    Plaintiffs .......................................................................................................11

      B.    Defendants ...................................................................................................33

III.  JURISDICTION AND VENUE ...............................................................................34

IV.   DRUG PRICING IN THE UNITED STATES.........................................................35

      A.    Entities Involved in Drug Pricing ...............................................................35

      B.    The Drug Payment & Distribution Structure ..............................................37

      C.    Different Prices for Different Players ..........................................................39

      D.    Consumer Drug Costs ..................................................................................40

      E.    Impact on Consumers ..................................................................................47

      F.    Manipulation of Cost-Saving Incentives: Drug Benchmark Price Competition and the Secret "Rebates" to PBMs ...............................................................49

V.    ANALOG INSULIN..................................................................................................52

      A.    Diabetes: The Disease and Demographics....................................................52

      B.    The Origins of Insulin Treatment ................................................................54

      C.    Current Insulin Treatment Landscape...........................................................59

      D.    Climbing Insulin Prices Unrelated to Any Rise in Production Costs...................61

      E.    Buying Formulary Status with "Rebates": The Real Reason for Novo Nordisk, Eli Lilly, and Sanofi's Increasing Benchmark Prices..................................................71

      F.    Novo Nordisk's, Eli Lilly's, and Sanofi's price increases have harmed patients...79

      G.    The Real Impact of Artificial Pricing ..................................................82

VI.   TOLLING OF THE STATUTE OF LIMITATIONS.........................................................85

      A.    Discovery Rule Tolling................................................................................85

    B.      Fraudulent Concealment Tolling ........................................................86

    C.      Estoppel...............................................................................................86

VII.    CLASS ACTION ALLEGATIONS ..................................................86

VIII.    CLAIMS FOR RELIEF ....................................................................90

COUNT ONE: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
    ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ, AGAINST NOVO NORDISK..90

    A.      The Levemir/Novolog Pricing Enterprise..................................91

    B.      Conduct of the Levemir/Novolog Pricing Enterprise ............................97

    C.      Novo Nordisk's Pattern of Racketeering Activity..................................99

    D.      Novo Nordisk's Use of the U.S. Mail and Interstate Wire Facilities .................101

    E.      Damages Caused by Novo Nordisk's Levemir and Novolog Pricing Fraud .......103

COUNT TWO: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
    ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ, AGAINST ELI LILLY ..........105

    A.      The Humalog Pricing Enterprise ........................................106

    B.      Conduct of the Humalog Pricing Enterprise.......................................112

    C.      Eli Lilly's Pattern of Racketeering Activity .......................................114

    D.      Eli Lilly's Use of the U.S. Mail and Interstate Wire Facilities...........................115

    E.      Damages Caused by Eli Lilly's Humalog Pricing Fraud.....................................118

COUNT THREE: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
    ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ, AGAINST SANOFI...............119

    A.      The Lantus/Apidra/Toujeo Pricing Enterprise....................................120

    B.      Conduct of the Lantus/Apidra/Toujeo Pricing Enterprise ...................................126

    C.      Sanofi's Pattern of Racketeering Activity .........................................128

    D.      Sanofi's Use of the U.S. Mail and Interstate Wire Facilities..............................130

    E.      Damages Caused by Sanofi's Lantus, Apidra, and Toujeo Pricing Fraud..........132

COUNT FOUR: VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
    AGAINST SANOFI (N.J.S.A. § 56:8-1, *ET SEQ*.).......................................134

COUNT FIVE: VIOLATION OF THE NEW JERSEY  CONSUMER FRAUD ACT AGAINST NOVO NORDISK (N.J.S.A. § 56:8-1, *ET SEQ*.)............................................................138

COUNT SIX: VIOLATION OF THE NEW JERSEY  CONSUMER FRAUD ACT AGAINST ELI LILLY, SANOFI, AND NOVO NORDISK (N.J.S.A. § 56:8-1, *ET SEQ*.)..............142

FACTUAL ALLEGATIONS RELEVANT TO COUNTS SEVEN THROUGH SIXTY..........144

COUNT SEVEN: VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-19-1, *ET SEQ*.) ...........................................................147

COUNT EIGHT: VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (ALASKA STAT. ANN. § 45.50.471, *ET SEQ*.)..148

COUNT NINE: VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT (ARIZONA REV. STAT. § 44-1521, *ET SEQ*.) .................................................................149

COUNT TEN: VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ*.) ....................................................150

COUNT ELEVEN: VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, *ET SEQ*.) ........................................................................152

COUNT TWELVE: VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.) ...........................................153

COUNT THIRTEEN: VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT (COLO. REV. STAT. § 6-1-101, *ET SEQ*.) ....................................................154

COUNT FOURTEEN: VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. § 42-110A, *ET SEQ*.)...................................155

COUNT FIFTEEN: VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT (DEL. CODE TIT. 6, § 2513, *ET SEQ*.) ....................................................................156

COUNT SIXTEEN: VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT (D.C. CODE § 28-3901, *ET SEQ*.) .........................................................157

COUNT SEVENTEEN: VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET SEQ*.) ...................................158

COUNT EIGHTEEN: VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT (GA. CODE ANN. § 10-1-390, *ET SEQ*.).....................................................159

COUNT NINETEEN: VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT (GA. CODE. ANN § 10-1-370, *ET SEQ*.) ........................................160

COUNT TWENTY: VIOLATION OF THE HAWAII ACT § 480-2(A) (HAW. REV. STAT. § 480, *ET SEQ*.) ...............................................................................161

COUNT TWENTY-ONE:  VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT (IDAHO CODE ANN. § 48-601, *ET SEQ.*) ................................................................162

COUNT TWENTY-TWO: VIOLATION OF THE ILLINOIS CONSUMER FRAUD  AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILL. COMP. STAT. § 505/1, *ET SEQ.* AND 720 ILL. COMP. STAT. § 295/1A) .............................................................163

COUNT TWENTY-THREE: VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3) .........................................................................164

COUNT TWENTY-FOUR: VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT (IOWA CODE § 714H.1, *ET SEQ.*) .....................165

COUNT TWENTY-FIVE: VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT (KAN. STAT. ANN. § 50-623, *ET SEQ.*) ......................................................................166

COUNT TWENTY-SIX: VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT. ANN. § 367.110, *ET SEQ.*) .....................................................167

COUNT TWENTY-SEVEN: VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES  AND CONSUMER PROTECTION LAW (LA. REV. STAT. ANN. § 51:1401, *ET SEQ.*) ............................................................................................................168

COUNT TWENTY-EIGHT: VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT (ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*) ...........................................169

COUNT TWENTY-NINE: VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT (MD. CODE, COM. LAW § 13-101, *ET SEQ.*) .....................................................169

COUNT THIRTY: VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*) ...................................................170

COUNT THIRTY-ONE: VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903, *ET SEQ.*) .........................................................171

COUNT THIRTY-TWO: VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (MINN. STAT. § 325F.68, *ET SEQ.*) ..............................173

COUNT THIRTY-THREE: VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT (MINN. STAT. § 325D.43-48, *ET SEQ.*) .........................................173

COUNT THIRTY-FOUR: VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT (MISS. CODE. ANN. § 75-24-1, *ET SEQ.*) ..........................................................174

COUNT THIRTY-FIVE: VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010, *ET SEQ.*) ...............................................................175

COUNT THIRTY-SIX: VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT OF 1973 (MONT. CODE ANN. § 30-14-101,
*ET SEQ.*) .................................................................................................................175

COUNT THIRTY-SEVEN: VIOLATION OF THE NEBRASKA CONSUMER PROTECTION
ACT (NEB. REV. STAT. § 59-1601, *ET SEQ.*).............................................................176

COUNT THIRTY-EIGHT: VIOLATION OF THE NEVADA DECEPTIVE TRADE
PRACTICES ACT (NEV. REV. STAT. § 598.0903, *ET SEQ.*) .....................................177

COUNT THIRTY-NINE: VIOLATION OF THE NEW HAMPSHIRE  CONSUMER
PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.*) ..........................178

COUNT FORTY: VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J.S.A.
§ 56:8-1, *ET SEQ.*).......................................................................................................179

COUNT FORTY-ONE: VIOLATION OF THE NEW MEXICO UNFAIR TRADE
PRACTICES ACT (N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*)......................................180

COUNT FORTY-TWO: VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW §§
349-350 (N.Y. GEN. BUS. LAW §§ 349-350) ..............................................................181

COUNT FORTY-THREE: VIOLATION OF THE NORTH CAROLINA UNFAIR AND
DECEPTIVE ACTS  AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1, *ET SEQ.*)182

COUNT FORTY-FOUR: VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD
ACT (N.D. CENT. CODE § 51-15-02) .........................................................................182

COUNT FORTY-FIVE: VIOLATION OF THE OHIO CONSUMER SALES PRACTICES
ACT (OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*) ..................................................183

COUNT FORTY-SIX: VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION
ACT (OKLA. STAT. TIT. 15, § 751, *ET SEQ.*)..............................................................184

COUNT FORTY-SEVEN: VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT (OR. REV. STAT. §§ 646.605, *ET SEQ.*).......................................186

COUNT FORTY-EIGHT: VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION LAW (73 PA. CONS. STAT. § 201-1,
*ET SEQ.*) ....................................................................................................................187

COUNT FORTY-NINE: VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION ACT (R.I. GEN. LAWS § 6-13.1, *ET
SEQ.*)...........................................................................................................................188

COUNT FIFTY: VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES
ACT (S.C. CODE ANN. § 39-5-10, *ET SEQ.*)...............................................................189

COUNT FIFTY-ONE: VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE
        PRACTICES  AND CONSUMER PROTECTION LAW (S.D. CODIFIED LAWS § 37-
        24-6) .................................................................................................................. 190

COUNT FIFTY-TWO: VIOLATION OF THE TENNESSEE CONSUMER PROTECTION
        ACT (TENN. CODE ANN. § 47-18-101, *ET SEQ*.) ........................................ 190

COUNT FIFTY-THREE: VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES
        CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ*.) 191

COUNT FIFTY-FOUR: VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT
        (UTAH CODE ANN. § 13-11-1, *ET SEQ*.) .................................................... 193

COUNT FIFTY-FIVE: VIOLATION OF THE VERMONT CONSUMER FRAUD ACT (VT.
        STAT. ANN. TIT. 9, § 2451 *ET SEQ*.) ......................................................... 194

COUNT FIFTY-SIX VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
        (VA. CODE ANN. §§ 59.1-196, *ET SEQ*.) .................................................... 194

COUNT FIFTY-SEVEN: VIOLATION OF THE WASHINGTON CONSUMER
        PROTECTION ACT (WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ*.) ................. 195

COUNT FIFTY-EIGHT: VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT
        AND PROTECTION ACT (W. VA. CODE § 46A-1-101, *ET SEQ*.) ........................... 196

COUNT FIFTY-NINE: VIOLATION OF THE WISCONSIN DECEPTIVE TRADE
        PRACTICES ACT (WIS. STAT. § 110.18) .................................................... 198

COUNT SIXTY: VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
        (WYO. STAT. §§ 40-12-105 *ET SEQ*.) ......................................................... 198

DEMAND FOR JUDGMENT ................................................................................. 199

JURY DEMAND .................................................................................................. 200

Plaintiffs, on behalf of themselves and all others similarly situated, for their complaint against defendants Novo Nordisk Inc. (Novo Nordisk), Eli Lilly and Company (Eli Lilly), Sanofi-Aventis U.S. LLC (Sanofi) (collectively, defendants) allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.     INTRODUCTION

1.       Diabetes is an epidemic in the United States.  One in five health care dollars is spent caring for people with diagnosed diabetes.[1]  Over 30 million people, 9.4% of the country, live with diabetes.[2]  A life-threatening disease, many of those living with diabetes rely on daily insulin treatments to survive.  Interruptions to these regimes can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin.  Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States.[3]  Missed or inadequate insulin therapy can leave diabetics with too little insulin in their system, triggering hyperglycemia and then diabetic ketoacidosis.  Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.[4]  Diabetic ketoacidosis is

---

[1] Press Release, American Diabetes Association, American Diabetes Association Releases New Research Estimating Annual Cost of Diabetes at $245 Billion, (Mar. 6, 2013), *available at* http://www.diabetes.org/newsroom/press-releases/2013/annual-costs-of-diabetes-2013.html?referrer=https://www.google.com/.

[2] *Statistics About Diabetes*, American Diabetes Association (July 19, 2017), http://www.diabetes.org/diabetes-basics/statistics/.

[3] *Chronic Disease Prevention and Health Promotion: Diabetes*, Centers for Disease Control Prevention (July 25, 2016), https://www.cdc.gov/chronicdisease/resources/publications/aag/diabetes.htm.

[4] *Diabetic Ketoacidosis*, Mayo Clinic: Diseases and Conditions, http://www.mayoclinic.org/diseases-conditions/diabetic-ketoacidosis/basics/definition/con-20026470 (last visited Dec. 17, 2017).

responsible for more than 500,000 hospital days per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.[5]

2.     Defendants Novo Nordisk, Eli Lilly, and Sanofi manufacture insulin used to treat diabetes.  Over the course of the last decade, each has raised the publicly reported benchmark prices of their respective medications in an astounding and unjustifiable manner.  Insulin products that previously cost $25 per prescription now cost between $300 and $600.  In the last five years alone, Novo Nordisk, Eli Lilly, and Sanofi have raised their benchmark prices by over 150%.  Some patients now pay almost $900 dollars a month just to obtain the insulin they need to survive.

3.     The rising cost of insulin is on top of the hundreds of dollars people living with diabetes must spend on their other diabetes supplies (*e.g.*, the test strips and glucose meters people with diabetes must use to read their blood sugar levels prior to taking insulin and the syringes, pens, infusion sets, and/or pods they need to administer their insulin).  In short, living with diabetes now costs some people well over $1000 per month.

4.     In February 2016, an endocrinologist wrote an op-ed, titled *Break Up the Insulin Racket*, in the New York Times. This piece cited some disturbing statistics:

> [T]he Big Three have simultaneously hiked their prices.  From 2010 to 2015, the price of Lantus (made by Sanofi) went up by 168 percent; the price of Levemir (made by Novo Nordisk) rose by 169 percent; and the price of Humulin R U-500 (made by Eli Lilly) soared by 325 percent.[6]

5.     Why has the price of insulin spiraled so out of control?  Although branded drug companies usually rely on their research and development costs to rationalize their supra-

---

[5] Abbas E. Kitabchi, et al., *Hyperglycemic Crises in Adult Patients with Diabetes*, 32 Diabetes Care 1335, 1335 (2009).

[6] Kasia Lipska, *Break Up the Insulin Racket*, N.Y. Times, Feb. 20, 2016, https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html.

competitive drug prices, the manufacturers of analog insulin – the defendants here – admit that their price hikes are unrelated to any jump in production or research and development costs.

6.     Instead, these price increases are the result of purported "rebate" schemes the defendants have devised and carried out with the aid of the largest national pharmacy benefit managers (PBMs).  In these schemes, defendants effectuate two different prices for their insulin treatments: a publicly-reported, *benchmark* price (that is used at the point-of-sale) and a markedly lower, but secret, *real* price (that is arrived at after deducting the manufacturer's "rebate" to PBMs or large plans and paid later in time than the pharmacy transaction).  The defendants offer their lower, real prices[7] to certain PBMs and some institutional payers.  But consumers do not see these lower prices because when they make their contribution – for example, as cash payers, or when making co-insurance payments, at the pharmacy point-of-sale – the transaction is based on the *benchmark* price, not the *real* price.  Consumer payments at the point-of-sale for these drugs are inflated due to the large and increasing "spread" between the benchmark and the real price arranged between the manufacturers and PBMs.

7.     PBMs are essentially middlemen between health insurers, pharmacies, and drug manufacturers: the PBMs negotiate directly with drug manufacturers on behalf of their insurer clients to determine the drug prices these insurers will pay.  As middlemen aggregators, PBMs ostensibly take advantage of economies of scale.  A single insurer might not have enough clout to negotiate price discounts with drug manufacturers.  But a PBM aggregating the business of multiple insurers might.  The most influential of the nation's PBMs are CVS Health, Express Scripts, and OptumRx.  Together, they control over 80% of the PBM market, covering 180 million insured lives.

---

[7] These markedly lower real prices are still supra-competitive.

8.     The source of the PBMs' power to negotiate price discounts is their control over formularies – ranked lists of drugs.  The PBMs set up tiered formularies for their clients (the health insurers) based, in part, on the real prices drug manufacturers offer them. Ostensibly cheaper and more effective medicines are placed into lower tiers.  Health insurers rely on these formularies to determine how much of their members' drug costs they will cover.  Drugs in lower, preferred formulary tiers are less expensive for plan members, in part, because the drugs themselves are less expensive and, in part, because insurers cover a greater portion of those drugs' costs.

9.     Where two medicines are in the same therapeutic category, a PBM will sometimes exclude, or place in a non-preferred position, the more expensive of the two.  When a drug is excluded from a formulary, health insurers using that formulary will not reimburse their members for purchases of that drug.  As a result, formularies push patients toward certain brands of drugs over others.

10.     Drug manufacturers seek to influence PBM formularies in order to control drug purchasing behavior.  The publicly-reported benchmark prices set by drug manufacturers impact PBM revenues in multiple ways, two of which are implicated here.  First, PBMs retain some or all of "rebate" dollars that the drug manufacturers pay them.  The larger the spread between a drug's benchmark and real price, the greater the headroom for the PBM to earn money on that drug.  Second, PBMs tie certain fees they charge insurers and patients to the drug manufacturers' benchmark prices. PBMs then effectuate an arbitrage between the prices patients pay to retail or mail order pharmacies and the amount they charge to insurers for that transaction.  As a result, when drug manufacturers raise benchmark prices, PBMs profit.

- 4 -

11.     But for these drugs, consumers pay, directly or indirectly, based on *benchmark* prices, not real prices.  When a consumer goes to pick up analog insulin at a pharmacy, the price the consumer sees is a charge based on the benchmark price (also known as the Average Wholesale Price (AWP)).[8]  Insured consumers pay all or a portion of this price depending on their insurance plan: consumers in high deductible plans typically pay this price until they meet their deductibles; consumers in plans with coinsurance rates pay a percentage of the price; and consumers in Medicare Part D plans pay different percentages of this price based on where they are in their plans' cycles. Uninsured consumers pay benchmark price less a small discount every time they pick up their medications.  Critically, the "rebates" drug manufacturers offer PBMs *are not reflected in these prices*.

12.     This system has led to reverse, perverse incentives for the pricing of analog insulin products.  There are two types of analog insulin: long-acting and rapid-acting.  The defendants are makers of analog insulin. Sanofi and Novo Nordisk have produced long-acting, analog insulin (Lantus and Levemir, respectively) for over 10 years.  Last year, Eli Lilly began producing its own long-acting analog insulin (Basaglar), and Sanofi started producing a second long-acting analog insulin (Toujeo) in 2015.  Novo Nordisk, Eli Lilly, and Sanofi also produce rapid-acting, analog insulins (Novolog, Humalog, and Apidra, respectively).

13.     Over the past decade, the defendants have consistently reported higher and higher benchmark prices, while maintaining the real prices they offer PBMs more or less constant.[9]  The defendants refuse to disclose these lower, real prices, labeling them trade secrets.  The public-

---

[8] If the consumer is uninsured, the pharmacy offers the consumer a "usual and customary rate" also based on benchmark price.

[9] Note, these real prices are still supra-competitive—there are no generic equivalents to the Defendants' insulin products and, therefore, there is no generic competition.

facing justification for such secrecy is: "We do not want our competitors to know the extent of our discounts." But there is a second, more nefarious reason for such concealment: they do not want the public to realize that their benchmark prices are wildly inflated.

14.     The practice of publicly publishing one price, while secretly offering another, has enabled the defendants to secure PBM business without significantly reducing their real prices. The defendants know that the PBMs stand to profit from larger spreads between the real and benchmark prices of their analog insulins.  Inflating the benchmark price of insulin does not hurt PBMs so long as real price stays constant; indeed, PBMs make more money the higher the benchmark price.  The PBMs can then sell these "increased rebates" to their clients (the insurance plans) when, in reality, the PBMs have not achieved true price discounts – the inflated benchmark prices merely give the appearance of price discounts.

15.     Drug companies could offer PBMs the same high "rebates" in a manner that would help consumers: they could *lower their real prices*, instead of inflating their benchmark prices.  Increasing spreads in this manner would benefit consumers.  Yet the insulin manufacturers refuse to significantly lower their real prices, and the PBMs continue to accept this behavior so long as benchmark prices continue to rise while real prices stay constant.

16.     Instead of marketing lower real prices, the defendants market higher benchmark prices; instead of competing openly on real prices, the defendants compete on kickbacks or payoffs.  The defendants are not acting legally to product their products, but rather illegally to promote their fraudulent "rebate" schemes.  Put simply, the defendants have offered the three largest PBMs—CVS Health, Express Scripts, and OptumRx—larger spreads as a *quid pro quo* for patient business.

17.     Insidiously, an arms race in the escalation of reported benchmark prices – and consequently spreads – has ensued between the defendants.  Each defendant has raised its benchmark prices just a bit more than its competitors, encouraging the large PBMs to keep its drugs on the formulary.  And the defendants have done so in perfect lockstep.

**Figure 1: The defendants have increased long-acting insulin benchmark prices in lock-step.**



**Figure 2: The defendants have increased rapid-acting insulin benchmark prices in lock-step.**



18.     Eli Lilly basically admitted to the spread-pricing-scheme in a January 2017

statement issued by spokeswoman Julie Williams:

> There is a wide and growing discrepancy between the published "list price" Lilly
> sets and the "net price" that Lilly actually receives.
>
> The list price (also known as the wholesale acquisition cost or WAC) is the price
> that a manufacturer sets as a starting point for negotiations with federal and state
> governments, private insurers, and pharmacy benefit managers to gain formulary
> access.  Manufacturers also use list price in negotiations with wholesalers and
> others involved in the distribution process.
>
> The amount the manufacturer receives after all discounts and rebates are applied
> is considerably less than the list price.  For example, the net price for Humalog—
> our most commonly used insulin—increased by 4 percent over the five-year

period of 2009 to 2014, which is a much smaller increase than what some consumers have experienced.

19.     The New York Times op-ed called for transparency in setting prices:

In the meantime, we need a fair and transparent system for setting prices.  In much of Europe, insulin costs about a sixth of what it does here.  That's because the governments play the role of pharmacy benefit managers.  They negotiate with the manufacturer directly and have been very effective at driving down prices.  In the United States, we rely on the private sector and a free market for drug pricing.  But in order for this to work, we need to regulate it better and demand greater transparency.[10]

20.     This benchmark price inflation has a victim: patients who rely on insulin to stay alive.  Consumers must pay for analog insulin based on the artificially inflated benchmark prices the defendants set.  As a result, the defendants' benchmark-price arms race has saddled individuals living with diabetes – whether insured and paying full benchmark prices before they hit their large deductibles, insured and paying increasingly common coinsurance, insured but hitting the Medicare Part D "Donut Hole," or uninsured and paying sticker prices for all drugs – with crushing out-of-pocket expenses.

21.     The physical, emotional, and financial tolls of paying such excessive prices for insulin are devastating.  Unable to afford their insulin drugs, patients report under-dosing their insulin, injecting expired insulin, re-using needles, and starving themselves to control their blood sugars with as little insulin as possible.  These behaviors are dangerous for people living with diabetes.  Because such behaviors ineffectively control those individuals' blood sugar levels, they can lead to serious complications such as kidney failure, heart disease, blindness, infection, and amputations.  Uninsured and unable to afford the insulin their doctors prescribed, multiple plaintiffs have lost their vision and kidneys.  Other plaintiffs have been rushed to emergency

---

[10] Lipska, *supra*.

rooms because they were unable to afford enough insulin to control their blood sugars and developed diabetic ketoacidosis.  To cut down on costs, many class members re-use needles and pen tips, a dangerous practice that can lead to infection.  Other class members explain that they avoid the doctor because their inability to afford insulin has caused their blood sugars to spike.  They know that their doctors will prescribe more insulin to treat this problem, and they simply cannot afford to take any more insulin.  Plaintiffs describe how the amount they spend on insulin makes it impossible for them to maintain the healthy diet that people living with diabetes need, further compromising their health.  Thus, while the purpose of insulin is to improve the health of those living with diabetes, the rising and excessive cost of these drugs is actually forcing the plaintiffs to jeopardize their health.

22.     The financial strain of these excessive insulin prices infects all areas of patients' lives.  Stories of patients taking out loans and accruing debt to afford insulin are common.  Multiple patients estimate that they spend over 50% of their monthly income on insulin medications.  Some patients have been unable to leave bad jobs for fear of losing their health insurance; others have been encouraged to leave good jobs for positions that might pay more or have better insurance.  Many patients describe rearranging their lives around their insulin costs— keeping lights off and the heat low to avoid high electricity bills, moving back in with parents, and leaving school.  Many parents of children with diabetes have had to make hard choices regarding their children's futures: pre-Kindergarten schooling or insulin?  As one patient put it, "[f]inancially, it's killing me."

23.     The financial hardships the defendants' price hikes impose on those living with diabetes also have serious mental health consequences.  Many patients describe the constant stress and anxiety that accompanies not knowing how they will pay for next month's insulin

supply.  "I often cry, and I think, have I done something wrong that I can't afford to take care of myself?"  Others express anger and a deep sense of betrayal that a once-affordable drug is now completely unaffordable.  "I feel so taken advantage of; now, I can't afford my medications, and for what?  All so some drug company can profit from my sickness?"  In short, a medication that should be a source of health has instead become a cause of pain.

24.     This action alleges that the three makers of analog insulin drug products – Novo Nordisk, Eli Lilly, and Sanofi – violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and various state consumer protection laws by engaging in a scheme and enterprise to unlawfully inflate the benchmark prices of rapid- and long-acting analog insulin drugs so that they can market a wider spread of profit to PBMs and thereby obtain preferred status on PBM formularies.  This scheme directly and foreseeably causes consumers to overpay for the analog insulins they need.

## II.     PARTIES

### A.     Plaintiffs

25.     Plaintiff Henry Appleby is a citizen of the Commonwealth of Massachusetts and resides in Wilmington, Massachusetts.

26.     Mr. Appleby has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

27.     Plaintiff Andre' Arnold is a citizen of the State of Illinois and resides in Belleville, Illinois.

28.     Ms. Arnold has type 2 diabetes, and she currently takes Lantus brand insulin to treat her diabetes.  In the past she took Levemir.  She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for both Lantus and Levemir.

29.     Plaintiff Frank Barnett is a citizen of the State of New Mexico and resides in Albuquerque, New Mexico.

30.     Mr. Barnett has type 2 diabetes, and he currently takes Lantus and Novolog brand insulin to treat his diabetes.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Lantus and Novolog.

31.     Plaintiff Roseanna Barnett is a citizen of the State of New Mexico and resides in Albuquerque, New Mexico.

32.     Mrs. Barnett has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes. She is insured under Medicare Part D and recently reached the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark prices. As a direct result of the scheme, she has overpaid for both Lantus and Novolog.

33.     Plaintiff Andrew Bauer is a citizen of the State of Nevada and resides in Las Vegas, Nevada.

34.     Mr. Bauer has type 2 diabetes, and he currently takes Lantus brand insulin to treat his diabetes.  In the past, he took Humalog brand insulin.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost

of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.  He has also lost his vision and his kidney is failing due to the high cost of insulin.

35.     Plaintiff Aletha Bentele is a citizen of the State of Missouri and resides in Independence, Missouri.

36.     Ms. Bentele has type 1 diabetes, and she currently takes Lantus and Humalog brand insulin to treat her diabetes.  She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for Lantus and Humalog.

37.     Plaintiff Julia Blanchette is a citizen of the State of Ohio and resides in Cleveland Heights, Ohio.

38.     Ms. Blanchette has type 1 diabetes, and takes Apidra brand insulin to treat her diabetes.  For a few months in the beginning of 2017, she took Novolog brand insulin.  She is insured in a high-deductible health plan and pays for her insulin based on benchmark price.  As a direct result of the scheme, she has overpaid for Apidra and Novolog.

39.     Plaintiff Mary Bobo is a citizen of the State of Indiana and resides in Kirklin, Indiana.

40.     Ms. Bobo has type 1 diabetes, and she is currently alternating between Humalog and Novolog brand insulin to treat her diabetes.  She is currently taking donated and expired insulin.  She has not purchased insulin since 2016.  She is insured in a high-deductible health plan.  Previously, she was paying for insulin based on benchmark price.  As a direct result of the scheme, she has overpaid for Novolog.

- 13 -

41.     Plaintiff James Bonser is a citizen of the State of Montana and resides in Bigfork, Montana.

42.     Mr. Bonser has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes.  He is insured under Medicare Part D and often reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

43.     Plaintiff Terry Brewster is a citizen of the State of Arkansas and has been traveling throughout the country since May.  His permanent address is his mother's address in Oak Ridge, Louisiana.

44.     Mr. Brewster has type 1 diabetes, and he currently takes Lantus and Apidra brand insulin to treat his diabetes.  He was prescribed Novolog, but he had a bad reaction to it and returned it.  He is currently insured in a high-deductible health plan.  In the past, Mr. Brewster did not have insurance and was paying for his insulin out-of-pocket based on benchmark price.  As a direct result of the scheme, he has overpaid for both Lantus and Apidra.

45.     Plaintiff Donald Chaires is a citizen of the Commonwealth of Massachusetts and resides in Springfield, Massachusetts.

46.     Mr. Chaires has type 2 diabetes, and he currently takes Lantus brand insulin to treat his diabetes.  In the past, he has taken Humalog brand insulin.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

- 14 -

47.     Plaintiff Scott Christensen is a citizen of the State of Utah and resides in Payson, Utah.

48.     Mr. Christensen has type 1 diabetes, and he currently takes Novolog and Humalog brand insulin to treat his diabetes.  For a portion of 2016, Mr. Christensen's insurance provider did not cover his insulin medication, and he was forced to pay for his insulin medications out-of-pocket based on benchmark price.  As a direct result of the scheme, Mr. Christensen overpaid for his Novolog and Humalog.

49.     Plaintiff Julia D'Arrigo is a citizen of the State of New York and resides in Staten Island, New York.

50.     Ms. D'Arrigo has type 1 diabetes, and she currently takes Novolog brand insulin to treat her diabetes.  In the past, she took Humalog brand insulin.  She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for at least Novolog.

51.     Plaintiff Patricia Dague is a citizen of the State of Texas and resides in Rosenberg, Texas.

52.     Ms. Dague has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes.  She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she receives assistance through a patient assistance program.  In the past, she was insured in a high deductible health plan, where she paid based on benchmark price.  As a direct result of the scheme, she has overpaid for Lantus and Novolog.

53.     Plaintiff Gay Deputee is a citizen of the State of Montana and resides in Hardin, Montana.

- 15 -

54.     Ms. Deputee has type 2 diabetes, and she currently takes Lantus and Humalog brand insulin to treat her diabetes.  In the past, she has taken Novolog and Levemir.  She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for both Lantus and Humalog.

55.     Plaintiff Scott Dercks is a citizen of the State of Wisconsin and resides in Milwaukee, Wisconsin.

56.     Mr. Dercks has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

57.     Plaintiff Mary Ann Devins is a citizen of the State of Vermont and resides in White River Junction, Vermont.

58.     Ms. Devins has type 2 diabetes, and she currently takes Basaglar and Novolog.  In the past, she took Lantus instead of Basaglar.  Ms. Devins is currently insured under Medicare and Blue Cross Blue Shield.  Her insurance covers a fixed percentage of her prescriptions and requires her to pay coinsurance based on benchmark price.  As a direct result of the scheme, Ms. Devins has overpaid for both Lantus and Novolog.

59.     Plaintiff Jane Doe is a citizen of the Commonwealth of Massachusetts and resides in Taunton, Massachusetts.

60.     Ms. Doe has type 2 diabetes, and she currently takes Lantus brand insulin to treat her diabetes.  She is insured under Medicare Part D and consistently reaches the Medicare Part D

"Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for Lantus.

61.     Plaintiff Donald Douthit is a citizen of the State of Colorado and resides in Woodland Park, Colorado.

62.     Mr. Douthit has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

63.     Plaintiff F. Donald Fellow is a citizen of the State of Arizona and resides in Phoenix, Arizona.

64.     Mr. Fellow has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

65.     Plaintiff Mildred Ford is a citizen of the State of Michigan and resides in Westland, Michigan.

66.     Ms. Ford has type 2 diabetes, and currently takes Levemir and Novolog.  She is insured under HAP Senior Plus. She pays a high coinsurance rate based on benchmark price.  As a direct result of the scheme, she has overpaid for Levemir and Novolog.

67.     Plaintiff Sarah Gierer is a citizen of the State of New York and resides in Bridgeport, New York.

68.     Ms. Gierer has type 1 diabetes, and she currently takes Apidra brand insulin to treat her diabetes.  She is currently insured under Medicaid and pays $3 for a vial of insulin.  However, from 2013 to 2016, she was insured in a high-deductible health plan.  In that plan, she paid for her insulin based on benchmark price before she hit her deductible.  As a direct result of the scheme, she has overpaid for Apidra.

69.     Plaintiff Dianna Gilmore is a citizen of the State of Utah and resides in Spanish Fork, Utah.

70.     Ms. Gilmore has type 2 diabetes, and she currently takes Novolog brand insulin to treat her diabetes.  In the past, she has taken Lantus, Levemir, and Humalog.  Ms. Gilmore is uninsured and has paid out-of-pocket for her insulin based on benchmark price.  As a direct result of the scheme, she has overpaid for Lantus, Levemir, Novolog and Humalog.

71.     Plaintiff Gerald Girard is a citizen of the Commonwealth of Massachusetts and resides in Fairhaven, Massachusetts.

72.     Mr. Girard has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes.  In the past, he has taken Novolog brand insulin.  He is insured under Medicare Part D and has high out-of-pocket costs due to benchmark prices.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

73.     Plaintiff Mark Goldsmith is a citizen of the State of New York and resides in New York, New York.

74.     Mr. Goldsmith purchases insulin on behalf of his minor daughter, who has type 1 diabetes.  His daughter currently takes Lantus and Novolog brand insulin to treat her diabetes.  Mr. Goldsmith purchased Lantus and Novolog to treat his daughter's diabetes in March, June,

- 18 -

and September 2016.  Mr. Goldsmith had very high out-of-pocket costs due to benchmark prices. As a direct result of the scheme, he has overpaid for both Lantus and Novolog.

75.     Plaintiff Michelle Gwin is a citizen of the State of Arizona and resides in Prescott Valley, Arizona.

76.     Ms. Gwin used to purchase insulin on behalf of her adult sons, Taylor and Alex Gwin.  She purchased insulin for Taylor until March 31, 2017, and purchased insulin for Alex until 2012.  Both Alex and Taylor have type 1 diabetes and take Humalog brand insulin to treat their diabetes.  Ms. Gwin has a high-deductible health plan and pays for insulin based on benchmark prices.  As a direct result of the scheme, she has overpaid for Humalog.

77.     Plaintiff Ruth Hart is a citizen of the State of Arizona and resides in Mesa, Arizona.

78.     Ms. Hart has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes.  In the past, she took Novolog.  Between May 2013 and April 2015, Ms. Hart was insured through her employer and enrolled in an employee welfare benefit health plan. Beginning in June 2015 through August 2017, she worked for a different employer and enrolled in that company's employee welfare benefit health plan.  Under the terms of that plan, she made high coinsurance payments for her insulin based on benchmark prices.  As a direct result of the scheme, she has overpaid for Humalog and/or Novolog.

79.     Plaintiff Diane Halkyard is a citizen of the State of Michigan and resides in Lincoln Park, Michigan.

80.     Ms. Halkyard has type 2 diabetes, and she takes Lantus and Novolog brand insulin to treat her diabetes.  She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based

on benchmark price.  As a direct result of the scheme, she has overpaid for both Lantus and Novolog.

81.     Plaintiff Sara Hasselbach is a citizen of the State of California and resides in San Diego, California.

82.     Ms. Hasselbach has type 1 diabetes, and she currently takes Novolog and Lantus brand insulin to treat her diabetes.  She is insured through her employer and has a high-deductible health plan with coinsurance requirements.  She has to pay for her insulin based on benchmark prices before she hits her deductible, and her coinsurance requirements are also calculated based on benchmark prices.  As a direct result of the scheme, she has overpaid for both Lantus and Novolog.

83.     Plaintiff David Hernandez is a citizen of the State of New Jersey and resides in Paterson, New Jersey.

84.     Mr. Hernandez has type 1 diabetes, and he currently takes Humalog and Lantus brand insulin to treat his diabetes.  He currently receives pharmaceutical coverage under the New Jersey Pharmaceutical Assistance to the Aged and Disabled Program.  However, until 2014, he was uninsured or had sporadic coverage.  During that time, he could not afford his insulin.  As a result, his blood sugar levels caused severe damage to his eyes and kidneys.  He is now blind in one eye and has had a kidney transplant due to his inability to afford insulin and control his type 1 diabetes.  As a direct result of the scheme, he has overpaid for both Humalog and Lantus.

85.     Plaintiff Ritch Hoard is a citizen of the State of Michigan and resides in Atlanta, Michigan.

86.     Mr. Hoard has type 1 diabetes, and he currently takes Lantus brand insulin to treat his diabetes.  He is insured under Medicare Part D and consistently reaches the Medicare Part D

- 20 -

"Donut Hole" where he must pay 40% of the cost of his insulin, based on benchmark price.  As a direct result of the scheme, he has overpaid for Lantus.

87.     Plaintiff Michael Horton is a citizen of the State of Texas and resides in Quinlan, Texas.

88.     Mr. Horton has type 2 diabetes, and he currently takes Novolin brand insulin to treat his diabetes.  In the past, he took Lantus brand insulin.  He is insured in a high-deductible health plan and has to pay for insulin based on benchmark prices.  As a direct result of the scheme, he has overpaid for Lantus.

89.     Plaintiff Arthur Janz is a citizen of the State of Indiana and resides in Elkhart, Indiana.

90.     Mr. Janz has type 2 diabetes, and he currently takes Levemir and Novolog brand insulin to treat his diabetes.  In the past, he took Lantus brand insulin.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Levemir and Novolog.

91.     Plaintiff Emma Jensen is a citizen of the State of Idaho and resides in Meridian, Idaho.

92.     Ms. Jensen has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes.  Previously, she purchased several different insulin brands, including Novolog and/or Lantus.  During the class period, she was uninsured and paid for her insulin out-of-pocket based on benchmark prices.  As a direct result of the scheme, she has overpaid for Humalog, Novolog, and/or Lantus.

93.     Plaintiff Edward Johnson is a citizen of the State of Florida and resides in Ponte Vedra, Florida.

94.     Mr. Johnson has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for Humalog.

95.     Plaintiff Richard Knauss is a citizen of the State of Iowa and resides in Madrid, Iowa.

96.     Mr. Knauss has type 1 diabetes, and he currently takes Lantus and Novolog brand insulin to treat his diabetes.  He recently switched to Novolog from Humalog brand insulin.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for Lantus, Novolog, and Humalog.

97.     Plaintiff Angela Kritselis is a citizen of the State of Wisconsin and resides in Grafton, Wisconsin.

98.     Ms. Kritselis has type 1 diabetes, and she currently takes Lantus and Humalog.  In the past, she has also taken Novolog.  Ms. Kritselis was uninsured until October 2017.  During the class period, Ms. Kritselis paid for Lantus and Humalog out-of-pocket based on benchmark prices.  Her health savings account is dwindling away due to the high cost of insulin.  As a direct result of the scheme, she has overpaid for Lantus and Humalog.

99.     Plaintiff Susan Landis is a citizen of the State of Michigan and resides in Taylor, Michigan.

100.    Ms. Landis has type 1 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes.  In the past, she took Humalog.  She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for Lantus, Novolog, and Humalog.

101.    Plaintiff Adam Levett is a citizen of the State of Illinois and resides in Chicago, Illinois.

102.    Mr. Levett has type 1 diabetes, and he currently takes Novolog brand insulin to treat his diabetes.  He is insured in a high deductible health plan and pays for his insulin based on benchmark price.  As a direct result of the scheme, he has overpaid for Novolog.

103.    Plaintiff Jeffrey Liedl is a citizen of the State of Arizona and resides in Gold Canyon, Arizona.

104.    Mr. Liedl has type 2 diabetes, and he currently takes Toujeo and Novolog brand insulin to treat his diabetes.  In the past, he has used Lantus and Levemir.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for Lantus, Toujeo, Levemir, and Novolog.

105.    Plaintiff John Loschen is a citizen of the State of Nebraska and resides in Holdrege, Nebraska.

106.    Mr. Loschen has type 1 diabetes, and he currently takes Levemir and Novolog brand insulin to treat his diabetes.  In the past, he took Lantus and Humalog brand insulin.  He is insured in a high deductible health plan and pays for his insulin based on benchmark prices. As a direct result of the scheme, he has overpaid for Lantus, Levemir, Humalog, and Novolog.

107.    Plaintiff Robert Lowman is a citizen of the State of New York and resides in Buffalo, New York.

108.    Mr. Lowman has type 1 diabetes, and he currently takes Humalog and Basaglar brand insulin to treat his diabetes.  In the past, he took Novolog, Levemir, and Lantus brand insulin as well.  He is currently uninsured for between a third and half of the year due to the seasonal nature of his employment.  During the months he was uninsured last year, he had very high out-of-pocket costs due to benchmark prices.  As a direct result of the scheme, he has overpaid for Lantus, Levemir, Humalog, and Novolog.

109.    Plaintiff Sean Mac an Airchinnigh is a citizen of the State of Florida and resides in Ave Maria, Florida.

110.    Mr. Airchinnigh has type 1 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes.  He is insured through Medicare Part D and hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for Lantus and Humalog.

111.    Plaintiff Jeanne MacNitt is a citizen of the State of California and resides in Sonora, California.

112.    Ms. MacNitt has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes.  She used to take Lantus and Humalog.  She is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for Novolog, Lantus, and Humalog.

113.    Plaintiff Lawrence Mandel is a citizen of the State of New Jersey and resides in West Orange, New Jersey.

- 24 -

114.    Mr. Mandel has type 1 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes.  He occasionally buys Levemir instead of Lantus depending on the drugs' prices.  He is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for Lantus, Levemir, and Humalog.

115.    Plaintiff Susan Marsh is a citizen of the State of Kansas and resides in Lenexa, Kansas.

116.    Ms. Marsh has type 1 diabetes, and she currently takes Novolog brand insulin to treat her diabetes.  In the past, she took Humalog, Lantus, and Apidra brand insulin.  In 2017, Ms. Marsh moved into a high-deductible health plan.  She must pay for insulin based on benchmark price.  As a direct result of the scheme, she has overpaid for Novolog.

117.    Plaintiff Anne Olinger is a citizen of the State of Florida and resides in Naples, Florida.

118.    Ms. Olinger purchases insulin for her 20-year-old adult child and has been since he was 12 years old. He has type 1 diabetes. In spring 2017, Ms. Olinger began to purchase Novolog brand insulin for him.  In the past, she has purchased Levemir and Humalog brand insulin.  She has a high deductible plan and must pay for insulin based on benchmark prices.  As a direct result of the scheme, she has overpaid for Levemir, Novolog, and Humalog.

119.    Plaintiff Russell Scott Palmer is a citizen of the State of Oregon and resides in Eugene, Oregon.

120.    Mr. Palmer has type 2 diabetes, and he currently takes Lantus brand insulin to treat his diabetes.  In 2015 and the first half of 2016, he was insured in a health insurance plan with high co-payments.  He is now insured through Medicare Part D, and expects to reach the

- 25 -

Medicare Part D "Donut Hole" where he will pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for Lantus.

121.    Plaintiff Juliana Patton is a citizen of the State of California and resides in Fresno, California.

122.    Ms. Patton purchases insulin for her minor daughter, Alexa Patton, who has type 1 diabetes.  In January 2017, Ms. Patton began to purchase Novolog brand insulin for her daughter.  Prior to that, she purchased Apidra and Humalog brand insulin.  Ms. Patton is insured in a high-deductible health plan and pays for her insulin based on benchmark price.  As a direct result of the scheme, she has overpaid for Novolog, Apidra, and Humalog.

123.    Plaintiff Marilyn Person is a citizen of the State of Georgia and resides in Villa Rica, Georgia.

124.    Ms. Person has type 2 diabetes, and she currently takes Levemir and Humalog brand insulin to treat her diabetes.  She was previously taking Novolog brand insulin.  She is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole."  She sometimes obtains samples when she cannot afford her prescribed insulin medications.  As a direct result of the scheme, she has overpaid for Levemir, Novolog, and Humalog.

125.    Plaintiff Willie Phillips is a citizen of the State of Tennessee and resides in Prospect, Tennessee.

126.    Ms. Phillips has type 2 diabetes, and she currently takes Levemir brand insulin to treat her diabetes.  She is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for Levemir.

127.    Plaintiff Patricia Quint is a citizen of the State of Michigan and resides in Rochester Hills, Michigan.

128.    Ms. Quint has type 1 diabetes, and she currently takes Humalog, Humulin R, and Humulin N brand insulin to treat her diabetes.  She is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for Humalog.

129.    Plaintiff Donna Ramsey is a citizen of the State of Kentucky and resides in Louisville, Kentucky.

130.    Ms. Ramsey has type 1 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes.  She is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price.  As a direct result of the scheme, she has overpaid for Lantus and Novolog.

131.    Plaintiff Robyn Rushing is a citizen of the State of Louisiana and resides in Winnsboro, Louisiana.

132.    Ms. Rushing has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes.  She previously took Levemir and Novolog brand insulin.  In November 2016, she enrolled in Medicaid.  She now pays $3 per bottle for insulin.  However, she was previously uninsured and paid for her insulin out-of-pocket based on benchmark price.  As a direct result of the scheme, she has overpaid for Humalog, Novolog, and Levemir.

133.    Plaintiff Marie Saffran is a citizen of the State of Nevada and resides in Henderson, Nevada.  She moved to Nevada from Indiana in September 2016.

- 27 -

134.    Ms. Saffran has type 2 diabetes, and she currently takes Humalog and Basaglar brand insulin to treat her diabetes.  She previously took Lantus brand insulin.  When she moved to Nevada, she enrolled in Medicaid.  Her insulin is now affordable.  However, she was previously insured in a high-deductible health plan and paid for her insulin based on benchmark price.  As a direct result of the scheme, she has overpaid for Lantus and Humalog.

135.    Plaintiff Bertha Sanders is a citizen of the State of California and resides in Los Angeles, California.

136.    Ms. Sanders has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes.  Ms. Sanders is currently insured through the BlueCross BlueShield Federal Employee Program.  Under the terms of that plan, she makes high coinsurance payments for her insulin, based on benchmark prices.  As a direct result of the scheme, she has overpaid for Lantus and Novolog.

137.    Plaintiff Mark Schloemer is a citizen of the State of California and resides in Corona, California.

138.    Mr. Schloemer purchased insulin for his adult son, Luke, who has type 1 diabetes.  Luke has taken Humalog and Novolog brand insulin to treat his diabetes.  Mr. Schloemer paid for these purchases under his GEHA health plan, which has a high-deductible and coinsurance requirement.  He was paying for his son's insulin based on benchmark prices.  As a direct result of the scheme, he has overpaid for Humalog and Novolog.

139.    Plaintiff Howard Schurr is a citizen of the State of Florida and resides in Boca Raton, Florida.

140.    Mr. Schurr has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes.  He is insured through Medicare Part D and consistently hits the

- 28 -

Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for Lantus and Humalog.

141.    Plaintiff Larissa Shirley is a citizen of the State of Ohio and resides in Marion, Ohio.

142.    Ms. Shirley has type 1 diabetes, and she currently takes Novolog brand insulin to treat her diabetes. She previously took Humalog brand insulin. She is insured under Medicare Part D, but when she hits the Donut Hole, she fills her prescriptions through her husband's health insurance plan. Her husband's plan is a high deductible plan. In that plan, she pays for her insulin based on benchmark price. As a direct result of the scheme, she has overpaid for at least Novolog.

143.    Plaintiff Tremayne Sirmons is a citizen of the State of Florida and resides in Winter Park, Florida.

144.    Mr. Sirmons has type 1 diabetes, and he currently takes Levemir and Humalog brand insulin to treat his diabetes. He is insured in a high-deductible health plan and pays for his insulin based on benchmark price. As a direct result of the scheme, he has overpaid for both Levemir and Humalog.

145.    Plaintiff Edward Stanford is a citizen of the State of Washington and resides in Olympia, Washington.

146.    Mr. Stanford has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. He has a high-deductible health plan and coinsurance requirement and pays for his insulin based on benchmark price. As a direct result of the scheme, he has overpaid for Humalog.

- 29 -

147.    Plaintiff Michael Starr is a citizen of the State of Wisconsin and resides in Pleasant Prairie, Wisconsin.

148.    Mr. Starr has type 2 diabetes, and he currently takes Levemir and Humalog brand insulin to treat his diabetes.  He is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for both Levemir and Humalog.

149.    Plaintiff Bret Stewart is a citizen of the State of Texas and resides in Dalhart, Texas.

150.    Mr. Stewart has type 1 diabetes, and he currently takes Novolin R and Novolin N brand insulin to treat his diabetes.  In the past, he took Humalog, Lantus, Apidra, and Tourjeo.  He is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark prices.  As a direct result of the scheme, he has overpaid for Humalog, Lantus, Apidra, and Tourjeo.

151.    Plaintiff Molly Thompson is a citizen of the State of Maine and resides in Portland, Maine.

152.    Ms. Thompson has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes.  In the past, she took Levemir brand insulin. She switched insurance in January 2017 to a high deductible plan.  Prior to January 2017, she was enrolled in a different high-deductible plan and paid for her insulin based on benchmark price. As a direct result of the scheme, she has overpaid for both Levemir and Humalog.

153.     Plaintiff Jon Ugland is a citizen of the State of Minnesota and resides in Byron, Minnesota.

154.     Mr. Ugland has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes.  In the past, he took Lantus and Novolog brand insulin. He is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price.  As a direct result of the scheme, he has overpaid for Humalog, Lantus, and/or Novolog.

155.     Plaintiff Hector J. Valdes Jr. is a citizen of the State of Florida and resides in Miami Springs, Florida.

156.     Mr. Valdes Jr. has type 2 diabetes, and he currently takes Novolog and Toujeo brand insulin to treat his diabetes.  At other times during the class period, he took Lantus brand insulin.  He is insured in a high deductible health plan and has high co-insurance requirements. He pays for his insulin based on benchmark price before he hits his deductible.  As a direct result of the scheme, he has overpaid for Novolog and Lantus.

157.     Plaintiff Hector J. Valdes Sr. is a citizen of the State of Florida and resides in Miami, Florida.

158.     Mr. Valdes Sr. has type 2 diabetes, and he currently takes Humalog brand insulin to treat his diabetes.  He is insured through AARP and Medicare parts A, B and D.  He consistently hits the Medicare part D "Donut Hole" where he must pay 40% of the cost of his insulin drug, based on benchmark price.  As a direct result of the scheme, he has overpaid for Humalog.

159.     Plaintiff Andrew Van Houzen is a citizen of the State of Michigan and resides in Lewiston, Michigan.

160.     Mr. Van Houzen has type 2 diabetes, and he currently takes Lantus brand insulin to treat his diabetes.  He is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drug, based on benchmark price.  As a direct result of the scheme, he has overpaid for Lantus.

161.     Plaintiff Alethea Weir is a citizen of the State of Mississippi and resides in Grenada, Mississippi.

162.     Ms. Weir has type 2 diabetes, and she currently takes Levemir brand insulin to treat her diabetes.  She is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where she pays for 40% of her insulin drug, based on benchmark price.  As a direct result of the scheme, she has overpaid for Levemir.

163.     Plaintiffs Kim and Jim Wallan are citizens of the State of Oregon and reside in Medford, Oregon.

164.     Their son, Eric Wallan, was diagnosed with type 1 diabetes in 2014.  He takes Lantus and Novolog brand insulin to treat his diabetes.  From April 2014 through December 2014, the Wallans were uninsured and paid for their son's insulin out-of-pocket based on benchmark prices.  As a direct result of the scheme, they have overpaid for Lantus and Novolog.

165.     Plaintiff Karyn Wofford is a citizen of the State of Georgia and resides in Jackson, Georgia.

166.     Ms. Wofford has type 1 diabetes, and she currently takes Lantus and Humalog brand insulin to treat her diabetes.  She is insured through the Georgia Healthcare Marketplace in a high-deductible health plan.  She started this plan in January and cannot afford to hit her deductible.  She is unsure what she will do when she can no longer afford her insulin.  As a direct result of the scheme, she has overpaid for both Lantus and Humalog.

- 32 -

167.     Certain plaintiffs regard their condition and payment issues as personal information and hence are suing as "Jane Doe" or "John Doe."  Upon entry of a protective order in this case, they will disclose their names to defendants.

168.     On information and belief, each plaintiff paid out-of-pocket for insulin and that payment was based on the artificially inflated benchmark price.  As a result, each plaintiff has been injured.

**B.     Defendants**

169.     Defendant Novo Nordisk Inc. is a Delaware corporation and has a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  Novo Nordisk manufactures Novolog and Levemir, which are used for the treatment of diabetes.  Novo Nordisk's revenues from the sale of Novolog were $3.03 billion in 2016 and over $2 billion in 2014 and 2015.  Revenues from Levemir were $955 million in 2013, $1.3 billion in 2014, and $1.3 billion in 2015.  Sales to diabetic patients are such a critical part of Novo Nordisk's business that its 2015 Annual Report's cover page stated in bold letters, "*Why Do So Many People in Cities Get Diabetes?*"

170.     Defendant Eli Lilly and Company is a corporation organized and existing under the laws of the State of Indiana and has a principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.  Eli Lilly manufactures Humalog, which is used for the treatment of diabetes.  Lilly's revenues from Humalog in 2016 were $2.84 billion.  Its revenues from Humalog were $1.5 billion in 2013 and $1.7 billion in 2015.

171.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.  Sanofi manufactures Lantus, which is used for the treatment of diabetes.  Sanofi's revenues from Lantus were $6.98 billion in 2016 and over $4 billion in each year since 2013.  Sanofi's SEC

- 33 -

Form 20-F for the year 2015 notes that "Lantus is particularly important; it was the Group's leading product . . . representing 17.2% of . . . net sales . . . ."

## III.   JURISDICTION AND VENUE

172.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the plaintiffs' claims arise under federal law and under 18 U.S.C. § 1964(c): this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.  Finally, this Court has supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

173.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because each defendant transacts business in, is found in, and/or has agents in the District of New Jersey, and because some of the actions giving rise to the complaint took place within this district.

174.    The Court has personal jurisdiction over each defendant.  Each defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District.  The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.   DRUG PRICING IN THE UNITED STATES

### A.   Entities Involved in Drug Pricing

175.   The prescription drug industry consists of an opaque network of entities engaged in multiple distribution and payment structures.  These entities include pharmaceutical companies, wholesalers, pharmacies, health benefit providers (institutional insurers, self-insured employers, health and welfare plans), pharmacy benefit managers, and patient-consumers.

176.   ***Pharmaceutical Companies***.  Pharmaceutical companies (also known as drug companies or drug manufacturers) own the rights to manufacture and market drugs.  This remains true even if these companies contract out the actual production of their drugs.  Pharmaceutical companies typically own or contract with facilities that manufacture drugs and then sell their products to wholesalers.[11]  The defendants here are pharmaceutical companies.

177.   ***Wholesalers***.  After production, many manufacturers send their drugs to FDA-registered drug wholesalers for further distribution.[12]  Wholesalers purchase, inventory, and sell pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals, and clinics.[13]  States license or authorize wholesalers to sell and distribute pharmaceuticals within their borders.[14]

---

[11] *See, e.g.*, Ernst Berndt & Joseph Newhouse, *Pricing and Reimbursement in U.S. Pharmaceutical Markets* 8 (Harvard Kennedy School, National Bureau of Economic Research, Sept. 2010).

[12] *Id*.

[13] *See Guidance for Industry: Prescription Drug Marketing Act (PDMA) Requirements*, Food and Drug Admin. 3 (Nov. 2006), *available at* http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/ guidances/ucm134399.pdf.

[14] *See Profile of the Prescription Drug Wholesaling Industry*, Food and Drug Admin. 3, *available at* https://www.fda.gov/ohrms/dockets/dockets/05n0403/05n-0403-bkg0001-04-02- 1.pdf.

010646-11 1006338 V1

178.   ***Health benefit providers***.  Health benefit providers include institutional insurers, self-insured employers, and health and welfare plans.  These plans submit payments on behalf of insured individuals to health care providers for services rendered to those individuals.[15]  Health insurers also cover a portion of their members' drugs costs, submitting payments to pharmacies on behalf of their members.  The term "health insurers" covers self-insured businesses, insurance companies, including those that participate in Medicaid and Medicare, and union-run health plans.[16]

179.   ***Pharmacy Benefit Managers***.  Pharmacy benefit managers (PBMs) act as middlemen between drug manufacturers, pharmacies, and health insurers.[17]  In this role, PBMs perform a variety of services on behalf of their health insurer clients, including the negotiation of drug prices with drug companies, creation of formularies, management of prescription billing, construction of retail pharmacy networks for insurers, and provision of mail-order services.[18]  Nonetheless, they generally are "not a direct link in the physical supply chain for pharmaceutical products" because, in most instances, they do not take possession or control of prescription drugs.[19]  The largest PBMs are CVS Health, Express Scripts, and OptumRx.[20]  Together, they cover roughly 80 to 85 percent of privately insured Americans.

---

[15] *See* Thomas Bodenheimer, *High and Rising Health Care Costs. Part 1: Seeking an Explanation*, 142 Ann. Internal Med. 847, 847 (May 17, 2005).

[16] *Id*.

[17] *See* Thomas Gryta, *What is a 'Pharmacy Benefit Manger'*, Wall St. J. (July 21, 2016), http://www.wsj.com/articles/SB10001424053111903554904576460322664055328.

[18] *Id*.

[19] *See* The Health Strategies Consultancy LLC, *Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain*, The Kaiser Family Found. 14 (Mar. 2005), http://avalere.com/research/docs/Follow_the_Pill.pdf.

[20] *See Pharmacy-Benefit Managers*, The Wall Street Journal (Mar. 30, 2015), http://blogs.wsj.com/briefly/2015/03/30/pharmacy-benefit-managers-the-short-answer/.

B.      **The Drug Payment & Distribution Structure**

180.    *Distribution*.  Generally speaking, for retail pharmacy channels, branded prescription drugs are distributed from manufacturer to wholesaler, wholesaler to retailer (or mail order), and retailer to patient.

181.    *Downstream charges*.  The downstream charges are from manufacturer to wholesaler, wholesaler to retailer (or mail order), and retailer (or mail order) to the health benefit providers (in the form of ingredient cost reimbursement and dispensing fees) and consumers (coinsurance, copayment, deductible payment, cash), with the amounts determined by PBMs where the transaction is privately insured.

182.    *Upstream charges*.  The upstream charges (e.g., "rebates") are from health benefit providers and/or PBM directly back to the manufacturer, and typically occur well after the point-of-sale transaction.

183.    The figure below illustrates this payment structure.[21]  This figure labels certain payments "payment" and others "negotiated payment."  The term "payment" refers to individual payments, made at the time of delivery; for example, when a patient walks into a pharmacy and picks up her prescription.  At that moment, her health plan also pays a service fee to its PBM for dispensing the drug through its network of retail pharmacies.  In contrast, a "negotiated payment" is a payment made under a negotiated contract.  For example, a PBM might negotiate a contract with a drug manufacturer for supply of X drug for $Y per pill for a period of time.  The figure also indicates the flow of products and rebates.

---

[21] U.S. Gov't Accountability Office, *Generic Drugs Under Medicare*, GAO-16-706, at 7 (Aug. 2016).

**Figure 3: The U.S. Drug Payment Structure[22]**



184.   When an insured consumer buys a medication from a pharmacy (a retailer), her insurer pays the pharmacy based on the price its PBM negotiated for that medication (the real price).  In addition to her insurer's payment, the patient usually pays her pharmacy a portion of her medication's cost, out-of-pocket.  Importantly, the patient's payment is based on the medication's *benchmark* price, whereas her insurer's payment is based on the *real* price her PBM negotiated.

185.   Insurers get their cash flow from employers or consumers, who purchase insurance coverage.  Employers and consumers typically pay their insurers fixed monthly premiums for their health insurance plans.  Health insurers rely on these monthly premiums to

---

[22] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

pay for the prescription drug needs of their members.  They also receive a large portion of the rebates the PBMs negotiate.

186.    Pharmacies usually obtain the drugs they distribute from wholesalers or the manufacturers themselves.  The wholesalers purchase these drugs directly from the drug manufacturers.[23]

## C.    Different Prices for Different Players

187.    The prices for the drugs distributed in this chain are different for each participating entity: different actors pay different prices for the same drugs.  In this system, only a drug's benchmark price – also known as its Average Wholesale Price (AWP) or the mathematically-related, Wholesale Acquisition Price (WAC) – is publicly available.

188.    These benchmarks serve as the starting points for negotiations between PBMs and drug manufacturers.  As previously explained, PBMs create formularies for their health insurer clients and those formularies significantly influence patients' drug purchasing behavior.  Health insurers cover all or a portion of their members' drug costs based on whether and where drugs fall on their PBMs' formularies.  Drug companies offer PBMs "rebates" to influence the PBMs' formulary decisions.  If a drug manufacturer can secure preferred or exclusive formulary status for a specific medication through "rebates," the PBM's health insurer clients will only reimburse their plan members for purchase of that drug.  As a result, drug manufacturers can exert control over consumer purchasing decisions through the "rebates" they provide to PBMs.[24]

---

[23] *See* U.S. Dep't of Health & Human Servs., The Assistant Sec'y for Planning and Evaluation, *Prescription Drug Prices* 100 (Apr. 1, 2000), https://aspe.hhs.govisites/defaultifiles/pdfi1721711c3.pdf.

[24] *See* Robert F. Atlas, *The Role of PBMs in Implementing the Medicare Prescription Drug Benefit*, 23 Health Affairs w4-504, w4-507 (July 2004).

189.    The undisclosed "rebates" manufacturers give to PBMs are usually shared by the

PBMs with their health insurer clients.  Therefore, institutional insurers sometimes pay prices

that more closely approximate real prices.

190.    But consumers pay based on benchmark prices.  Uninsured consumers and

consumers in high deductible health plans, must pay the full price they are quoted at their retail

or mail order pharmacy.  Consumers in health plans with high coinsurance rates or in Medicare

Part D plans (who reach the "Donut Hole") pay a significant percentage of that price.  Thus, as

benchmark prices rise, so too do these consumers' out-of-pocket costs.

**D.    Consumer Drug Costs**

191.    *Uninsured*.  Uninsured consumers must pay based on, directly or indirectly, the

full benchmark price every time they pick up their prescriptions.  Despite the Affordable Care

Act's expansion of Medicaid coverage and establishment of Health Insurance Marketplaces,

millions of people—28.5 million in 2015—remain without coverage.  This uninsured population

is especially concentrated in states that did not take the Medicaid expansion, where diabetes is

prevalent.  Of the 28.5 million uninsured, reports indicate that 46% tried to get coverage but

could not afford it.  The uninsured population may grow drastically in the next few years if the

Affordable Care Act is repealed without a suitable replacement or cost-sharing reduction

payments are discontinued.

192.    *High-Deductible Plans*.  But the uninsured are not the only patients saddled with

high out-of-pocket-costs.  Despite their monthly insurance premiums, insured consumers often

still pay a significant portion of a drug's benchmark price.  Out-of-pocket-costs for insured

consumers come in three forms: deductibles, coinsurance requirements, and/or copayment

requirements.

- 40 -

193.    The term "deductible" refers to a set amount of healthcare cost an insured must pay for by herself (out-of-pocket) before her plan will begin to contribute to her healthcare costs. Once a patient reaches her deductible, her health plan begins to contribute, paying a portion of her healthcare costs.  Although most health plans have some form of a deductible, high-deductible health plans are aptly named for their larger-than-average deductibles.  And while high-deductible health plans usually boast lower premiums, they are nonetheless more onerous to patients and families that need expensive care on a regular basis.  Insured individuals in high-deductible plans are usually required to pay for medications based on full benchmark prices before they reach their deductibles.

194.    The past decade has witnessed a shift away from traditional health plans, which provide broader coverage, toward high-deductible health plans.  In their 2016 survey of employer health benefits, the Kaiser Family Foundation found that 29% of all covered employees are now enrolled in high-deductible health plans, up from 17% in 2011.  Although Preferred Provider Organizations (PPOs) are still the most common plan type (48% of Americans are enrolled in PPOs), enrollment in PPOs has fallen 10% over the last two years, while enrollment in high-deductible health plans has increased by 8%.  Figure 4 illustrates the rising trend in high-deductible plans.

**Figure 4: Percentage of covered workers enrolled in high-deductible health plans from 2006-2016.[25]**



*Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information, see the Survey Methods Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



195.    Moreover, deductibles themselves have risen.  The average annual deductible for an individual enrolled in a high-deductible plan is now between $2,031 and $2,295, depending on the exact type of plan.[26]  The average annual deductible for family coverage is now between $4,321 and $4,364, again, depending on the type of plan.

196.    A recent Kaiser Family Foundation study found that 30% to 40% of U.S. households with private coverage *do not have enough liquid assets* to pay the deductible required by their health plan. Figure 5 below demonstrates this reality.

---

[25] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 3 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

[26] There are two primary types of high-deductible health plans: high-deductible plans with Health Reimbursement Arrangements and high-deductible plans with Health Savings Accounts.

010646-11 1006338 V1

**Figure 5: Share of non-elderly households with liquid assets less than their deductibles among people with private health insurance.[27]**



197.    Overall, in the entire employer-based health plan market, deductibles have risen 12% since 2015—four times faster than premiums increased in the same period.  Among all individuals enrolled in employer health plans (both high-deductible plans as well as others), the average deductible in 2016 was $1,478.

198.    The average deductible for individuals working at smaller firms is higher than that in larger firms ($2,069 vs. $1,238).

199.    Figure 6 shows the increase in health plans with a general annual deductible of $1,000 or more, broken down by firm size.

---

[27] Drew Altman, *The Biggest Health Issue We Aren't Debating*, Axios (Nov. 22, 2017), https://www.axios.com/the-biggest-health-issue-we-arent-debating-2511098849.html (graphic based on data from Matthew Rae, Gary Claxton, and Larry Levitt, *Do Health Plan Enrollees Have Enough Money to Pay Cost Sharing*, Kaiser Family Found. (Nov. 23, 2017), https://www.kff.org/health-costs/issue-brief/do-health-plan-enrollees-have-enough-money-to-pay-cost-sharing/).

**Figure 6: Percentage of covered workers enrolled in a plan with a general annual deductible of $1000 or more for single coverage, by firm size, from 2006-2016.[28]**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: These estimates include workers enrolled in HDHP/SO and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



200.    The average deductibles for plans available under the Affordable Care Act on the Marketplace Exchanges are also high.  The Marketplace health plans are broken into "metal" tiers: bronze, silver, gold, and platinum.  The cheapest plans—bronze and silver—unsurprisingly come with very high-deductibles.  In 2016, the average deductibles in such plans were $5,765 for bronze plans (up from $5,328 in 2015) and $3,064 for silver plans (up from $2,556 in 2015).

201.    High deductible plans are particularly hard on patients with chronic diseases: Not only do patients living with chronic diseases, like diabetes, hit their deductibles year after year, but they hit their deductibles over a shorter period of time, resulting in significant financial burden at the start of each year.  Individuals and families who do not have savings or access to credit often take less insulin than they are prescribed to spread their out-of-pocket payments over a longer period of time.

---

[28] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 4 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

202.    ***Coinsurance and Copayments***.  In addition to their deductibles, individuals with insurance must usually make copayments or coinsurance payments for the healthcare services they need.  A copayment is a fixed fee that an individual must pay for a healthcare service at the time of care; for example, when she picks up a prescription.  Copayment rates vary depending on the drug; drugs in preferred formulary positions have lower copays, and drugs in disfavored formulary positions require larger copays.

203.    Coinsurance is similar.  However, instead of paying a fixed fee for a particular service, individuals with coinsurance arrangements are required to pay a fixed *percentage* of the cost of the healthcare service provided.  For drugs, this means a percentage of the drug's *benchmark* price at the point of sale.  This percentage varies depending on the drug, with lower coinsurance rates for preferred drugs, and higher coinsurance rates for disfavored drugs.

204.    For those in high deductible health plans, copayments and coinsurance obligations begin after they reach their deductibles.  Plans that cover prescription drugs right away, not requiring patients to reach deductibles first, usually require copayments or coinsurance contributions for every drug purchase.

205.    For covered workers enrolled in health plans with three or more tiers of cost sharing for prescription drugs, average coinsurance rates are 17% for first-tier drugs, 25% for second-tier drugs, 37% for third-tier drugs, and 29% for fourth-tier drugs (fourth tier drugs are usually specialty medications, for diseases such as cancer, and are extremely expensive).  Lantus, Levemir, Humalog, Novolog, and Apidra are still branded drugs.  Therefore, insurance plans generally classify them as second- or third-tier drugs on their formularies.  As a result, coinsurance payments keyed to the benchmark prices of these drugs can be quite burdensome.

206.     Recently, health plans have been demanding higher and higher coinsurance

contributions from patients.  Table 1 shows this trend.

### Table 1: Rising Coinsurance Rates

| Retail Coinsurance Payment | | | |
|---|---|---|---|
| | T2 Brand | T3 Brand | Flat |
| 1998 | 24.7% | 26.0% | 20.7% |
| 1999 | 24.9% | 26.9% | 21.0% |
| 2000 | 26.0% | 28.0% | 22.0% |
| 2001 | 24.0% | 29.0% | 20.0% |
| 2002 | 24.4% | 34.7% | 23.0% |
| 2003 | 24.3% | 32.4% | 22.0% |
| 2004 | 25.0% | 32.0% | 25.0% |
| 2005 | 26.5% | 35.6% | 23.0% |
| 2006 | 26.2% | 36.0% | 23.0% |
| 2007 | 26.4% | 37.9% | 22.0% |
| 2008 | 26.1% | 37.0% | 24.0% |
| 2009 | 26.3% | 35.8% | 22.0% |
| 2010 | 25.2% | 36.6% | 24.0% |
| 2011 | 25.6% | 37.9% | 23.0% |
| 2012 | 26.1% | 37.6% | 22.0% |
| 2013 | 25.5% | 37.1% | 22.0% |
| 2014 | 24.3% | 35.9% | 22.0% |
| 2015 | 27.1% | 41.8% | 22.0% |

207.     Overall, out-of-pocket spending for prescription drugs has shifted away from

copayments, toward deductible and coinsurance spending over the past decade.  In 2014, patients

paid for 24% of their out-of-pocket prescription drug expenses through deductibles, compared to

just 4% in 2004.  Similarly, patients paid for 20% of their out-of-pocket drug expenses through

coinsurance in 2014, compared to just 3% in 2004.

208.     ***Medicare Part D***.  Finally, patients in Medicare Part D plans – Medicare's

prescription drug program – often pay a large portion of their drugs' benchmark prices.  In 2017,

the Medicare Part D standard prescription drug plan had a $400 deductible and a 25%

coinsurance obligation up to an initial coverage limit of $3,700.  This means patients in Medicare

Part D plans paid full, point-of-sale prices (based on benchmark price), until they spent $400.

After they hit this deductible, they paid 25% of the point-of-sale prices (the higher price) until

they, together with their plans, spent $3,700 on drugs. Once Part D patients met this $3,700

coverage limit, they fell into the coverage gap, more commonly known as the "Donut Hole." In the Donut Hole, they were required to pay 40% of their brand-name drugs' point-of-sale prices. Only once the patients' total out-of-pocket spending (both before and in the Donut Hole) reached $4,950 did their Medicare Part D plans begin to shoulder 95% of their healthcare costs again. Figure 7 demonstrates patient cost-sharing in the standard Medicare Part D plan for 2017.

**Figure 7: The standard Medicare prescription drug benefit in 2017.[29]**





NOTE: Some amounts rounded to nearest dollar. ¹Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.

**E.      Impact on Consumers**

209.    This system of pricing and payment for drugs has been exploited by the defendants and their collaborators, forcing patient consumers to pay drastically higher prices for insulin than their insurers (if they have insurance). If a patient is responsible for all of her drugs costs before she hits her deductible, she is required to pay *full*, *point-of-sale prices* (based on

---

[29] *The Medicare Part D Prescription Drug Benefit,* The Kaiser Family Foundation 6 (Sept. 26, 2016), http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.

benchmark price) until she meets her deductible; if she pays coinsurance, she pays for a percentage of her drugs' *point-of-sale price* (based on benchmark price); if she is in a Medicare Part D plan and reaches the Donut Hole, she pays 40% of *point-of-sale prices* (based on benchmark price). In contrast, the defendants provide institutional insurers, through their PBMs, significant "rebates" or other "discounts" in exchange for formulary placement.[30] Thus, these institutions never pay based on benchmark prices; instead, they pay based on the real prices of the drugs, as negotiated by the PBMs. Over time, the publicly-reported benchmark prices used for consumer transactions has climbed further and further away from the real prices institutional payers pay.

210.    An example helps illustrate this structure. A woman with diabetes needs to purchase a box of insulin pens. She goes to her local retail pharmacy where the pharmacist tells her the box's benchmark price is $450. She has health insurance through her employer. Her plan requires her to pay a $2,000 deductible and then 30% coinsurance after she hits her deductible. If she has not yet reached her deductible, she pays $382.50 (benchmark price (AWP) minus 15%) for the box of insulin. If she has reached her deductible (and already paid $2,000 in health care costs), she pays $114.75 (382.50 x .3) for the box. The consumer believes her insurer paid the remaining $276.75. But it does not. In fact, in a transaction concealed from the patient, the drug manufacturer has paid an undisclosed amount of money back to the PBM (and sometimes, directly to the institutional payer). The PBM then paid a portion of this "rebate" to its insurer clients. Thus, the *real*, net price of this insulin is much lower, and the patient's insurer pays based on this lower price. The "rebates" the analog insulin makers pay to

---

[30] *See* Congressional Budget Office, *Prescription Drug Pricing in the Private Sector* 12 (Jan. 1, 2007).

the PBMs and institutional payers from can be very high: 35%, 40%, 45%, or more.  So, taking the example one step further, the manufacturer's reported benchmark price is $450, but the real price might be $229.50 (AWP minus 15%, less a 40% "rebate").  As a result, when the consumer paid $382.50 for the box during her deductible period, she really paid 166% of the real price ($382.50 divided by $229.50).  And when she paid $114.75 for her 30% co-insurance, she really paid 50% coinsurance ($114.75 divided by $229.50).

F.    **Manipulation of Cost-Saving Incentives: Drug Benchmark Price Competition and the Secret "Rebates" to PBMs**

211.    PBMs turn a profit in two primary ways: First, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies.  Second, PBMs take a cut of the drug "rebates" they negotiate with drug companies (with the rest passed on to their health insurer clients).  The manufacturers' "rebate" arrangements are meant to create an incentive for PBMs to negotiate lower *real* drug prices: the lower the real price they negotiate, the larger the spread (*i.e.*, rebates or kickbacks), the higher their profits.[31]  But the manufacturers know that this business model can be manipulated such that PBMs no longer have an incentive to control costs.

212.    PBMs have the greatest leverage to negotiate lower prices when drugs are FDA-approved as bioequivalent or biosimilar, *i.e.*, when a drug "goes generic."  But PBMs also have leverage when two or more drug companies manufacture drugs that, while not bioequivalent or biosimilar, are nevertheless in the same therapeutic class and are perceived to have similar effectiveness and risk profiles.  That is the case with the analog insulin drugs.  In such a scenario, the drug companies should compete for formulary access by lowering their real prices.

---

[31] *Id.*

213.    But the defendants have found a way to game this system.  As the defendants have realized, the spread between real and benchmark price can be enlarged by *raising benchmark prices* while holding *real prices constant*.  In exchange for this spread enlargement, the PBMs agree, either explicitly or implicitly, to favor, or at least not disfavor, the drug with the most elevated benchmark price.  The defendants know that when they increase the benchmark prices of their insulins, the PBMs can earn substantially greater revenues so long as real prices remain constant.

214.    The perverse, reverse incentives for larger benchmark prices (and consequent overpayments by consumers) was described in a recent report on the drug industry:

> At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher benchmark price increases than would otherwise occur, particularly on the eve of a general election.  Price protection rebates between brand manufacturers and PBMs are common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors.  When brand manufacturers' [benchmark price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors.  Thus all else equal in a given category, the product with the more rapid benchmark price increases is more profitable to the PBM.  Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of benchmark price inflation at least as high, and ideally just a bit higher, than peers'.  Durable benchmark price inflation is the natural result.  Net price inflation is unaffected, but unit volumes suffer as higher benchmark prices directly impact consumers who have not yet met their deductibles. [32]

215.    This is not the first time manipulation of the spread between benchmark and real prices has been the subject of large-scale litigation.  In *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.P. 79 (D. Mass. 2007), the court certified a class alleging that McKesson, a wholesaler, and First Data, a drug price publisher, engaged in a scheme to

---

[32] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC, 36 (Oct. 5, 2016).

inflate the benchmark prices of brand name drugs.  McKesson asserted that a class could not be certified because the PBMs had become aware of the phony increase in the spread, and promptly acted to offset the spread by vigorously seeking rebates for its health insurer clients.  However, part of the evidence the district court relied upon in rejecting this argument was evidence showing that the PBMs pocketed a portion of the increase in the spread at the expense of consumers and health insurers:

> Because these PBMs benefited from the increased [benchmark price] spreads perpetuated by the Scheme, Plaintiffs argue that they had no incentive to inform [third party payers] of the inflated AWP, let alone fiercely compete to mitigate any damage.  As proof, Plaintiffs quote an April 26, 2002 internal ESI e-mail, sent around the same time as the ESI letter, that states that "the AWP increases being pushed through by First Data Bank [are] having a very favorable impact on our mail margins."  The e-mail goes on to state, "Our clients will not be sympathetic to our financial situation since we [will have benefited] from the AWP increase in the mail and they hired us to control drug trend."  The e-mail includes a handwritten note, in response, "Let's put a lid on it and not make it a big deal."[33]

216.   Just so, the defendants here have used the phony benchmark prices to their advantage.  They use the "rebate" system to provide kickbacks to PBMs in exchange for formulary status.  Indeed, as the District Court for the District of Massachusetts recently explained, rebates are really "direct kickbacks," disguised as market-share discounts and rebates."[34]  This "rebate" scheme enables the defendants to maintain preferred formulary positions without reducing their real prices.

___

[33] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass 2008) (internal citations omitted).

[34] *United States ex rel. Banigan v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2016 WL 6571269, at *1 (D. Mass. Jan. 20, 2016).

010646-11 1006338 V1

217.    And the PBMs benefit through the increased kickbacks they receive. The PBMs

can boast of the "increased rebates" they have achieved, when, in reality, the "discounts" they

have obtained are simply reductions off artificially-inflated benchmark prices.

218.    The losers in this scheme are insulin consumers.  When the defendants inflate

benchmark prices so that they can offer PBMs larger spreads, they harm: uninsured patients,

insured consumers in high-deductible plans, insured consumers paying coinsurance, and insured

consumers in Medicare Part D plans, especially those who reach the Donut Hole, all who pay for

insulin based on benchmark prices.

## V.      ANALOG INSULIN

### A.      Diabetes: The Disease and Demographics

219.    The number of Americans who live with diabetes has exploded in the last half

century.  In 1958, only 1.6 million people in the United States had diabetes.  By the turn of the

century, that number had grown to over 10 million.  Just 14 years later, the head count tripled

again.  Now over 30 million people—9.4% of the country—live with the disease.  And this trend

does not appear to be slowing: 86 million Americans have prediabetes, a health condition that

significantly increases a person's risk of type 2 diabetes.

220.    Diabetes occurs when a person has too much glucose – sugar – in their blood

stream.  Normally, the human body breaks down ingested food into glucose, which in turn feeds

cells and enables them to function.  In this process, insulin functions as a key, opening the cells

and permitting glucose to enter.  A lack of insulin or responsiveness to insulin causes the process

to break down.  Glucose is unable to enter the cells, which leads to high blood sugar levels.

Unchecked, high blood sugar levels in a non-diabetic can lead to type 2 diabetes.

221.    There are two basic types of diabetes.  Ninety to 95% of Americans living with

diabetes developed the disease because they do not produce enough insulin or have become

resistant to the insulin their bodies do produce.  Known as type 2, this more common form of diabetes is typically associated with increased body weight and is often developed later in life. When first diagnosed, many type 2 patients can initially be treated with tablets that help their bodies either secrete more insulin or better respond to the insulin they already produce. Nonetheless, these tablets are often insufficient for patients in the long term.  To adequately control their blood sugar levels, many type 2 patients must inject insulin to supplement that which their bodies produce.  About a quarter of type 2 patients rely on insulin treatment.

222.     Type 1 occurs when a patient completely ceases insulin production.  This form of diabetes is usually diagnosed in children and young adults, but can occur at any age.  In contrast to type 2 patients, people with type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die.  Individuals living with type 1 must rely on insulin treatments from the point of diagnosis until death.

223.     If left untreated or under-treated, diabetes can become a debilitating and deadly disease.  Indeed, it remains the seventh leading cause of death in the United States despite the availability of effective treatment.  People with diabetes are almost twice as likely to have heart disease or a heart attack and 1.5 times more likely to have a stroke as those without the disease. Chronic kidney disease and failure is also much more common among those with diabetes. Furthermore, diabetes damages blood vessels and nerves, leading to serious, hard-to-treat infections and even amputations.  Finally, the disease is the leading cause of blindness.

224.     The explosion in diabetes prevalence has hit minorities and the poor the hardest. Type 2 diabetes disproportionately impacts African-Americans, American Indians, Asian Americans, Hispanics/Latinos and Pacific Islanders.  For example, Native Americans are 420% more likely to die from diabetes-related causes of death than other Americans.  With decreased

- 53 -

access to nutritious food sources and fitness options, low-income individuals are at a greater risk

of obesity and, correspondingly, diabetes.  These same demographic groups also account for a

disproportionate share of the uninsured.

**B.      The Origins of Insulin Treatment**

225.    Despite its potentially deadly impact, diabetes is a highly treatable illness.  For

patients who are able to follow a prescribed treatment plan consistently, the harmful symptoms

and health complications associated with the disease are entirely avoidable.  And what's more,

unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

226.    A "widely celebrated tale of biomedical serendipity,"[35] the innovation of insulin

treatment is revered for two reasons.  First, the duo that discovered how to extract insulin for

patient treatment was an unlikely pair: a young orthopedic surgeon without laboratory training,

Frederick Banting, and his medical-student assistant, Charles Best.  In 1922, the two men

pioneered a technique for removing active insulin from an animal pancreas that could then be

used to treat human patients with diabetes.  Prior to this innovation, diabetes was almost always a

death sentence.

227.    However unlikely Banting and Best were as pharmaceutical innovators, the

second reason for their fame is even more striking – especially to those familiar with the current

pharmaceutical industry.  At first, neither Banting nor Best applied for a patent on their game-

changing innovation because they wanted their discovery to remain open to the public, available

to all.  Ironically, they eventually ended up filing a patent to ensure access: Banting and Best

realized that if they did not patent their drug, someone else would.  To prevent others from

---

[35] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

obtaining exclusive rights and restricting supply, Banting and Best obtained a patent and then

sold it to the University of Toronto for $1 each.  As they wrote to the University's president, the

patent was a form of publication: "When the details of the method of preparation are published

anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[36]

228.   After selling their patent to the University of Toronto, university researchers

attempted to manufacture insulin on campus.  However, they quickly realized they lacked the

expertise necessary to meet the demand.  Therefore, to scale production, the University of

Toronto teamed up with Eli Lilly, "an established pharmaceutical company with experience

producing glandular extracts."[37]  Under this arrangement, Eli Lilly was allowed to apply for U.S.

patents on any improvements to the manufacturing process.  In addition to their contract with Eli

Lilly, the Toronto team licensed the rights to produce insulin to a few other companies, including

Denmark's Nordisk Insulin Laboratorium and Novo Terapeutisk Laboratorium.[38]  Those initial

licenses laid the groundwork for Eli Lilly and Nordisk's future domination over the sale of

insulin products.

229.   Although the Toronto team's early iteration of insulin was immediately perceived

as "a lifesaving drug of vast clinical public health significance,"[39] subsequent research led to

further improvements in the drug's efficacy.  The original animal insulin isolated by the Toronto

team was short acting – it only had an effect on patient blood sugar levels for three to six hours.

In the early 1930s, scientists at Nordisk discovered that the addition of a certain protein to insulin

---

[36] M. Bliss, *The Discovery of Insulin* (2013).

[37] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

[38] Nordisk and Novo merged in 1989 to form Novo Nordisk.

[39] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1172 (2015).

altered its absorption into the blood stream, prolonging its effect. This form of insulin became known as long-acting. A subsequent innovation in 1946 – the addition of zinc to form the crystalline protamine-isophane insulin, now known as neutral protamine Hagedorn (NPH) – made it possible to combine long-acting and rapid-acting insulin. This advance allowed many diabetes patients to take a single daily injection. Soon afterward, a method for prolonging the action of insulin without adding protamine was discovered. These improvements offered important new options for the dosing of insulin. But they also extended the reach of insulin patents into the 1970s.

230.    When the animal-based insulin patents finally began to expire, researchers made another leap forward in insulin technology. In the late 1970s, scientists began to produce human insulin through recombinant technology. By 1982, Eli Lilly brought the first recombinant human insulins – Humulin R (regular) and N (NPH) – to the U.S. marketplace. Around the same time, Novo and Nordisk developed methods for chemically converting bovine insulin into human insulin. By 1988, a year prior to merging, Novo and Nordisk obtained approval for their own recombinant insulin. This innovation allowed them to continue shared domination over the sale of insulin products with Eli Lilly. It also enabled Eli Lilly and Novo Nordisk to spin a fresh web of insulin patents, promising to stretch into the 21st century.

231.    After the introduction of human insulin, an improved understanding of the human genetic code and recombinant technology put a third insulin advance within reach. In the mid-1980s, scientists began to modify the molecular structure of insulin, attempting to improve its physiological effects. By 1996, Eli Lilly had obtained approval for Humalog (generic name, insulin lispro), the first rapid-acting, man-made insulin. This new type of insulin – known as an analog – allowed for substantially faster absorption times. Never far behind, Novo Nordisk

released its own rapid-acting analog, Novolog (generic name, insulin aspart), in 2000.  Four years after that, a third pharmaceutical company, Sanofi, released another rapid-acting analog, Apidra (generic name, insulin glulisine).

232.    The same technological advances that brought about rapid-acting analogs also gave rise to long-acting analogs.  In 2000, Sanofi released the first long-acting analog.  This drug was branded as Lantus (generic name, insulin glargine).  Five years later, Novo Nordisk gained approval for its own long-acting analog, Levemir (generic name, insulin detemir).  The first patents on these long-acting analogs expired in June 2014, nearly a century after Banting and Best's first patent application in 1923.

233.    In 2015, Sanofi launched a higher dosage of insulin glargine, branded as Toujeo. In December 2016, Eli Lilly released its own version of insulin glargine, branded as Basaglar. Basaglar is a follow-on product to Lantus.  However, it is not considered a generic drug because it did not rely on the Food, Drug, and Cosmetic Act's (FDCA) Abbreviated New Drug Application pathway – the normal pathway to generic entry – for approval.  Instead, Basaglar was approved through a different FDCA pathway as a follow-on medication. Table 2 summarizes the current insulin treatment landscape.

| Table 2: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| *Insulin Type* | *Action* | *Brand Name* | *Generic Name* | *Company* | *FDA Approval*[40] | *Benchmark Price (AWP)* |
| *Human* | **Rapid-acting** | Humulin R | Insulin Regular | Eli Lilly | 1982 | $185.88 (vial[i]) |
| | | Novolin R | Insulin Regular | Novo Nordisk | 1991 | $172.13 (vial[ii]) |
| | **Intermediate** | Humulin N | Insulin Suspension Isophane (NPH) | Eli Lilly | 1982 | $185.88 (vial[iii]) |
| | | Novolin N | Insulin Suspension Isophane (NPH) | Novo Nordisk | 1991 | $172.13 (vial[iv]) |
| *Analogs* | **Rapid-Acting** | Humalog | Lispro | Eli Lilly | 1996 | $663.00 (pen[v]) $343.38 (vial[vi]) |
| | | Novolog | Aspart | Novo Nordisk | 2000 | $665.28 (pen[vii]) $344.48 (vial[viii]) |
| | | Apidra | Glulisine | Sanofi | 2004 | $616.04 (pen[ix]) $318.89 (vial[x]) |
| | **Long-Acting** | Lantus | Glargine | Sanofi | 2000 | $479.93 (pen[xi]) $319.96 (vial[xii]) |
| | | Levemir | Detemir | Novo Nordisk | 2005 | $504.38 (FlexTouch[xiii]) $336.24 (vial[xiv]) |
| | | Basaglar | Glargine | Eli Lilly | 2016 | $396.06 (pen[xv]) |
| | | Toujeo | Glargine | Sanofi | 2015 | $736.67(pen[xvi]) |

[i] Humulin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[ii] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[iii] Humulin N 100unit/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

[iv] Novolin N 100units/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

[40] *FDA-Approved Diabetes Medicines*, U.S. Food & Drug Administration (Feb. 21, 2007), https://www.fda.gov/ForPatients/Illness/Diabetes/ucm408682.htm.

[v] Humalog KwikPen 100unit/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Lispro 100U/1mL, Solution for injection).

[vi] Humalog 100unit/ml Cartridge Solution for Injection (box, 5 cartridges, 3 ml Insulin Lispro 100U/1mL, Solution for injection).

[vii] Novolog Flexpen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection).

[viii] Novolog 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection).

[ix] Apidra SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glulisine 100U/1mL, Solution for injection).

[x] Apidra 100unit/ml Solution for Injection (vial, 10 ml Insulin Glulisine 100U/1mL, Solution for injection).

[xi] Lantus SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection).

[xii] Lantus 100units/mL Solution for Injection (vial, 10 ml Insulin Glargine 100U/1mL, Solution for injection).

[xiii] Levemir FlexTouch 100units/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection).

[xiv] Levemir 100units/ml Solution for Injection (vial, 10 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection).

[xv] Basaglar KwikPen 100units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection).

[xvi] Toujeo SoloStar 300units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 1.5 ml Insulin Glargine 300U/1mL, Solution for injection).

## C.    Current Insulin Treatment Landscape

234.    Today, analogs dominate the insulin market.  Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas.  As a result, it can be used in more flexible ways.

235.    The American Diabetes Association—the organization responsible for setting guidelines for diabetes care in the United States—recommends analogs for treatment of individuals with both type 1 and type 2 diabetes.

- 59 -

236.    For type 1 patients, insulin analogs are unquestionably the best course of treatment.  Doctors uniformly prescribe analogs for type 1 patients.

237.    For patients with type 2 diabetes, the American Diabetes Association describes long-acting analog insulin as the "most convenient initial insulin regimen."[41]  Nonetheless, the organization notes that type 2 patients without a history of hypoglycemia (a condition caused by a drop in blood sugar level) can safely use cheaper, human insulins.

238.    But doctors still prefer to prescribe analog insulins to type 2 patients.  A recent study found that as of 2010, among adults who filled prescriptions for more than one brand of insulin, 91.5% filled prescriptions for insulin analogs.  The study found that percentage has grown considerably since 2000, when only 14.8% of patients (who filled more than one prescription for insulin) filled prescriptions for analog insulin.  Now, type 2 patients use human insulin less frequently: the study found that only 14.8% of type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000.  As one specialist has observed, "[h]uman insulin has become almost entirely obsolete in private clinical practice."[42]

---

[41] American Diabetes Association, *Approaches to Glycemic Care*, 38 Diabetes Care S52, S57 (2016), http://care.diabetesjournals.org/content/39/Supplement_1/S52?ijkey=07291605370b0a3e07418e 06fb5e894fb4314f05&keytype2=tf_ipsecsha.

[42] Tsai, *supra*.

**Figure 8: Type of insulin used among U.S. adults with type 2 diabetes
(who filled more than one prescription).**[43]



239.    Last year, the top three selling insulins were all analogs: Sanofi's long-acting

Lantus garnered $6.98 billion in sales; Novo Nordisk's long-acting Novolog: $3.03 billion; and

Eli Lilly's rapid-acting Humalog: $2.84 billion.

### D.    Climbing Insulin Prices Unrelated to Any Rise in Production Costs

240.    Despite the availability of a number of highly effective insulin drugs, too many

people living with diabetes go without proper treatment for an all too familiar reason: cost.

241.    Novo Nordisk's current benchmark prices (AWP) for Levemir are now $504.38

for a package of pens and $336.24 for a vial.  Novo Nordisk's benchmark prices for Novolog

now sit at $665.28 for a package of pens and $344.48 for a vial.  Most diabetes patients need at

---

[43] Kasia Lipska, et al., *Use and Out-of-Pocket Costs of Insulin for Type 2 Diabetes Mellitus
from 2000 to 2010*, 311 J. Am. Med. Ass'n 2331, 2332 (2014).

010646-11 1006338 V1

least one package of insulin per month.  Figures 9 and 10 demonstrate Novo Nordisk's price increases from 2006 to 2016 for Levemir and Novolog.

**Figure 9: Rapidly rising benchmark prices of Levemir vials and pens from 2006-2016.**



**Figure 10: Rapidly rising benchmark prices of Novolog vials and pens from 2006-2016.**



242.     Eli Lilly has raised the benchmark prices of Humalog to $663.00 for a package of pens and $343.38 for a vial.  Figure 11 demonstrates Eli Lilly's price increases from 2006 to 2016 for Humalog.

**Figure 11: Rapidly rising benchmark prices of Humalog vials and pens from 2006-2016.**



243.    Sanofi's benchmark prices for Lantus, the top-selling analog insulin, now sit at $479.93 for a package of pens and $319.96 for a vial.  Sanofi's benchmark prices for Apidra are $616.04 for a package of pens and $318.89 for a vial.  Sanofi's benchmark price for Toujeo is $442 for a package of Toujeo pens.  Figures 12 and 13 demonstrate Sanofi's price increases from 2006 to 2016 for Lantus and Apidra vial and pen packages.

**Figure 12: Rapidly rising benchmark prices of Lantus vials and pens from 2006-2016.**



010646-11 1006338 V1

**Figure 13: Rapidly rising benchmark prices of Apidra vials and pens from 2006-2016.**



244.    The benchmark prices of insulin analogs have not always been so high.  In just the

last five years, Sanofi and Novo Nordisk have raised Lantus and Levemir's reported prices an

astounding 168% and 169%, respectively.[44]  In fact, last year, Novo Nordisk and Sanofi were

responsible for the highest drug benchmark price increases in the *entire pharmaceutical*

*industry.*[45]  This distinction largely reflected their price hikes for Lantus and Levemir: Sanofi and

---

[44] *See* Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg
(May 6, 2016), http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-
with-prices-that-rise-in-lockstep; Tsai, *supra*.

[45] *See* Jeffrey Balin, et al., *Global Pharma: Rising US Rebates Limit Margin Expansion*,
Credit Suisse, 23 (May 1, 2015).

Novo Nordisk raised the benchmark prices of those drugs by 30% over the course of 2014.[46]

Figure 14 shows Novo Nordisk, Eli Lilly, and Sanofi's exponential benchmark price hikes from 2000 to 2015.

**Figure 14: Rapidly rising insulin benchmark prices from 2000-2015.[47]**



245.    Novo Nordisk, Eli Lilly, and Sanofi have not only dramatically increased their insulins' benchmark prices in the last 10 years, they have done so in perfect lock-step.  In 13 instances since 2009, Sanofi and Novo Nordisk raised the benchmark prices of their long-acting analog insulins, Lantus and Levemir, in tandem, "taking the same price increase down to the decimal point within a few days of each other."[48]  As one healthcare analyst put it: "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."[49] Novo Nordisk, Eli Lilly, and Sanofi have engaged in the same lock-step behavior with respect to

---

[46] *See* Langreth, *supra.*

[47] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup.  But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

[48] Langreth, *supra.*

[49] *Id.*

their rapid-acting analog insulins, Novolog, Humalog, and Apidra, respectively. Figures 15 and 16 demonstrate this seemingly collusive behavior with respect to Lantus and Levemir, with the entry of Eli Lilly's Basaglar and Sanofi's Toujeo noted as well. Figures 17 and 18 demonstrate this behavior with respect to Novolog, Humalog, and Apidra.

**Figure 15: Rapidly rising benchmark prices of long-acting insulins from 2006-2016.**

**Figure 16: Rapidly rising Lantus and Levemir benchmark prices from 2001-2015.[50]**



---

[50] Ramsey, *supra*.

**Figure 17: Rising benchmark prices of rapid-acting insulin from 2006-2016.**



**Figure 18: Rapidly rising Humalog and Novolog benchmark prices from 1996-2016.[51]**



### E.    Buying Formulary Status with "Rebates": The Real Reason for Novo Nordisk, Eli Lilly, and Sanofi's Increasing Benchmark Prices

246.    In the past, Novo Nordisk maintained that their price increases reflected the "clinical benefit" of their drugs.[52]   But Levemir and Novolog are the exact same drugs that they were 10 years ago – their clinical benefits have not changed.  Where clinical benefit has not changed, it cannot be used to justify a 169% price increase.  Therefore, another factor motivates these benchmark price increases.

247.    The real reason Novo Nordisk, Eli Lilly, and Sanofi have increased their benchmark prices is because these firms choose to compete based on hidden rebates to PBMs rather than transparent prices for all.  PBMs control the formularies that determine whether people living with diabetes will purchase Novo Nordisk, Eli Lilly, or Sanofi's drugs.  The

---

[51] *Id.*

[52] Tsai, *supra.*

defendants have realized that they can manipulate the PBMs' formulary choices by raising benchmark prices, rather than lower real prices.

248.    While this practice benefits both drug companies and PBMs, and sometimes insurers, it harms consumers.  Consumers shoulder the burden of the higher benchmark prices, paying more out-of-pocket for their insulins.

249.    Under pressure to explain its rising benchmark prices, Novo Nordisk admitted to this behavior in a recent press release.  On November 30, 2016, Novo Nordisk stated:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . .  News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "[benchmark] price" increases we've made over the last decade.  In other words, a [benchmark] price increase by **XX percent leads to an automatic XX percent profit** for the drug maker.  We believe that is misleading and here's why: As the manufacturer, we do set the "[benchmark] price" and have full accountability for those increases.  However, after we set the [benchmark] price, we negotiate with the companies that actually pay for the medicines, which we call payers.  This is necessary in order for our medicines to stay on their preferred drug list or formulary.  The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price."  The net price more closely reflects our actual profits.[53]

Explaining the company's benchmark price increases, Novo Nordisk directly admitted that it "set[s] [benchmark] price" with an eye to achieving "preferred" formulary status.

250.    Eli Lilly, too, has admitted that it raises benchmark prices as a *quid pro quo* for formulary positions: "The reason drugmakers sharply raise benchmark prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[54]

---

[53] Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

[54] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at B1.

251.    Finally, Sanofi has conceded its participation in this formulary scheme:

> [S]ince 2014, we have increased the level of rebates granted for Lantus® in order to maintain favorable formulary positions with key payers in the US.[55]

252.    However, these explanations omit a crucial detail.  Drug companies could offer PBMs the same high "rebates" in a manner that would help consumers: *they could significantly lower their real prices, instead of inflating their benchmark prices*.  Increasing spread through lower real prices would benefit consumers.  Yet the insulin manufacturers refuse to significantly lower their real prices, and the PBMs continue to accept their benchmark-raising behavior so long as real prices stay constant.

253.    In furtherance of this scheme, Novo Nordisk has steeply raised the benchmark prices of Levemir and Novolog while keeping the real prices of these drugs constant.  Figures 19 and 20 (included in Novo Nordisk's press release) illustrate this conduct.

**Figure 19: Real versus Benchmark Prices of Novolog Vials[56]**



---

[55] Sanofi, Annual Report (Form 20-F) (Dec. 31, 2016).

[56] Novo Nordisk Press Release, *supra*.

- 73 -

**Figure 20: Real versus Benchmark Prices of Novolog FlexPens**[57]



254.    Sanofi has done the same for Lantus, as Figure 21 demonstrates.

**Figure 21: Real versus Benchmark Price of Lantus**



---

[57] *Id.* The FlexPen is a type of insulin injection.  Patients who use this pen stick themselves with a pen-like insulin distributor instead of injecting insulin through a pump or syringe.

255.    Overall, the sales-weighted net prices for the long-acting insulins fell 12% in

2016.  Figure 22 illustrates this phenomenon.

**Figure 22: Difference between benchmark and net prices for long-acting insulins from 2008-2016.[58]**



256.    Novo Nordisk, Eli Lilly, and Sanofi's spread-increasing behavior is also visible

from data on these companies' "rebates" to PBMs and insurers.  The two figures below illustrate

Novo Nordisk's "rebates" from 2007 to 2014.

---

[58] Evans, Hinds, & Baum, *supra*.

**Figure 23: Novo Nordisk's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.[59]**



**Figure 24: Novo Nordisk's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.[60]**



---

[59] Balin, et al., *supra*.

[60] *Id.*

257.    Eli Lilly has also greatly increased its spreads.  Figures 25 and 26 show the

amount Eli Lilly has increased its rebates (spreads) from 2007 to 2014.

**Figure 25: Eli Lilly's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.[61]**



**Figure 26: Eli Lilly's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.[62]**



---

[61] *Id.* at 17.

[62] *Id.*

258.    Finally, Sanofi has greatly increased its spreads.  Figures 27 and 28 show the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

**Figure 27: Sanofi's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.[63]**



**Figure 28: Sanofi's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.[64]**



---

[63] *Id.* at 26.

[64] *Id.*

259.    Sanofi and Novo Nordisk have stretched the spreads on their analog insulin medications to the point where they have become the second and third largest rebators in the entire pharmaceutical industry.[65]  In an industry where artificial benchmark prices inflation has become common, Novo Nordisk, Eli Lilly, and Sanofi are three of the worst offenders.

260.    Over the last decade, diabetes patients who need analog insulins have been paying higher and higher benchmark prices for Lantus, Levemir, Novolog, Humalog, and Apidra.  But, in reality, the real prices of these medications to the largest PBMs are staying constant (and even slightly dropping).  The vast majority of diabetes patients have no idea that the benchmark prices they struggle to afford are not only different from the prices PBMs and insurers receive, but actually trend in an entirely different direction.  As the benchmark prices of Lantus, Levemir, Novolog, Humalog, and Apidra soar further and further away from their real, net prices, these benchmark prices become so misrepresentative, so untethered from the reality as to be fraudulent.  While this practice enables Novo Nordisk, Eli Lilly, and Sanofi to offer larger rebates to PBMs (and, as a result, insurers), it does so at the price of access. Novo Nordisk's, Eli Lilly's, and Sanofi's artificial prices increases are crushing the uninsured and underinsured – some of the most vulnerable populations in the United States.

F.    **Novo Nordisk's, Eli Lilly's, and Sanofi's price increases have harmed patients.**

261.    As previously explained, the defendants' price hikes have hit a number of patient groups particularly hard: the uninsured, those in high-deductible plans, those with high coinsurance rates, and those who hit the Medicare Part D Donut Hole.

---

[65] *Id.*

262.     Currently, 150 million Americans get healthcare insurance through their employers.  Increasingly, individuals within this group are unable to afford their prescribed insulins due to the cost-sharing obligations their health plans impose.  A 2014 study found that among patients with commercial insurance, out-of-pocket costs for people with type 2 diabetes rose a staggering 89% from 2000 to 2010.[66]

263.     In fact, patients with endocrine disorders, such as diabetes, are more likely to shoulder out-of-pocket costs in excess of $1,000 than patients *in any other disease class*.  As Figure 27 illustrates, 70% of people with endocrine disorders have out-of-pocket drug spending at or above $1,000.

---

[66] Lipska, et al., *Use and Out-of-Pocket Costs*, *supra*.

**Figure 29: Conditions that are more likely to lead to high out-of-pocket spending.**[67]



264.    The increasing number of patients with high-deductible plans and coinsurance

obligations, together with the rise in coinsurance rates, has made the pain associated with the

Lantus, Levemir, Humalog, Novolog, and Apidra price hikes particularly acute.  Although

insulin has been available for over 100 years, Novo Nordisk's, Eli Lilly's, and Sanofi's price

hikes are now making it harder than ever to obtain.[68]

---

[67] Cynthia Cox, et al., *Examining High Prescription Drug Sending for People with Employer Sponsored Health Insurance*, Kaiser Family Foundation (Oct. 27, 2016), http://www.healthsystemtracker.org/insight/examining-high-prescription-drug-spending-for-people-with-employer-sponsored-health-insurance/.

[68] The Affordable Care Act sets a limit for patient out-of-pocket spending.  For 2017, the Affordable Care Act has capped out-of-pocket costs at $7,150 for an individual plan and $14,300 for family plans.  Obamacare Facts, *Out-of-Pocket Maximums and Deductibles for 2017 Health Plans*, http://obamacarefacts.com/out-of-pocket-maximums-and-deductible-limits-for-2017-

G.     **The Real Impact of Artificial Pricing**

265.   For many plaintiffs and class members, the defendants' artificial price inflation has cost them their health, financial stability, and emotional wellbeing.  Unable to afford the defendants' price increases, many patients have begun to engage in highly risky behaviors with respect to their disease.  Plaintiffs report under-dosing their insulin, skipping their refills, injecting expired insulin, reusing needles, and avoiding doctors' visits.  To compensate for their lack of insulin, some patients starve themselves, foregoing one or even two meals a day.  These practices – which ineffectively control blood sugar levels – can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness.  Multiple plaintiffs have lost their vision as a result of their inability to consistently afford insulin.  Others have experienced loss of kidney function, and have had to have kidney transplants. Ineffective control of blood sugar can also cause sustained hyperglycemia and, in severe cases, diabetic ketoacidosis – a life-threatening condition.  Many plaintiffs describe multiple trips to the emergency room for diabetic ketoacidosis.  Other plaintiffs explain that their insulin costs have left them unable to afford the healthy diets they should be maintaining.  Too many plaintiffs re-use needles and pen tips to cut back on their diabetes costs.  This practice is dangerous as it can cause infection.  Others attempt to lower their costs by skipping the glucose testing they should be doing prior to injecting insulin.  Foregoing glucose testing can lead to under- or over-dosing insulin.  While analog insulin should be improving the health of plaintiffs, the defendants' price hikes have had the opposite effect.

---

health-plans/ (last visited Feb. 1, 2017). Nevertheless, for many low- and middle-income individuals and families, these ceilings provide little relief—many cannot afford to hit them.

266.     The toll of the defendants' price hikes is not just physical: the high cost of insulin causes serious financial difficulty and emotional stress.  Multiple class members spend over 50% of their income on their insulin supplies.  Plaintiffs describe going into debt, taking out loans, moving back in with their parents, and quitting school to pay for their insulin.  Multiple plaintiffs state that they keep the heat low – even in the dead of winter – so they can afford insulin. Parents of children with diabetes describe the anguish of not being able to afford pre-kindergarten and other educational services for their children due to their insulin costs.  They say that the cost of insulin is a huge stress in their children's lives, as these young patients realize the financial strain their disease puts on their families.  As one plaintiff, whose son has type 1 diabetes, explained:

> As a mom, of course I would sacrifice anything for my child, so over the years, we have had to learn to adjust to living around the cost of insulin.  [My son] and his sisters live at home and commute to a nearby college instead of being able to go off to college, . . . all with keeping in mind that we all need to learn a lifestyle of constantly fearing the cost to keep [my son] going, as this is a lifelong disease.  However, the most immediate financial consequence came that very first month of diagnosis when we had not budgeted for a sudden increase in our bills. So when [we were] suddenly hit with an extra expense for insulin, the first thing to go was the youngest sibling's pending preschool tuition.  This cost was the easiest to cut financially, but not mentally/emotionally.  We could not cut our other bills (mortgage, utilities, etc.) much more, so my youngest child has forgone her early childhood education.  It makes me feel like a horrible mother to admit, but that was our panic response to save ourselves from going into more debt.  We are a family that . . . works hard for everything we have.  We don't take handouts or accumulate debt.  We put ourselves through college and earn all that we have.  We value a strong work ethic; we are middle America.  Since [my son's] diagnosis, every penny I spend and save is with affording insulin in mind.  Since type 1 is hereditary, an autoimmune disease, any of our other children could be diagnosed at any time, and their children, and so on, so in that sense, our entire family is 100% insulin dependent, and it could span generations.  Without it, my son can't survive.

Every class representative described the anxiety associated with their insulin costs as all-consuming and constant.

267.    The PBMs claim that their scheme of discounts and "rebates" ultimately benefits plan enrollees by providing them with lower drug costs.  Even assuming that some part of the discounts does reach insured patients (after the PBMs and institutional insurers have both taken their cuts), these discounts are never redistributed to uninsured patients.  It also does not come back to under-insured patients – those in plans with high-deductibles and coinsurance obligations – who must pay much of their prescription drug costs out-of-pocket.  Many patients cannot afford to hit their deductibles year after year.  They must begin to ration their insulin before they hit their deductibles and their insurers begin to kick in for their insulin costs.

268.    Cognizant of the damage increasing benchmark prices have inflicted on patients, Novo Nordisk and Eli Lilly have recently announced that they will take steps, going forward, to rein in this harm.  In its November 30, 2016 press release, Novo Nordisk made a modest commitment to "limit[] any potential future benchmark price increases for our medicines to no more than single-digit percentages annually."[69]  On December 13, 2016, Eli Lilly announced that, starting on January 1,[70] patients who pay full-retail prices out-of-pocket for Eli Lilly's insulin will gain access to 40% discounts on their Eli Lilly's insulins.[71]

269.    Long overdue, these affordability measures still do not end or even address the insidious practice of artificially inflating the spread between benchmark and net price.  Nor do they make whole the patients who have spent thousands of dollars out-of-pocket on long acting insulins for the past few years.  Therefore, these measures fail to address the structural issues that

---

[69] Novo Nordisk Press Release, *supra*.

[70] Eli Lilly Press Release (Dec. 13, 2016),
https://investor.lilly.com/releasedetail.cfm?ReleaseID=1003887.

[71] *Id.*

have given rise to the price hikes that have hurt under-insured and uninsured diabetes patients for years.

270.    Individuals living with diabetes spend, on average, twice as much as those without the disease despite the fact that treatment for the disease has existed for more than 100 years. Diagnosed diabetes now costs the United States over $245 billion per year; an estimated $1 of every $5 spent on health care in the United States.  Novo Nordisk's, Eli Lilly's, and Sanofi's artificial inflation of analog insulin prices has pushed, and will continue to push, access to life-saving drugs out of reach of uninsured and underinsured American diabetes patients, even despite recent efforts to control prices.  Without access to proper treatment, diabetes patients experience serious and costly health complications.  Despite Banting and Best's efforts to ensure insulin was widely accessible, the pharmaceutical companies that have inherited their legacy have eschewed this aspiration, sublimating it to the companies' profit margins.  The fraudulent practice of creating a large spread between benchmark and real prices has harmed and will continue to harm diabetes patients across the country.  Millions more will suffer painful complications and early death unless Novo Nordisk, Eli Lilly, and Sanofi make analog insulin more affordable. This case focuses on the overcharges the plaintiffs have incurred as a result of the defendants' fraudulent scheme.  Plaintiffs seeks relief from these overcharges.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

271.    Plaintiffs and class members had no way of knowing about the defendants' scheme and deception with respect to insulin pricing.

272.    The manufacturers and PBMs refuse to disclose the real, net prices of insulin, labeling them trade secrets, hence a reasonable plaintiff and consumer could not discover the truth.

- 85 -

273.     Within the time period of any applicable statutes of limitation, plaintiffs and members of the proposed class could not have discovered through the exercise of reasonable diligence that the defendants were concealing the conduct complained of herein and misrepresenting the true cost of insulin.

274.     Plaintiffs and the other class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that the defendants were engaged in the scheme and were publishing phony benchmark prices, nor would a reasonable and diligent investigation have disclosed the true facts.

275.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all insulin products identified herein.

**B.     Fraudulent Concealment Tolling**

276.     All applicable statutes of limitation have also been tolled by the defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

**C.     Estoppel**

277.     The defendants were under a continuous duty to disclose to plaintiffs and class members the true character, quality, and nature of the benchmark prices upon which their payments for insulin were based.

278.     Based on the foregoing, the defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ACTION ALLEGATIONS

279.     Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a class defined as follows:

> All individual persons in the United States and its territories who
> paid any portion of the purchase price for a prescription of Lantus,
> Levemir, Novolog, Humalog, Apidra, and/or Toujeo at a price
> calculated by reference to a benchmark price, AWP (Average
> Wholesale Price) or WAC (Wholesale Acquisition Price) for
> purposes other than resale.  The class period is tolled to the earliest
> date of the defendants' initiation of the rebate scheme.

Excluded from the class are: (a) Novo Nordisk and any entity in which it has a controlling

interest, and their legal representatives, officers, directors, assignees, and successors; (b) Eli Lilly

and any entity in which it has a controlling interest, and their legal representatives, officers,

directors, assignees, and successors; (c) Sanofi and any entity in which it has a controlling

interest, and their legal representatives, officers, directors, assignees, and successors; and (d) any

co-conspirators, and their officers, directors, management, employees, subsidiaries, and

affiliates.

280.     There are a number of ways in which an individual person may pay a portion of

the purchase price of Lantus, Levemir, Novolog, Humalog, Apidra, and/or Toujeo and thereby

gain inclusion in the class.  First, a person may be uninsured and, therefore, responsible for

paying 100% of the cost of her prescription needs (the uninsured scenario).  Second, a person's

insurance plan may require her to satisfy a deductible before insurance benefits cover all or a

portion of her prescription needs.  If so, that person is paying for 100% of the cost of any

prescriptions filled before the deductible is met (the deductible scenario).  Third, a person may

have a coinsurance requirement – an obligation to pay a portion of any prescription or medical

benefit that she purchases, which is expressed as a percentage of the cost of the medication or

service provided (the coinsurance scenario).  If so, she would be responsible for paying for a

portion of the Lantus, Levemir, Novolog, Humalog, Apidra, and/or Toujeo purchase, consistent

with the terms of her plan.  Fourth, a person may obtain insurance through a Medicare Part D

Plan; if so, there is a coverage gap, often referred to as the "Donut Hole" (the Donut Hole

scenario).  Once that person and her plan has spent a stated amount of money on prescription drugs, the person becomes responsible for 40% of the cost of her brand-name prescriptions until her total annual out-of-pocket expenses reach the next stated benchmark amount.  After this benchmark, her plan covers the majority of her drug costs again.

281.    In each of these scenarios – the uninsured scenario, the deductible scenario, the coinsurance scenario, and the Donut Hole scenario – a person's out-of-pocket expenses for Lantus, Levemir, Novolog, Humalog, Apidra, and/or Toujeo are determined by the benchmark prices of these drugs.  Accordingly, each falls within the class definition.

282.    Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable.  Hundreds of thousands of prescriptions are written for Lantus, Levemir, Novolog, Humalog, Apidra, and/or Toujeo throughout the United States every week, and these prescriptions are filled by hundreds of thousands of individuals.  The class is readily identifiable from information and records in the possession of Novo Nordisk, Eli Lilly, and Sanofi.

283.    Plaintiffs' claims are typical of the claims of the members of the class.  Plaintiffs and all members of the class were damaged by the same wrongful conduct of the defendants— *i.e.*, as a result of Novo Nordisk, Eli Lilly, and Sanofi's misconduct, these purchasers paid artificially inflated prices for Lantus, Levemir, Novolog, Humalog, Apidra, and/or Toujeo.

284.    Plaintiffs will fairly and adequately protect and represent the interests of the class.  The interests of plaintiffs are coincident with, and not antagonistic to, those of the other members of the class.

285.    Lead counsel that represents the plaintiffs are experienced in the prosecution of class action litigation and have particular experience with class action litigation involving

pharmaceutical products and extensive experience in class actions concerning the use of benchmark pricing, including two cases in federal district court (*AWP* and *McKesson*) that resulted in recoveries well in excess of $500 million.

286.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because the defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate.  Such generally-applicable conduct is inherent in the defendants' wrongful conduct.

287.     Questions of law and fact common to the class include:

i.      Whether the benchmark prices set by Novo Nordisk, Eli Lilly, and Sanofi are used as benchmarks for payments by class members;

ii.     What the benchmark and real prices for Lantus, Levemir, Novolog, Humalog, Apidra, and/or Toujeo are;

iii.    Whether Novo Nordisk, Eli Lilly, and Sanofi are engaged in a course of conduct that improperly inflates the benchmark-to-real price ratio and the ultimate benchmark prices used by plaintiffs and class members as a basis for reimbursement;

iv.     Whether Novo Nordisk, Eli Lilly, and Sanofi artificially inflated their benchmark prices;

v.      Whether Novo Nordisk, Eli Lilly, and Sanofi gave "rebates" to PBMs such as CVS Health, Express Scripts, and OptumRX that created substantial spreads between the benchmark prices and the real, net price charged by the manufacturers;

vi.     Whether the large benchmark-to-real price spread was intended to induce CVS Health, Express Scripts, and OptumRX to give Lantus, Levemir, Novolog, Humalog, Apidra, and/or Toujeo favorable placement on their formularies;

vii.    Whether each defendant conspired with the PBMs from the Pricing Enterprise for the purpose of carrying out its pricing fraud;

viii.   Whether Novo Nordisk, Eli Lilly, and Sanofi conducted, or participated in the conduct of, the Pricing Enterprise;

- 89 -

ix.    Whether the defendants engaged in mail or wire fraud in furtherance of the Pricing Enterprise;

x.    Whether the defendants engaged in a pattern and practice that caused plaintiffs and class members to make inflated payments for Lantus, Levemir, Novolog, Humalog, Apidra, and/or Toujeo;

xi.    Whether the defendants engaged in deceptive fraudulent conduct;

xii.    Whether the defendants' deceptive and/or fraudulent activity was intended to defraud or harm plaintiffs and class members;

xiii.    Whether the defendants' conduct violated RICO or the State Consumer Protection Statute; and

xiv.    Whether the defendants are liable to plaintiffs and the class members for damages flowing from their misconduct.

288.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

289.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

## COUNT ONE
## (AGAINST DEFENDANT NOVO NORDISK)

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ.*

290.    Plaintiffs Andre Arnold, Frank Barnett, Roseanna Barnett, Julia Blanchette, Mary Bobo, Scott Christensen, Julia D'Arrigo, Patricia Dague, Mary Ann Devins, Mildred Ford,

Dianna Gilmore, Mark Goldsmith, Ruth Hart, Diane Halkyard, Sara Hasselbach, Arthur Janz,

Emma Jensen, Richard Knauss, Susan Landis, Jeffrey Liedl, John Loschen, Robert Lowman,

Jeanne MacNitt, Lawrence Mandel, Susan Marsh, Anne Olinger, Juliana Patton, Marilyn Person,

Willie Phillips, Donna Ramsey, Robyn Rushing, Bertha Sanders, Mark Schloemer, Larissa

Shirley, Tremayne Sirmons, Michael Starr, Molly Thompson, Jon Ugland, Hector J. Valdes Jr.,

Kim and Jim Wallan, and Alethea Weir (the Novo Nordisk plaintiffs) hereby incorporate by

reference the allegations contained in the preceding paragraphs of this Complaint.

291.    This claim is brought on behalf of the class against Novo Nordisk for actual

damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C.

§ 1962, *et seq.*

292.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who

conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18

U.S.C. § 1962(c).

293.    Plaintiffs and the members of the class are each "persons," as that term is defined

in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Novo

Nordisk's fraudulent scheme.

**A.    The Levemir/Novolog Pricing Enterprise**

294.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact

that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among

those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's

purpose.

295.    Novo Nordisk formed just such an association-in-fact enterprise—sometimes

referred to in this complaint as the Levemir/Novolog Pricing Enterprise.  The Levemir/Novolog

Pricing Enterprise consists of (a) Novo Nordisk, including its employees and agents; (b) the

PBM CVS Health, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.[72]

296.    The Levemir/Novolog Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common fraudulent purpose. This enterprise promotes a fraudulent payoff scheme that exchanges kickbacks or "rebates" for preferred formulary positions for Novo Nordisk's long-acting analog insulin product, Levemir, and its rapid-acting analog insulin product, Novolog, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

297.    To accomplish this purpose, the Levemir/Novolog Pricing Enterprise periodically and systematically inflates the benchmark prices of Levemir and Novolog and represents – either affirmatively or through half-truths and omissions – to the general public and consumers, including plaintiffs and the class, that Levemir and Novolog's benchmark prices fairly and accurately reflect the actual cost of these drugs.  The Enterprise conceals from the general public and consumers, like plaintiffs and the class members, the existence and amount of steep rebates Novo Nordisk gave to the PBMs in exchange for preferred formulary positions.  These rebates were and are worth at least 25% of the benchmark prices.  The Levemir/Novolog Pricing Enterprise also conceals from the public the purpose of these "rebates": they ultimately result in higher profits for the drug manufacturers, through ensuring formulary access without requiring any real price reductions.  These "rebates" enable the drug manufacturers to secure favorable positions on the PBMs' formularies without offering the PBMs real price reductions.  The rebates function as kickbacks, ensuring the PBMs will not demand real price reductions in

---

[72] CVS Health, Express Scripts, and OptumRx are collectively referred to as the PBMs.

exchange for formulary status. This scheme translated into larger profits for Novo Nordisk than would have been possible if they had been forced to compete on real prices as well as larger spreads for the PBMs.

298.     The persons engaged in the Levemir/Novolog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Novo Nordisk. There is regular communication between Novo Nordisk and each of the PBMs: these entities share information regarding the Levemir and Novolog benchmark prices and discuss and agree on rebate amounts. Typically, this communication occurs, and has occurred, through the use of the wires and the mail. Novo Nordisk and the PBMs function as a continuing unit for the purposes of implementing the Levemir and Novolog pricing scheme and, when issues arise during the scheme, each agrees to take actions to hide the scheme and continue its existence.

299.     At all relevant times, CVS Health has been aware of Novo Nordisk's conduct, has been a knowing and willing participant in that conduct, and has reaped profits from that conduct. CVS Health has struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and Novolog and profit from the inflated rebates (kickbacks). CVS Health has represented to the public that the rebates it negotiates save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But it has known that the rebates did not and do not actually decrease the real costs of Levemir and Novolog for consumers: The published benchmark prices were and are falsely inflated, and when consumers make payments at the point-of-sale, their transactions do not reflect the manufacturers' real, net prices. CVS Health has also known, but has not disclosed, that the other PBMs—Express Scripts and OptumRx—were and are engaged in the same rebating schemes, to the detriment of

consumers.  But for the Levemir/Novolog Pricing Enterprise's unlawful fraud, CVS Health would have the incentive to disclose the deceit by Novo Nordisk.  By failing to disclose this information, Novo Nordisk and CVS Health perpetuate the Levemir/Novolog Pricing Enterprise's scheme, and continue to reap substantial profits.

300.    At all relevant times, Express Scripts has been aware of Novo Nordisk's conduct, has been a knowing and willing participant in that conduct, and has reaped profits from that conduct.  Express Scripts has struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and Novolog and profit from the inflated rebates (kickbacks).  Express Scripts has represented to the public that the rebates it negotiates save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs.  But it has known that the rebates did not and do not actually decrease the real costs of Levemir and Novolog for consumers: The published benchmark prices were and are falsely inflated, and when consumers make payments at the point-of-sale, their transactions do not reflect the manufacturers' real, net prices.  Express Scripts has also known, but has not disclosed, that the other PBMs—CVS Health and OptumRx—were and are engaged in the same rebating schemes, to the detriment of consumers.  But for the Levemir/Novolog Pricing Enterprise's unlawful fraud, Express Scripts would have the incentive to disclose the deceit by Novo Nordisk.  By failing to disclose this information, Novo Nordisk and Express Scripts perpetuate the Levemir/Novolog Pricing Enterprise's scheme, and continue to reap substantial profits.

301.    At all relevant times, OptumRx has been aware of Novo Nordisk's conduct, has been a knowing and willing participant in that conduct, and has reaped profits from that conduct.  OptumRx has struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and Novolog and profit from the inflated rebates (kickbacks).  OptumRx has represented to the

public that the rebates it negotiates save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But it has known that the rebates did not and do not actually decrease the real costs of Levemir and Novolog for consumers: The published benchmark prices were and are falsely inflated, and when consumers make payments at the point-of-sale, their transactions do not reflect the manufacturers' real, net prices. OptumRx has also known, but has not disclosed, that the other PBMs—Express Scripts and CVS Health—were and are engaged in the same rebating schemes, to the detriment of consumers. But for the Levemir/Novolog Pricing Enterprise's unlawful fraud, OptumRx would have the incentive to disclose the deceit by Novo Nordisk. By failing to disclose this information, Novo Nordisk and OptumRx perpetuate the Levemir/Novolog Pricing Enterprise's scheme, and continue to reap substantial profits.

302.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs have not challenged Novo Nordisk's reported benchmark prices, terminated their role in the Levemir/Novolog Pricing Enterprise, or disclosed publicly that the Levemir and Novolog benchmark prices did not and do not accurately reflect the real, net prices of the drugs.

303.    Novo Nordisk and CVS Health, Express Scripts, and OptumRx have participated in the conduct of the Levemir/Novolog Pricing Enterprise. They share the common fraudulent purpose of providing kickbacks in exchange for exclusive or favorable formulary positions for Levemir and Novolog through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343. Novo Nordisk and

the PBMs knowingly made material misstatements to the general public in furtherance of the fraudulent scheme regarding:

      a.      The actual prices of Levemir and Novolog;

      b.      The extent to which the real prices of Levemir and Novolog departed from their published, artificially-inflated benchmark prices;

      c.      The extent to which Novo Nordisk and the PBMs negotiated the rebates discounting the benchmark prices of Levemir and Novolog in good faith and for a proper purpose;

      d.      Whether the rebates were intended to benefit plan members and/or the general public;

      e.      Whether the rebates saved plan members and the general public money;

      f.      Whether Levemir and Novolog's "preferred" formulary status reflects the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

      g.      Whether Levemir and Novolog would have been placed in "preferred" formulary positions absent the rebates; and

      h.      The extent to which the rebating scheme forces plan members to incur additional expenses for their Levemir and Novolog prescriptions.

304.     Novo Nordisk alone could not have accomplished the purpose of the Levemir/Novolog Pricing Enterprise without the assistance of the PBMs.  For Novo Nordisk to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formularies, on which Levemir and Novolog were given favorable treatment.  And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured significant discounts.  However, these discounts were only significant because

Novo Nordisk artificially inflated the benchmark prices of Levemir and Novolog.  The discounts were fictitious, the result of a deliberate scheme to create large rebates without lowering real prices.  Without these misrepresentations, the Levemir/Novolog Pricing Enterprise could not have achieved its common purpose.

305.   The Levemir/Novolog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the prices of drugs that were sold to and utilized by thousands of class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

306.   The impacts of the Levemir/Novolog Pricing Enterprise's scheme are still in place, *i.e.*, the increased spreads between the benchmark and real prices of Levemir and Novolog are still being maintained and increased. PBMs and pharmacies still profit from the spread between the benchmark and real prices of these drug, *i.e.*, the rebates.  Under this system, higher spreads result in increased profits for PBMs.

307.   The foregoing evidence that Novo Nordisk, CVS Health, Express Scripts, and OptumRx were each willing participants in the Levemir/Novolog Pricing Enterprise, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, to increase profits for both Novo Nordisk and the PBMs through kickbacks to the PBMs and continued formulary status without real price reductions for Novo Nordisk.

**B.     Conduct of the Levemir/Novolog Pricing Enterprise**

308.   During the class period, Novo Nordisk exerted control over the Levemir/Novolog Pricing Enterprise and participated in the operation or management of the affairs of the Levemir/Novolog Pricing Enterprise, directly or indirectly, in the following ways:

- 97 -

a.      Novo Nordisk selects and causes to be published the Levemir and Novolog benchmark prices;

b.      Novo Nordisk periodically raises the published Levemir and Novolog benchmark prices and uses mail and interstate facilities to do so[73];

c.      Novo Nordisk grants to the PBMs substantial rebates representing discounts off of the Levemir and Novolog benchmark prices in exchange for the PBMs' promise to give Levemir and Novolog exclusive or at least favorable, formulary placement;

d.      Novo Nordisk conceals from the public the amount and purpose of the rebates;

e.      Novo Nordisk intends that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Levemir and Novolog) saved health care payers and consumers like plaintiffs and class members money on their prescription needs; and

f.      Novo Nordisk represents to the general public, by stating Levemir and Novolog's benchmark prices without stating that these benchmark prices differed substantially from those negotiated by the PBMs, that the Levemir and Novolog benchmark prices reflected or approximated Levemir and Novolog's actual costs.

309.   The scheme has a hierarchical decision-making structure that was headed by Novo Nordisk.  Novo Nordisk controlled the Levemir and Novolog benchmark prices, and doled

---

[73] *See, e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

out rebates to the PBMs in exchange for the PBMs' assurances that Levemir and Novolog would receive exclusive, or at least favorable, formulary placement.

310. The PBMs also participate in the conduct of the affairs of the Levemir/Novolog Pricing Enterprise, directly or indirectly, in the following ways:

a. The PBMs promise to, and did, confer on Levemir and Novolog exclusive or at least favorable formulary placement;

b. The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Levemir and Novolog) save consumers like plaintiffs and class members money on their prescription needs; and

c. The PBMs conceal the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

311. The scheme devised and implemented by Novo Nordisk, as well as other members of the Levemir/Novolog Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Levemir and Novolog; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Levemir and Novolog written by plan members' physicians.

## C.   Novo Nordisk's Pattern of Racketeering Activity

312. Novo Nordisk conducted and participated in the affairs of the Levemir/Novolog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The pattern of racketeering activity by the Levemir/Novolog Pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Levemir and Novolog pricing scheme. Each of these fraudulent mailings and

interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Novo Nordisk and the PBMs intended to defraud plaintiffs, members of the class, and other intended victims.

313.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including plaintiffs and members of the class. Novo Nordisk and the PBMs calculated and intentionally crafted the Levemir and Novolog pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on plaintiffs and members of the class who would be over-billed for Levemir and Novolog. In designing and implementing the scheme, Novo Nordisk was, at all times, cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs in setting benchmark prices and establishing rebates.

314.    By intentionally and artificially inflating the Levemir and Novolog benchmark prices, and then subsequently failing to disclose such practices to the individual consumers, Novo Nordisk and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

315.    Novo Nordisk's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive plaintiffs and members of the class. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Novo Nordisk was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the class. Novo Nordisk has engaged in the pattern of racketeering activity for

the purpose of conducting the ongoing business affairs of its Levemir/Novolog Pricing
Enterprise.

316.    The pattern of racketeering activity alleged herein and the Levemir/Novolog
Pricing Enterprise are separate and distinct from each other.  Likewise, Novo Nordisk is distinct
from the Levemir/Novolog Pricing Enterprise.

317.    The pattern of racketeering activity alleged herein is continuing as of the date of
this complaint, and, upon information and belief, will continue into the future unless enjoined by
this Court.

**D.    Novo Nordisk's Use of the U.S. Mail and Interstate Wire Facilities**

318.    The Levemir/Novolog Pricing Enterprise engaged in and affected interstate
commerce because it engaged in the following activities across state boundaries: the transmission
and publication of false and misleading information concerning the Levemir and Novolog
benchmark prices; the payment from Novo Nordisk to the PBMs of substantial rebates off of the
benchmark price; and transmission of false or incomplete statements intended to mislead health
care payers and consumers regarding the existence, amount, and purpose of the rebates.

319.    During the class period, the Levemir/Novolog Pricing Enterprise's unlawful
conduct and wrongful practices were carried out by an array of employees, working across state
boundaries, who necessarily relied upon frequent transfers of documents, information, products,
and funds by the U.S. Mail and interstate wire facilities.

320.    The nature and pervasiveness of the Levemir and Novolog pricing fraud scheme,
which was orchestrated out of the corporate headquarters of Novo Nordisk and each PBM,
necessarily required those headquarters to communicate directly and frequently by U.S. Mail and
interstate wire facilities.

010646-11 1006338 V1

321.    Many of the precise dates of the Levemir/Novolog Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Novo Nordisk's, CVS Health's, Express Scripts's, and OptumRx's books and records.  Indeed, an essential part of the successful operation of the Enterprise alleged herein depended on secrecy.  However, plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme.

322.    Novo Nordisk's use of the U.S. Mail and interstate wire facilities to perpetrate the Levemir and Novolog pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

      a.    Marketing materials about Novo Nordisk's Levemir and Novolog products and their prices, which Novo Nordisk sent to health care payers and health care providers located across the country;

      b.    Written communications between Novo Nordisk and the publishers of benchmark price compendia regarding the Levemir and Novolog benchmark prices and their subsequent mark-ups, which occurred on a regular basis each year;

      c.    Written representations and telephone calls between Novo Nordisk and CVS Health regarding Levemir and Novolog markups and benchmark prices;

      d.    Written representations and telephone calls between Novo Nordisk and Express Scripts regarding Levemir and Novolog markups and benchmark prices;

      e.    Written representations and telephone calls between Novo Nordisk and OptumRx regarding Levemir and Novolog markups and benchmark prices;

f.      Written representations and telephone calls between Novo Nordisk and CVS Health regarding Levemir and Novolog rebates;

g.      Written representations and telephone calls between Novo Nordisk and Express Scripts regarding Levemir and Novolog rebates;

h.      Written representations and telephone calls between Novo Nordisk and OptumRx regarding Levemir and Novolog rebates;

i.      Hundreds of e-mails between Novo Nordisk and the PBMs agreeing to or effectuating the implementation of the Levemir and Novolog pricing fraud scheme;

j.      Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Levemir and Novolog benchmark prices were; the existence, amount, or purpose of the Levemir and Novolog rebates; and the true costs of Levemir and Novolog that were designed to conceal the scheme, deter investigations into Levemir and Novolog pricing, or forestall changes to healthcare payers' reimbursement of Levemir and Novolog prescriptions based on something other than Levemir and Novolog benchmark prices; and

k.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

323.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Novo Nordisk that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit consumers, like plaintiffs and class members.

**E.      Damages Caused by Novo Nordisk's Levemir and Novolog Pricing Fraud**

324.    Novo Nordisk's violations of federal law and its pattern of racketeering activity have directly and proximately caused plaintiffs and class members to be injured in their business

or property because plaintiffs and class members have paid inflated out-of-pocket expenses for Levemir and/or Novolog.

325.     As described above, when a healthcare consumer fills a prescription for a drug like Levemir and/or Novolog, she is responsible for paying all or a portion of the medication's cost.  If the consumer is uninsured, she is responsible for 100% of the drug's costs.  If the consumer has a high-deductible health plan, she must pay for 100% of her drug until she satisfies her deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drug cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug's cost until she reaches her maximum contribution.

326.     The amount of each of these cash payments is based on the drug's benchmark price.  Therefore, when Novo Nordisk, through the Levemir/Novolog Pricing Enterprise, artificially inflates the Levemir and Novolog benchmark prices, it also artificially inflates consumers' out-of-pocket expenses.

327.     Plaintiffs' injuries, and those of the class members, were proximately caused by Novo Nordisk's racketeering activity.  But for the misstatements made by Novo Nordisk and the PBMs and the pricing scheme employed by the Levemir/Novolog Pricing Enterprise, plaintiffs and others similarly situated would have paid less for their out-of-pocket Levemir and Novolog expenses.

328.     Plaintiffs' injuries were directly caused by Novo Nordisk's racketeering activity. Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible

payments (by private and public plan members), and payments made in the "Donut Hole" (for Medicare members).  So, although the misstatements made by the PBMs in furtherance of the Levemir/Novolog Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility.  Therefore, the health care payers did not suffer the overcharges that are the harms alleged in this suit.

329.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from Novo Nordisk's fraudulent scheme.

330.    By virtue of these violations of 18 U.S.C. § 1962(c), Novo Nordisk is liable to plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT TWO**
**(AGAINST ELI LILLY)**

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ.***

331.    Plaintiffs Henry Appleby, Andrew Bauer, Aletha Bentele, James Bonser, Donald Chaires, Scott Christensen, Gay Deputee, Scott Dercks, Donald Douthit, F. Donald Fellow, Dianna Gilmore, Gerald Girard, Michelle Gwin, Ruth Hart, David Hernandez, Emma Jensen, Edward Johnson, Richard Knauss, Angela Kritselis, Susan Landis, John Loschen, Robert Lowman, Sean Mac an Airchinnigh, Jeanne MacNitt, Lawrence Mandel, Anne Olinger, Juliana Patton, Marilyn Person, Patricia Quint, Robyn Rushing, Marie Saffran, Mark Schloemer, Howard Schurr, Tremayne Sirmons, Edward Stanford, Michael Starr, Bret Stewart, Molly Thompson, Jon Ugland, Hector J. Valdes Sr., and Karyn Wofford (the Eli Lilly plaintiffs) hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

332.    This claim is brought on behalf of the class against Eli Lilly for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

333.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

334.    Plaintiffs and the members of the class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Eli Lilly's fraudulent scheme.

**A.      The Humalog Pricing Enterprise**

335.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

336.    Eli Lilly formed just such an association-in-fact enterprise – sometimes referred to in this complaint as the Humalog Pricing Enterprise.  The Humalog Pricing Enterprise consists of (a) Eli Lilly, including its employees and agents; (b) the PBM CVS Health, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.[74]

337.    The Humalog Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common fraudulent purpose. This enterprise promotes a

---

[74] CVS Health, Express Scripts, and OptumRx are collectively referred to as the PBMs.

fraudulent payoff scheme that exchanges kickbacks or "rebates" for preferred formulary position for Eli Lilly's rapid-acting analog insulin product, Humalog, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

338.    To accomplish this purpose, the Humalog Pricing Enterprise periodically and systematically inflates the benchmark price of Humalog and represents – either affirmatively or through half-truths and omissions – to the general public and consumers, including plaintiffs and the class, that Humalog's benchmark price fairly and accurately reflects the actual cost of this drug.  The Enterprise conceals from the general public and consumers, like plaintiffs and the class members, the existence and amount of steep rebates Eli Lilly gave to the PBMs in exchange for preferred formulary positions.  These rebates were and are worth at least 25% of the benchmark prices.  The Humalog Pricing Enterprise also conceals from the public the purpose of these "rebates": they ultimately result in higher profits for the drug manufacturers, through ensuring formulary access without requiring any real price reductions.  These "rebates" enable the drug manufacturers to secure favorable positions on the PBMs' formularies without offering the PBMs real price reductions.  The rebates function as kickbacks, ensuring the PBMs will not demand real price reductions in exchange for formulary status.  This scheme translated into larger profits for Eli Lilly than would have been possible if they had been forced to compete on real prices as well as larger spreads for the PBMs.

339.    The persons engaged in the Humalog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Eli Lilly.  There is regular communication between Eli Lilly and each of the PBMs: these entities share information regarding the Humalog benchmark price and discuss and agree on rebate amounts.  Typically, this communication occurs, and has occurred, through the

use of the wires and the mail. Eli Lilly and the PBMs function as a continuing unit for the purposes of implementing the Humalog pricing scheme and, when issues arise during the scheme, each agrees to take actions to hide the scheme and continue its existence.

340. At all relevant times, CVS Health has been aware of Eli Lilly's conduct, has been a knowing and willing participant in that conduct, and has reaped profits from that conduct. CVS Health has struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the inflated rebates (kickbacks). CVS Health has represented to the public that the rebates it negotiates save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But it has known that the rebates did not and do not actually decrease the real cost of Humalog for consumers: The published benchmark prices were and are falsely inflated, and when consumers make payments at the point-of-sale, their transactions do not reflect the manufacturers' real, net prices. CVS Health has also known, but has not disclosed, that the other PBMs—Express Scripts and OptumRx—were and are engaged in the same rebating schemes, to the detriment of consumers. But for the Humalog Pricing Enterprise's unlawful fraud, CVS Health would have the incentive to disclose the deceit by Eli Lilly. By failing to disclose this information, Eli Lilly and CVS Health perpetuate the Humalog Pricing Enterprise's scheme, and continue to reap substantial profits.

341. At all relevant times, Express Scripts has been aware of Eli Lilly's conduct, has been a knowing and willing participant in that conduct, and has reaped profits from that conduct. Express Scripts has struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the inflated rebates (kickbacks). Express Scripts has represented to the public that the rebates it negotiates save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But it has known that the rebates did

not and do not actually decrease the real cost of Humalog for consumers: The published benchmark prices were and are falsely inflated, and when consumers make payments at the point-of-sale, their transactions do not reflect the manufacturers' real, net prices. Express Scripts has also known, but has not disclosed, that the other PBMs—CVS Health and OptumRx—were and are engaged in the same rebating schemes, to the detriment of consumers. But for the Humalog Pricing Enterprise's unlawful fraud, Express Scripts would have the incentive to disclose the deceit by Eli Lilly. By failing to disclose this information, Eli Lilly and Express Scripts perpetuate the Humalog Pricing Enterprise's scheme, and continue to reap substantial profits.

342.    At all relevant times, OptumRx has been aware of Eli Lilly's conduct, has been a knowing and willing participant in that conduct, and has reaped profits from that conduct. OptumRx has struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the inflated rebates (kickbacks). OptumRx has represented to the public that the rebates it negotiates save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But it has known that the rebates did not and do not actually decrease the real cost of Humalog for consumers: The published benchmark prices were and are falsely inflated, and when consumers make payments at the point-of-sale, their transactions do not reflect the manufacturers' real, net prices. OptumRx has also known, but has not disclosed, that the other PBMs—Express Scripts and CVS Health—were and are engaged in the same rebating schemes, to the detriment of consumers. But for the Humalog Pricing Enterprise's unlawful fraud, OptumRx would have the incentive to disclose the deceit by Eli Lilly. By failing to disclose this information, Eli Lilly and OptumRx perpetuate the Humalog Pricing Enterprise's scheme, and continue to reap substantial profits.

343.     Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs – including insulin – the PBMs have not challenged Eli Lilly's reported benchmark price, terminated their role in the Humalog Pricing Enterprise, or disclosed publicly that the Humalog benchmark price did not and does not accurately reflect the real, net price of the drug.

344.     Eli Lilly and CVS Health, Express Scripts, and OptumRx have participated in the conduct of the Humalog Pricing Enterprise.  They share the common fraudulent purpose of providing kickbacks in exchange for an exclusive or favorable formulary position for Humalog through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.  Eli Lilly and the PBMs knowingly made material misstatements to the general public in furtherance of the fraudulent scheme regarding:

a.     The actual price of Humalog;

b.     The extent to which the real price of Humalog departed from its published, artificially-inflated benchmark prices;

c.     The extent to which Eli Lilly and the PBMs negotiated the rebates discounting the benchmark price of Humalog in good faith and for a proper purpose;

d.     Whether the rebates were intended to benefit plan members and/or the general public;

e.     Whether the rebates saved plan members and the general public money;

f.     Whether Humalog's "preferred" formulary status reflects the drug's safety, efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

g.      Whether Humalog would have been placed in a "preferred" formulary position absent the rebates; and

h.      The extent to which the rebating scheme forces plan members to incur additional expenses for their Humalog prescriptions.

345.    Eli Lilly alone could not have accomplished the purpose of the Humalog Pricing Enterprise without the assistance of the PBMs.  For Eli Lilly to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formularies, on which Humalog was given favorable treatment.  And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured significant discounts.  However, these discounts were only significant because Eli Lilly artificially inflated the benchmark price of Humalog.  The discounts were fictitious, the result of a deliberate scheme to create large rebates without lowering real prices.  Without these misrepresentations, the Humalog Pricing Enterprise could not have achieved its common purpose.

346.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the prices of drugs that were sold to and utilized by thousands of class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

347.    The impacts of the Humalog Pricing Enterprise's scheme are still in place, *i.e.*, the increased spreads between the benchmark and real price of Humalog is still being maintained and increased. PBMs and pharmacies still profit from the spread between the benchmark and real prices of these drug, *i.e.*, the rebates.  Under this system, higher spreads result in increased profits for PBMs.

- 111 -

348.    The foregoing evidence that Eli Lilly, CVS Health, Express Scripts, and OptumRx were each willing participants in the Humalog Pricing Enterprise, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, to increase profits for both Eli Lilly and the PBMs through kickbacks to the PBMs and continued formulary status without real price reductions for Eli Lilly.

**B.    Conduct of the Humalog Pricing Enterprise**

349.    During the class period, Eli Lilly exerted control over the Humalog Pricing Enterprise and participated in the operation or management of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

a.    Eli Lilly selects and causes to be published the Humalog benchmark price;

b.    Eli Lilly periodically raises the published Humalog benchmark price and uses mail and interstate facilities to do so[75];

c.    Eli Lilly grants to the PBMs substantial rebates representing discounts off of the Humalog benchmark price in exchange for the PBMs' promise to give Humalog exclusive or at least favorable, formulary placement;

d.    Eli Lilly conceals from the public the amount and purpose of the rebates;

e.    Eli Lilly intends that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates

---

[75] *See, e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

(such as those applied to Humalog) saved health care payers and consumers like plaintiffs and class members money on their prescription needs; and

       f.    Eli Lilly represents to the general public, by stating Humalog's benchmark price without stating that this benchmark price differed substantially from that negotiated by the PBMs, that the Humalog benchmark price reflected or approximated Humalog's actual cost.

350.    The scheme has a hierarchical decision-making structure that was headed by Eli Lilly. Eli Lilly controlled the Humalog benchmark price, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Humalog would receive exclusive, or at least favorable, formulary placement.

351.    The PBMs also participate in the conduct of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

       a.    The PBMs promise to, and did, confer on Humalog exclusive or at least favorable formulary placement;

       b.    The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Humalog) save consumers like plaintiffs and class members money on their prescription needs; and

       c.    The PBMs conceal the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

352.    The scheme devised and implemented by Eli Lilly, as well as other members of the Humalog Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Humalog; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Humalog written by plan members' physicians.

- 113 -

C.      **Eli Lilly's Pattern of Racketeering Activity**

353.    Eli Lilly conducted and participated in the affairs of the Humalog Pricing

Enterprise through a pattern of racketeering activity, including acts that are indictable under 18

U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern

of racketeering activity by the Humalog Pricing Enterprise likely involved thousands of separate

instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful

Humalog pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions

constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively,

these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. §

1961(5), through which Eli Lilly and the PBMs intended to defraud plaintiffs, members of the

class, and other intended victims.

354.    Each instance of racketeering activity alleged herein was related, had similar

purposes, involved the same or similar participants and methods of commission, and had similar

results affecting similar victims, including plaintiffs and members of the class.  Eli Lilly and the

PBMs calculated and intentionally crafted the Humalog pricing scheme to ensure their own

profits remained high, without regard to the effect such pricing behavior had on plaintiffs and

members of the class who would be over-billed for Humalog.  In designing and implementing

the scheme, Eli Lilly was, at all times, cognizant of the fact that those in the distribution chain

who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs

in setting benchmark prices and establishing rebates.

355.    By intentionally and artificially inflating the Humalog benchmark price, and then

subsequently failing to disclose such practices to the individual consumers, Eli Lilly and the

PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of

racketeering activity.

010646-11 1006338 V1

356.    Eli Lilly's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive plaintiffs and members of the class.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Eli Lilly was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the class.  Eli Lilly has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Humalog Pricing Enterprise.

357.    The pattern of racketeering activity alleged herein and the Humalog Pricing Enterprise are separate and distinct from each other.  Likewise, Eli Lilly is distinct from the Humalog Pricing Enterprise.

358.    The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

**D.    Eli Lilly's Use of the U.S. Mail and Interstate Wire Facilities**

359.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning the Humalog benchmark price; the payment from Eli Lilly to the PBMs of substantial rebates off of the benchmark price; and transmission of false or incomplete statements intended to mislead health care payers and consumers regarding the existence, amount, and purpose of the rebates.

360.    During the class period, the Humalog Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

361.     The nature and pervasiveness of the Humalog pricing fraud scheme, which was orchestrated out of the corporate headquarters of Eli Lilly and each PBM, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

362.     Many of the precise dates of the Humalog Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Eli Lilly's, CVS Health's, Express Scripts', and OptumRx's books and records.  Indeed, an essential part of the successful operation of the Enterprise alleged herein depended on secrecy.  However, plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme.

363.     Eli Lilly's use of the U.S. Mail and interstate wire facilities to perpetrate the Humalog pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

a.     Marketing materials about Eli Lilly's Humalog product and its prices, which Eli Lilly sent to health care payers and health care providers located across the country;

b.     Written communications between Eli Lilly and the publishers of benchmark price compendia regarding the Humalog benchmark price and its subsequent mark-up, which occurred on a regular basis each year;

c.     Written representations and telephone calls between Eli Lilly and CVS Health regarding Humalog markups and benchmark prices;

d.     Written representations and telephone calls between Eli Lilly and Express Scripts regarding Humalog markups and benchmark prices;

010646-11 1006338 V1

e.      Written representations and telephone calls between Eli Lilly and OptumRx regarding Humalog markups and benchmark prices;

f.      Written representations and telephone calls between Eli Lilly and CVS Health regarding Humalog rebates;

g.      Written representations and telephone calls between Eli Lilly and Express Scripts regarding Humalog rebates;

h.      Written representations and telephone calls between Eli Lilly and OptumRx regarding Humalog rebates;

i.      Hundreds of e-mails between Eli Lilly and the PBMs agreeing to or effectuating the implementation of the Humalog pricing fraud scheme;

j.      Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Humalog benchmark prices were; the existence, amount, or purpose of the Humalog rebates; and the true costs of Humalog that were designed to conceal the scheme, deter investigations into Humalog pricing, or forestall changes to healthcare payers' reimbursement of Humalog prescriptions based on something other than Humalog benchmark prices; and

k.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

364.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Eli Lilly that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit consumers, like plaintiffs and class members.

**E.    Damages Caused by Eli Lilly's Humalog Pricing Fraud**

365.    Eli Lilly's violations of federal law and its pattern of racketeering activity have directly and proximately caused plaintiffs and class members to be injured in their business or property because plaintiffs and class members have paid inflated out-of-pocket expenses for Humalog.

366.    As described above, when a healthcare consumer fills a prescription for a drug like Humalog, she is responsible for paying all or a portion of the medication's cost.  If the consumer is uninsured, she is responsible for 100% of the drug's costs.  If the consumer has a high-deductible health plan, she must pay for 100% of her drug until she satisfies her deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drug cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug's cost until she reaches her maximum contribution.

367.    The amount of each of these cash payments is based on the drug's benchmark price.  Therefore, when Eli Lilly, through the Humalog Pricing Enterprise, artificially inflates the Humalog benchmark price, it also artificially inflates consumers' out-of-pocket expenses.

368.    Plaintiffs' injuries, and those of the class members, were proximately caused by Eli Lilly's racketeering activity.  But for the misstatements made by Eli Lilly and the PBMs and the pricing scheme employed by the Humalog Pricing Enterprise, plaintiffs and others similarly situated would have paid less for their out-of-pocket Humalog expenses.

369.    Plaintiffs' injuries were directly caused by Eli Lilly's racketeering activity.  Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible

payments (by private and public plan members), and payments made in the "Donut Hole" (for Medicare members). So, although the misstatements made by the PBMs in furtherance of the Humalog Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility. Therefore, the health care payers did not suffer the overcharges that are the harms alleged in this suit.

370. Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from Eli Lilly's fraudulent scheme.

371. By virtue of these violations of 18 U.S.C. § 1962(c), Eli Lilly is liable to plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT THREE**
**(AGAINST DEFENDANT SANOFI)**

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ.***

372. Plaintiffs Henry Appleby, Andre Arnold, Frank Barnett, Roseanna Barnett, Andrew Bauer, Julia Blanchette, James Bonser, Terry Brewster, Donald Chaires, Patricia Dague, Gay Deputee, Scott Dercks, Mary Ann Devins, Jane Doe, Donald Douthit, F. Donald Fellow, Sarah Gierer, Dianna Gilmore, Gerald Girard, Mark Goldsmith, Diane Halkyard, Sara Hasselbach, David Hernandez, Ritch Hoard, Michael Horton, Emma Jensen, Richard Knauss, Angela Kritselis, Susan Landis, Jeffrey Liedl, John Loschen, Robert Lowman, Sean Mac an Airchinnigh, Jeanne MacNitt, Lawrence Mandel, Russell Scott Palmer, Juliana Patton, Patricia Quint, Donna Ramsey, Marie Saffran, Bertha Sanders, Howard Schurr, Bret Stewart, Jon Ugland, Hector J. Valdes Jr., Andrew Van Houzen, Kim and Jim Wallan, and Karyn Wofford

(the Sanofi plaintiffs) hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

373.    This claim is brought on behalf of the class against Sanofi for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

374.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

375.    Plaintiffs and the members of the class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Sanofi's fraudulent scheme.

A.    The Lantus/Apidra/Toujeo Pricing Enterprise

376.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

377.    Sanofi formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Lantus/Apidra/Toujeo Pricing Enterprise.  The Lantus/Apidra/Toujeo Pricing Enterprise consists of (a) Sanofi, including its employees and agents; (b) the PBM CVS Health, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.[76]

---

[76] CVS Health, Express Scripts, and OptumRx are collectively referred to as the PBMs.

378.    The Lantus/Apidra/Toujeo Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common fraudulent purpose. This enterprise promotes a fraudulent payoff scheme that exchanges kickbacks or "rebates" for preferred formulary positions for Sanofi's long-acting analog insulin products, Lantus and Toujeo, and its rapid-acting analog insulin product, Apidra, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

379.    To accomplish this purpose, the Lantus/Apidra/Toujeo Pricing Enterprise periodically and systematically inflates the benchmark prices of Lantus, Apidra, and Toujeo and represents—either affirmatively or through half-truths and omissions—to the general public and consumers, including plaintiffs and the class, that Lantus, Apidra, and Toujeo's benchmark prices fairly and accurately reflect the actual cost of these drugs.  The Enterprise conceals from the general public and consumers, like plaintiffs and the class members, the existence and amount of steep rebates Sanofi gave to the PBMs in exchange for preferred formulary positions. These rebates were and are worth at least 25% of the benchmark prices.  The Lantus/Apidra/Toujeo Pricing Enterprise also conceals from the public the purpose of these "rebates": they ultimately result in higher profits for the drug manufacturers, through ensuring formulary access without requiring any real price reductions.  These "rebates" enable the drug manufacturers to secure favorable positions on the PBMs' formularies without offering the PBMs real price reductions.  The rebates function as kickbacks, ensuring the PBMs will not demand real price reductions in exchange for formulary status.  This scheme translated into larger profits for Sanofi than would have been possible if they had been forced to compete on real prices as well as larger spreads for the PBMs.

010646-11 1006338 V1

380.    The persons engaged in the Lantus/Apidra/Toujeo Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Sanofi.  There is regular communication between Sanofi and each of the PBMs: these entities share information regarding the Lantus, Apidra, and Toujeo benchmark prices and discuss and agree on rebate amounts.  Typically, this communication occurs, and has occurred, through the use of the wires and the mail.  Sanofi and the PBMs function as a continuing unit for the purposes of implementing the Lantus, Apidra, and Toujeo pricing scheme and, when issues arise during the scheme, each agrees to take actions to hide the scheme and continue its existence.

381.    At all relevant times, CVS Health has been aware of Sanofi's conduct, has been a knowing and willing participant in that conduct, and has reaped profits from that conduct.  CVS Health has struck rebate deals with Sanofi to conceal the true prices of Lantus, Apidra, and Toujeo and profit from the inflated rebates (kickbacks).  CVS Health has represented to the public that the rebates it negotiates save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs.  But it has known that the rebates did not and do not actually decrease the real costs of Lantus, Apidra, and Toujeo for consumers: The published benchmark prices were and are falsely inflated, and when consumers make payments at the point-of-sale, their transactions do not reflect the manufacturers' real, net prices.  CVS Health has also known, but has not disclosed, that the other PBMs—Express Scripts and OptumRx—were and are engaged in the same rebating schemes, to the detriment of consumers.  But for the Lantus/Apidra/Toujeo Pricing Enterprise's unlawful fraud, CVS Health would have the incentive to disclose the deceit by Sanofi.  By failing to disclose this information,

Sanofi and CVS Health perpetuate the Lantus/Apidra/Toujeo Pricing Enterprise's scheme, and continue to reap substantial profits.

382.    At all relevant times, Express Scripts has been aware of Sanofi's conduct, has been a knowing and willing participant in that conduct, and has reaped profits from that conduct. Express Scripts has struck rebate deals with Sanofi to conceal the true prices of Lantus, Apidra, and Toujeo and profit from the inflated rebates (kickbacks).  Express Scripts has represented to the public that the rebates it negotiates save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs.  But it has known that the rebates did not and do not actually decrease the real costs of Lantus, Apidra, and Toujeo for consumers: The published benchmark prices were and are falsely inflated, and when consumers make payments at the point-of-sale, their transactions do not reflect the manufacturers' real, net prices.  Express Scripts has also known, but has not disclosed, that the other PBMs—CVS Health and OptumRx—were and are engaged in the same rebating schemes, to the detriment of consumers.  But for the Lantus/Apidra/Toujeo Pricing Enterprise's unlawful fraud, Express Scripts would have the incentive to disclose the deceit by Sanofi.  By failing to disclose this information, Sanofi and Express Scripts perpetuate the Lantus/Apidra/Toujeo Pricing Enterprise's scheme, and continue to reap substantial profits.

383.    At all relevant times, OptumRx has been aware of Sanofi's conduct, has been a knowing and willing participant in that conduct, and has reaped profits from that conduct. OptumRx has struck rebate deals with Sanofi to conceal the true prices of Lantus, Apidra, and Toujeo and profit from the inflated rebates (kickbacks).  OptumRx has represented to the public that the rebates it negotiates save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs.  But it has known that the rebates

did not and do not actually decrease the real costs of Lantus, Apidra, and Toujeo for consumers: The published benchmark prices were and are falsely inflated, and when consumers make payments at the point-of-sale, their transactions do not reflect the manufacturers' real, net prices. OptumRx has also known, but has not disclosed, that the other PBMs—Express Scripts and CVS Health—were and are engaged in the same rebating schemes, to the detriment of consumers. But for the Lantus/Apidra/Toujeo Pricing Enterprise's unlawful fraud, OptumRx would have the incentive to disclose the deceit by Sanofi. By failing to disclose this information, Sanofi and OptumRx perpetuate the Lantus/Apidra/Toujeo Pricing Enterprise's scheme, and continue to reap substantial profits.

384.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs have not challenged Sanofi's reported benchmark prices, terminated their role in the Lantus/Apidra/Toujeo Pricing Enterprise, or disclosed publicly that the Lantus, Apidra, and Toujeo benchmark prices did not and do not accurately reflect the real, net prices of the drugs.

385.    Sanofi and CVS Health, Express Scripts, and OptumRx have participated in the conduct of the Lantus/Apidra/Toujeo Pricing Enterprise. They share the common fraudulent purpose of providing kickbacks in exchange for exclusive or favorable formulary positions for Lantus, Apidra, and Toujeo through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343. Sanofi and the PBMs knowingly made material misstatements to the general public in furtherance of the fraudulent scheme regarding:

a.      The actual prices of Lantus, Apidra, and Toujeo;

b.      The extent to which the real prices of Lantus, Apidra, and Toujeo departed from their published, artificially-inflated benchmark prices;

c.      The extent to which Sanofi and the PBMs negotiated the rebates discounting the benchmark prices of Lantus, Apidra, and Toujeo in good faith and for a proper purpose;

d.      Whether the rebates were intended to benefit plan members and/or the general public;

e.      Whether the rebates saved plan members and the general public money;

f.      Whether Lantus, Apidra, and Toujeo's "preferred" formulary status reflects the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

g.      Whether Lantus, Apidra, and Toujeo would have been placed in "preferred" formulary positions absent the rebates; and

h.      The extent to which the rebating scheme forces plan members to incur additional expenses for their Lantus, Apidra, and Toujeo prescriptions.

386.    Sanofi alone could not have accomplished the purpose of the Lantus/Apidra/Toujeo Pricing Enterprise without the assistance of the PBMs.  For Sanofi to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formularies, on which Lantus, Apidra, and Toujeo were given favorable treatment. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured significant discounts.  However, these discounts were only significant because Sanofi artificially inflated the benchmark prices of Lantus, Apidra, and Toujeo.  The discounts were fictitious, the result of a deliberate scheme to create large rebates without

- 125 -

lowering real prices.  Without these misrepresentations, the Lantus/Apidra/Toujeo Pricing

Enterprise could not have achieved its common purpose.

387.     The Lantus/Apidra/Toujeo Pricing Enterprise engaged in and affected interstate

commerce because, *inter alia*, it set the prices of drugs that were sold to and utilized by

thousands of class members throughout the United States, its territories, the District of Columbia,

and the Commonwealth of Puerto Rico.

388.     The impacts of the Lantus/Apidra/Toujeo Pricing Enterprise's scheme are still in

place, *i.e.*, the increased spreads between the benchmark and real prices of Lantus, Apidra, and

Toujeo are still being maintained and increased. PBMs and pharmacies still profit from the

spread between the benchmark and real prices of these drug, *i.e.*, the rebates.  Under this system,

higher spreads result in increased profits for PBMs.

389.     The foregoing evidence that Sanofi, CVS Health, Express Scripts, and OptumRx

were each willing participants in the Lantus/Apidra/Toujeo Pricing Enterprise, had a common

fraudulent purpose and interest in the objective of the scheme, and functioned within a structure

designed to effectuate the Enterprise's purpose, *i.e.*, to increase profits for both Sanofi and the

PBMs through kickbacks to the PBMs and continued formulary status without real price

reductions for Sanofi.

**B.      Conduct of the Lantus/Apidra/Toujeo Pricing Enterprise**

390.     During the class period, Sanofi exerted control over the Lantus/Apidra/Toujeo

Pricing Enterprise and participated in the operation or management of the affairs of the

Lantus/Apidra/Toujeo Pricing Enterprise, directly or indirectly, in the following ways:

a.      Sanofi selects and causes to be published the Lantus, Apidra, and Toujeo

benchmark prices;

        b.      Sanofi periodically raises the published Lantus, Apidra, and Toujeo benchmark prices and uses mail and interstate facilities to do so[77];

        c.      Sanofi grants to the PBMs substantial rebates representing discounts off of the Lantus, Apidra, and Toujeo benchmark prices in exchange for the PBMs' promise to give Lantus, Apidra, and Toujeo exclusive or at least favorable, formulary placement;

        d.      Sanofi conceals from the public the amount and purpose of the rebates;

        e.      Sanofi intends that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Lantus, Apidra, and Toujeo) saved health care payers and consumers like plaintiffs and class members money on their prescription needs; and

        f.      Sanofi represents to the general public, by stating Lantus, Apidra, and Toujeo's benchmark prices without stating that these benchmark prices differed substantially from those negotiated by the PBMs, that the Lantus, Apidra, and Toujeo benchmark prices reflected or approximated Lantus, Apidra, and Toujeo's actual costs.

391.    The scheme has a hierarchical decision-making structure that was headed by Sanofi.  Sanofi controlled the Lantus, Apidra, and Toujeo benchmark prices, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Lantus, Apidra, and Toujeo would receive exclusive, or at least favorable, formulary placement.

392.    The PBMs also participate in the conduct of the affairs of the Lantus/Apidra/Toujeo Pricing Enterprise, directly or indirectly, in the following ways:

---

[77] *See, e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

a.      The PBMs promise to, and did, confer on Lantus, Apidra, and Toujeo exclusive or at least favorable formulary placement;

b.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Lantus, Apidra, and Toujeo) save consumers like plaintiffs and class members money on their prescription needs; and

c.      The PBMs conceal the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

393.    The scheme devised and implemented by Sanofi, as well as other members of the Lantus/Apidra/Toujeo Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Lantus, Apidra, and Toujeo; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Lantus, Apidra, and Toujeo written by plan members' physicians.

C.      **Sanofi's Pattern of Racketeering Activity**

394.    Sanofi conducted and participated in the affairs of the Lantus/Apidra/Toujeo Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern of racketeering activity by the Lantus/Apidra/Toujeo Pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Lantus, Apidra, and Toujeo pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Sanofi and the PBMs intended to defraud plaintiffs, members of the class, and other intended victims.

395.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including plaintiffs and members of the class.  Sanofi and the PBMs calculated and intentionally crafted the Lantus, Apidra, and Toujeo pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on plaintiffs and members of the class who would be over-billed for Lantus, Apidra, and Toujeo.  In designing and implementing the scheme, Sanofi was, at all times, cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs in setting benchmark prices and establishing rebates.

396.    By intentionally and artificially inflating the Lantus, Apidra, and Toujeo benchmark prices, and then subsequently failing to disclose such practices to the individual consumers, Sanofi and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

397.    Sanofi's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive plaintiffs and members of the class.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Sanofi was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the class.  Sanofi has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Lantus/Apidra/Toujeo Pricing Enterprise.

398.    The pattern of racketeering activity alleged herein and the Lantus/Apidra/Toujeo Pricing Enterprise are separate and distinct from each other.  Likewise, Sanofi is distinct from the Lantus/Apidra/Toujeo Pricing Enterprise.

399.     The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

**D.     Sanofi's Use of the U.S. Mail and Interstate Wire Facilities**

400.     The Lantus/Apidra/Toujeo Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning the Lantus, Apidra, and Toujeo benchmark prices; the payment from Sanofi to the PBMs of substantial rebates off of the benchmark price; and transmission of false or incomplete statements intended to mislead health care payers and consumers regarding the existence, amount, and purpose of the rebates.

401.     During the class period, the Lantus/Apidra/Toujeo Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

402.     The nature and pervasiveness of the Lantus, Apidra, and Toujeo pricing fraud scheme, which was orchestrated out of the corporate headquarters of Sanofi and each PBM, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

403.     Many of the precise dates of the Lantus/Apidra/Toujeo Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Sanofi's, CVS Health's, Express Scripts', and OptumRx's books and records.  Indeed, an essential part of the successful operation of the Enterprise alleged herein depended on secrecy.  However, plaintiffs can

generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme.

404.     Sanofi's use of the U.S. Mail and interstate wire facilities to perpetrate the Lantus, Apidra, and Toujeo pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

a.      Marketing materials about Sanofi's Lantus, Apidra, and Toujeo products and their prices, which Sanofi sent to health care payers and health care providers located across the country;

b.      Written communications between Sanofi and the publishers of benchmark price compendia regarding the Lantus, Apidra, and Toujeo benchmark prices and their subsequent mark-ups, which occurred on a regular basis each year;

c.      Written representations and telephone calls between Sanofi and CVS Health regarding Lantus, Apidra, and Toujeo markups and benchmark prices;

d.      Written representations and telephone calls between Sanofi and Express Scripts regarding Lantus, Apidra, and Toujeo markups and benchmark prices;

e.      Written representations and telephone calls between Sanofi and OptumRx regarding Lantus, Apidra, and Toujeo markups and benchmark prices;

f.      Written representations and telephone calls between Sanofi and CVS Health regarding Lantus, Apidra, and Toujeo rebates;

g.      Written representations and telephone calls between Sanofi and Express Scripts regarding Lantus, Apidra, and Toujeo rebates;

h.      Written representations and telephone calls between Sanofi and OptumRx regarding Lantus, Apidra, and Toujeo rebates;

- 131 -

i.      Hundreds of e-mails between Sanofi and the PBMs agreeing to or effectuating the implementation of the Lantus, Apidra, and Toujeo pricing fraud scheme;

j.      Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Lantus, Apidra, and Toujeo benchmark prices were; the existence, amount, or purpose of the Lantus, Apidra, and Toujeo rebates; and the true costs of Lantus, Apidra, and Toujeo that were designed to conceal the scheme, deter investigations into Lantus, Apidra, and Toujeo pricing, or forestall changes to healthcare payers' reimbursement of Lantus, Apidra, and Toujeo prescriptions based on something other than Lantus, Apidra, and Toujeo benchmark prices; and

k.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

405.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Sanofi that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit consumers, like plaintiffs and class members.

**E.      Damages Caused by Sanofi's Lantus, Apidra, and Toujeo Pricing Fraud**

406.    Sanofi's violations of federal law and its pattern of racketeering activity have directly and proximately caused plaintiffs and class members to be injured in their business or property because plaintiffs and class members have paid inflated out-of-pocket expenses for Lantus, Apidra, and/or Toujeo.

407.    As described above, when a healthcare consumer fills a prescription for a drug like Lantus, Apidra, and/or Toujeo, she is responsible for paying all or a portion of the medication's cost.  If the consumer is uninsured, she is responsible for 100% of the drug's costs. If the consumer has a high-deductible health plan, she must pay for 100% of her drug until she

satisfies her deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drug cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug's cost until she reaches her maximum contribution.

408.    The amount of each of these cash payments is based on the drug's benchmark price.  Therefore, when Sanofi, through the Lantus/Apidra/Toujeo Pricing Enterprise, artificially inflates the Lantus, Apidra, and Toujeo benchmark prices, it also artificially inflates consumers' out-of-pocket expenses.

409.    Plaintiffs' injuries, and those of the class members, were proximately caused by Sanofi's racketeering activity.  But for the misstatements made by Sanofi and the PBMs and the pricing scheme employed by the Lantus/Apidra/Toujeo Pricing Enterprise, plaintiffs and others similarly situated would have paid less for their out-of-pocket Lantus, Apidra, and Toujeo expenses.

410.    Plaintiffs' injuries were directly caused by Sanofi's racketeering activity.  Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible payments (by private and public plan members), and payments made in the "Donut Hole" (for Medicare members).  So, although the misstatements made by the PBMs in furtherance of the Lantus/Apidra/Toujeo Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility.  Therefore, the health care payers did not suffer the overcharges that are the harms alleged in this suit.

411.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from Sanofi's fraudulent scheme.

412.    By virtue of these violations of 18 U.S.C. § 1962(c), Sanofi is liable to plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT FOUR
## VIOLATION OF THE NEW JERSEY
## CONSUMER FRAUD ACT AGAINST SANOFI
## (N.J.S.A. § 56:8-1, *ET SEQ.*)

413.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

414.    This claim is brought by Sanofi plaintiffs, on behalf of all members of the class. While plaintiffs and class members hail from across the country, Sanofi is a corporation with its headquarters in Bridgewater, New Jersey.  New Jersey "has a powerful incentive to ensure that local merchants deal fairly with citizens of other states and countries,"[78] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[79] Furthermore, New Jersey has some of the strongest consumer protection laws in the country so, although other states may have some interest in protecting their own consumers, that interest is not frustrated by the application of New Jersey's law.  "If a strong state policy or interest will

---

[78] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J.1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[79] *Kalow & Springut LLP v. Commence Corp.*, 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

[not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[80]

415.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."  N.J.S.A. § 56:8-2.

416.    Sanofi and plaintiffs are "persons" within the meaning of N.J.S.A. § 56:8-1(d).

417.    Sanofi engaged in "sales" of "merchandise" within the meaning of N.J.S.A. § 56:8-1(c), (d).

418.    As described above, through the Lantus/Apidra/Toujeo Pricing Enterprise, Sanofi engaged in deceptive business practices prohibited by state consumer protection laws, including: inflating the stated benchmark prices of Lantus, Apidra, and Toujeo; representing, affirmatively and through omission, that the Lantus, Apidra, and Toujeo benchmark prices were the prices of these drugs; concealing or misrepresenting the true prices of Lantus, Apidra, and Toujeo and the existence and amount of the benchmark-to-real price spreads amounting to a discount off the prices of Lantus, Apidra, and Toujeo; and engaging in other unconscionable, false, misleading or deceptive acts or practices in the conduct of trade or commerce.  Sanofi engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

---

[80] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the New Jersey CFA).

concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission, in connection with the pricing and sale of Lantus, Apidra, and Toujeo.

419.    From the outset, Sanofi knew, but did not disclose, that the benchmark prices it selected and published for Lantus, Apidra, and Toujeo did not reflect the true prices of the products: It knew of the substantial spread resulting in a windfall to the PBMs in exchange for the PBMs' agreement to grant Lantus and Apidra exclusive or at least favorable placement on the formulary.  Sanofi knew, but did not disclose, that the benchmark-to-real price spread did not result in a reduction in the prices paid by consumers who paid for all or part of their Lantus, Apidra, and Toujeo prescriptions out-of-pocket.  Sanofi knowingly and deliberately misled consumers regarding the purpose, existence, and amount of price reductions off the Lantus, Apidra, and Toujeo benchmark prices.

420.    By failing to disclose and by actively concealing this pricing deceit, Sanofi engaged in unfair and deceptive business practices in violation of the New Jersey CFA.  In the course of Sanofi's business, it willfully failed to disclose and actively concealed its misrepresentations regarding Lantus, Apidra, and Toujeo's prices.

421.    Sanofi intentionally and knowingly misrepresented material facts regarding the true prices of Lantus, Apidra, and Toujeo with the intent to mislead consumers, including plaintiffs.  As alleged above, Sanofi, through the Lantus/Apidra/Toujeo Pricing Enterprise, made material misstatements about the prices of Lantus, Apidra, and Toujeo and the existence and extent of the Lantus, Apidra, and Toujeo benchmark-to-real price spreads that were either false or misleading.

422.     Sanofi owed plaintiffs a duty to disclose the true prices of Lantus, Apidra, and Toujeo and the existence of rebates off of Lantus, Apidra, and Toujeo's benchmark prices because Sanofi:

a.     Possessed exclusive knowledge about the means by which they selected the benchmark prices for Lantus, Apidra, and Toujeo;

b.     Knew material non-public information regarding the existence and amount of price reductions off of Lantus, Apidra, and Toujeo's benchmark prices; and

c.     Made incomplete representations about the prices of Lantus, Apidra, and Toujeo, while purposefully withholding material facts from plaintiffs that contradicted these representations.

423.     Because Sanofi fraudulently concealed the true prices of Lantus, Apidra, and Toujeo, plaintiffs were deprived of the benefit of their bargain since they paid more than their pro-rata share of the actual prices of Lantus, Apidra, and Toujeo (*i.e.*, the price paid by PBMs after the artificially-inflated Lantus, Apidra, and Toujeo benchmark prices were reduced by the rebates).

424.     The truth about the actual price of these drugs, as distinguished from the inflated benchmark prices, would be material to a reasonable consumer.  As a result, Sanofi's concealment of the Lantus/Apidra/Toujeo pricing fraud was material to plaintiffs.  Had plaintiffs been aware of the true prices of Lantus, Apidra, and Toujeo, they would have demanded lower prices of Sanofi.

425.     Sanofi's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including plaintiffs, about the true prices of Lantus, Apidra, and Toujeo.

010646-11 1006338 V1

426.     Sanofi knew, or should have known, that its conduct violated state consumer protection laws.

427.     As a direct and proximate result of Sanofi's violations of the New Jersey CFA, plaintiffs have suffered injury-in-fact and/or actual damages.  As a direct result of Sanofi's misconduct, all plaintiffs incurred damages in at least the amount of money they paid out-of-pocket for Lantus, Apidra, and Toujeo.

428.     This wrongful conduct by Sanofi, coupled with the damage plaintiffs and class members incurred, entitles members of the class to relief under the New Jersey CFA.  Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J.S.A.  § 56:8-19, and any other just and appropriate relief.

**COUNT FIVE**
**VIOLATION OF THE NEW JERSEY**
**CONSUMER FRAUD ACT AGAINST NOVO NORDISK**
**(N.J.S.A. § 56:8-1, *ET SEQ.*)**

429.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

430.     This claim is brought by plaintiffs who paid for Levemir and Novolog, on behalf of all members of the class.  While plaintiffs and class members hail from across the country, Novo Nordisk Inc. is a corporation with its headquarters in Plainsboro, New Jersey.  New Jersey "has a powerful incentive to ensure that local merchants deal fairly with citizens of other states and countries,"[81] and a "strong interest 'in regulating its domestic businesses and in deterring

---

[81] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J.1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

fraudulent business practices.'"[82]  Furthermore, New Jersey has some of the strongest consumer

protection laws in the country so, although other states may have some interest in protecting their

own consumers, that interest is not frustrated by the application of New Jersey's law.  "If a

strong state policy or interest will [not be] frustrated by the failure to apply [that state's law], it is

highly unlikely that that state has any interest whatsoever in blanketing that particular issue with

its law."[83]

431.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any

person of any unconscionable commercial practice, deception, fraud, false pretense, false

promise, misrepresentation, or the knowing concealment, suppression or omission of any

material fact with the intent that others rely upon such concealment, suppression or omission, in

connection with the sale or advertisement of any merchandise or real estate, or with the

subsequent performance of such person as aforesaid, whether or not any person has in fact been

misled, deceived or damaged thereby . . . ."  N.J.S.A. § 56:8-2.

432.    Novo Nordisk and plaintiffs are "persons" within the meaning of N.J.S.A.  § 56:8-

1(d).

433.    Novo Nordisk engaged in "sales" of "merchandise" within the meaning of

N.J.S.A. § 56:8-1(c), (d).

434.    As described above, through the Levemir/Novolog Pricing Enterprise, Novo

Nordisk engaged in deceptive business practices prohibited by state consumer protection laws,

including: inflating the stated benchmark prices of Levemir and Novolog; representing,

---

[82] *Kalow & Springut LLP v. Commence Corp.*, 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

[83] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the New Jersey CFA).

affirmatively and through omission, that the Levemir and Novolog benchmark prices were the prices of Levemir and Novolog; concealing or misrepresenting the true prices of Levemir and Novolog and the existence and amount of the benchmark-to-real price spread amounting to discounts off the prices of Levemir and Novolog; and engaging in other unconscionable, false, misleading or deceptive acts or practices in the conduct of trade or commerce. Novo Nordisk engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission, in connection with the pricing and sales of Levemir and Novolog.

435.    From the outset, Novo Nordisk knew, but did not disclose, that the benchmark prices it selected and published for Levemir and Novolog did not reflect the true prices of the products. It knew of the substantial spread resulting in a windfall to the PBMs in exchange for the PBMs' agreement to grant Levemir and Novolog exclusive or at least favorable placements on the formulary. Novo Nordisk knew, but did not disclose, that the benchmark-to-real price spread did not result in a reduction in the prices paid by consumers who paid for all or part of Levemir and/or Novolog prescriptions out-of-pocket. Novo Nordisk knowingly and deliberately misled consumers regarding the purpose, existence, and amount of price reductions off Levemir and Novolog's benchmark prices.

436.    By failing to disclose and by actively concealing this pricing deceit, Novo Nordisk engaged in unfair and deceptive business practices in violation of the New Jersey CFA. In the course of Novo Nordisk's business, it willfully failed to disclose and actively concealed its misrepresentations regarding Levemir and Novolog's prices.

437.    Novo Nordisk intentionally and knowingly misrepresented material facts regarding the true prices of Levemir and Novolog with the intent to mislead consumers, including plaintiffs.  As alleged above, Novo Nordisk, through the Levemir/Novolog Pricing Enterprise, made material misstatements about the prices of Levemir and Novolog and the existence and extent of the Levemir and Novolog benchmark-to-real price spreads that were either false or misleading.

438.    Novo Nordisk owed plaintiffs a duty to disclose the true prices of Levemir and Novolog and the existence of rebates off of Levemir and Novolog's benchmark prices because Novo Nordisk:

a.    Possessed exclusive knowledge about the means by which it selected the benchmark prices for Levemir and Novolog;

b.    Knew material non-public information regarding the existence and amount of price reductions off of Levemir and Novolog's benchmark price; and

c.    Made incomplete representations about the prices of Levemir and Novolog, while purposefully withholding material facts from plaintiffs that contradicted these representations.

439.    Because Novo Nordisk fraudulently concealed the true price of Levemir and Novolog, plaintiffs were deprived of the benefit of their bargain since they paid more than their pro-rata share of the actual prices of Levemir and Novolog (*i.e.*, the price paid by PBMs after the artificially-inflated Levemir and Novolog benchmark prices were reduced by the rebates).

440.    The truth about actual prices of these drugs, as distinguished from the inflated benchmark prices, would be material to a reasonable consumer.  As a result, Novo Nordisk's

concealment of the Levemir and Novolog pricing fraud was material to plaintiffs.  Had plaintiffs

been aware of the true prices of Levemir and Novolog, they would have demanded lower prices.

441.    Novo Nordisk's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including plaintiffs, about the true prices of Levemir and

Novolog.

442.    Novo Nordisk knew, or should have known, that its conduct violated state

consumer protection laws.

443.    As a direct and proximate result of Novo Nordisk's violations of the New Jersey

CFA, plaintiffs have suffered injury-in-fact and/or actual damages.  As a direct result of Novo

Nordisk's misconduct, all plaintiffs incurred damages in at least the amount of money they paid

out-of-pocket for Levemir and Novolog.

444.    This wrongful conduct by Novo Nordisk, coupled with the damage plaintiffs and

class members incurred, entitles members of the class to relief under the New Jersey CFA.

Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining

unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J.S.A.

§ 56:8-19, and any other just and appropriate relief.

**COUNT SIX**
**VIOLATION OF THE NEW JERSEY**
**CONSUMER FRAUD ACT AGAINST ELI LILLY, SANOFI, AND NOVO NORDISK**
**(N.J.S.A. § 56:8-1, *ET SEQ*.)**

439.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint.

440.    In addition to prohibiting fraudulent and deceptive conduct, the New Jersey

Consumer Fraud Act prohibits unconscionable conduct.

441.    Unconscionability "is an amorphous concept obviously designed to establish a broad business ethic.  The standard of conduct that the term 'unconscionable' implies is a lack of good faith, honesty in fact and observance of fair dealing."[84]  Unconscionable practices include performance of an agreement, in addition to inducing a purchase.[85]  Charging a price far in excess of the seller's costs, combined with taking advantage of an unfair situation, is an unconscionable practice contrary to the Consumer Fraud Act.[86]

442.    As is set forth above, the prices paid by consumers for insulin have been skyrocketing, but for no reason other than Novo Nordisk, Eli Lilly, and Sanofi can charge more.

443.    The analog insulin they are producing now has not changed since it entered the marketplace in the 1990s and 2000s.  It is no more effective and provides no more benefit, but the benefit it provides is crucial to consumers.  It is literally a life or death product.

444.    Moreover, there is no economic or technological reason why insulin would have become more expensive to produce during the time period outlined above.  Indeed, with technological advances and economies of scale, the per-unit cost of insulin should have gone down during the same time period that the drug makers were drastically raising prices, allowing the drug makers to generate unconscionable profits.

445.    The drug makers were able to raise the selling price of insulin because consumers with diabetes literally have no choice but to purchase and use insulin.  If they do not, they will

---

[84]    *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 543-44 (1971)).

[85]    *Pollitt v. DRS Towing LLC*, No. 10-1285 (AET), 2011 WL 1466378, at *7 (D.N.J. 2011) (citing *New Mea Construction Corp. v. Harper*, 203 N.J. Super. 486, 501 (App. Div. 1985)).

[86]    *Kugler v. Romain*, 58 N.J. 522, 542-45 (1971); *In re Nat'l Credit Mgt. Group, LLC*, 21 F. Supp. 2d 424, 452-53 (D.N.J. 1998); *In re Fleet*, 95 B.R. 319, 336 (E.D. Pa. 1989); *Pro v. Hertz Equipment Rental*, No. 06-cv-03830, 2012 WL 12906183 (D.N.J. June 25, 2012).

die, and the drug makers know it.  Even cutting back on insulin to save money, as is described above, can lead to serious health consequences.

446.     The increasingly larger rebates paid to PBMs are a way of giving the PBMs a slice of this increasingly larger pie to ensure that the PBMs continue to keep the defendant's products on formulary so they can continue to charge unconscionable prices to consumers and reap unconscionable profits.

447.     These actions are made all the more unconscionable by the fact that the rate of diabetes is rising in the U.S., giving drug makers and PBMs more people to take advantage of. Moreover, each of the drug makers knows that the others have not and will not compete on price for insulin.  Even in the absence of collusion, it is in each of the drug makers' individual best interest to not compete on price because doing so would lead to a price war which would upset the unconscionable profits being earned by all of them.

448.     The plaintiffs and other class members have suffered ascertainable losses as a result of the defendants' unconscionable practices in the amount by which defendants overcharged for insulin above a reasonable price had market forces been able to work.

**FACTUAL ALLEGATIONS RELEVANT TO COUNTS SEVEN THROUGH SIXTY**

445.     The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

446.     In addition to violating RICO, the defendants' conduct set forth above constitutes unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various states' consumer protection statutes.

447.     As described above, through the Levemir/Novolog, Humalog, and Lantus/Apidra/Toujeo Pricing Enterprises, the defendants engaged in deceptive business practices prohibited by state consumer protection laws including: inflating the stated benchmark

prices of Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo to achieve an unlawful

purpose; making false or misleading statements regarding the real prices of Levemir, Novolog,

Humalog, Lantus, and Apidra and the existence and amount of the benchmark-to-real price

spread; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in

the conduct of trade or commerce.  The truth about the real prices of Levemir, Novolog,

Humalog, Lantus, Apidra, and Toujeo as distinguished from the inflated benchmark prices,

would be material to a reasonable consumer.

448.    The defendants also engaged in unlawful trade practices by employing deception,

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission

of material facts with the intent that others rely on such concealment, suppression, or omission,

in connection with the pricing and sale of Levemir, Novolog, Humalog, Lantus, Apidra, and

Toujeo.

449.    From the outset, the defendants knew, but did not disclose, that the benchmark

prices they selected and published for Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo

did not reflect the real prices of those products.  The defendants substantially inflated their

benchmark prices so they could offer larger spreads to the PBMs in exchange for favorable

formulary positions.  The defendants knew, but did not disclose, that the benchmark-to-real price

spreads did not reduce the prices paid by consumers who purchased Levemir, Novolog,

Humalog, Lantus, Apidra, and Toujeo prescriptions based on benchmark price.  The defendants

knowingly and deliberately misled consumers regarding the pricing of Levemir, Novolog,

Humalog, Lantus, Apidra, and Toujeo.

450.    By failing to disclose and actively concealing this pricing deceit, the defendants

engaged in unfair and deceptive business practices in violation of state consumer protection laws.

- 145 -

In the course of their business, the defendants willfully failed to disclose and actively concealed their misrepresentations regarding Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo's prices.

451.    The defendants intentionally and knowingly misrepresented material facts regarding the true prices of Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo with the intent to mislead consumers, including the plaintiffs.  As alleged above, the defendants, through the Levemir/Novolog, Humalog, and Lantus/Apidra/Toujeo Pricing Enterprises, made material misstatements about the prices of Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo and the existence and extent of rebates on these drugs.  These misstatements were either false or misleading.

452.    The defendants owed the plaintiffs a duty to disclose the true price of Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo and the existence of rebates off of the defendants' benchmark prices because the defendants:

a.      Possessed exclusive knowledge about the benchmark prices of Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo;

b.      Knew material, non-public information regarding rebates off of Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo's benchmark prices; and

c.      Made incomplete representations about the prices of Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo, while purposefully withholding material facts from the plaintiffs that contradicted these representations.

453.    Because the defendants fraudulently concealed the true prices of Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo, the plaintiffs were deprived of the benefit of their bargain: they overpaid for Levemir, Novolog, Humalog, Lantus, Apidra, and/or Toujeo.

454.    The defendants' concealment of the Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo pricing fraud was material to the plaintiffs.  Had the plaintiffs known that the real prices of these drugs were much lower, they would have demanded lower prices from the defendants when they paid for these drugs based on benchmark price.

455.    The defendants' unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including the plaintiffs, about the true prices of Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo.

456.    The defendants knew, or should have known, that their conduct violated state consumer protection laws.

457.    As a direct and proximate result of the defendants' violations of state consumer protection laws, the plaintiffs have suffered injury-in-fact and/or actual damages.  As a direct result of the defendants' misconduct, all plaintiffs incurred damages in at least the amount of money they paid out-of-pocket for Levemir, Novolog, Humalog, Lantus, Apidra, and Toujeo.

458.    This wrongful conduct by the defendants, coupled with the damage incurred by the plaintiffs and class members, entitles members of the class to relief under the consumer protection laws of the state in which each plaintiff or class member resides, as set forth below.

### COUNT SEVEN
### VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT
### (ALA. CODE § 8-19-1, *ET SEQ.*)

459.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

460.    This claim is brought by plaintiffs on behalf of residents of Alabama who are members of the class.

461.    The Alabama Deceptive Trade Practices Act (Alabama DTPA) declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact

concerning the reasons for, existence of, or amounts of, price reductions"; and "(27) engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."  Ala. Code § 8-19-5.

462.    Plaintiffs and class members are "consumers" within the meaning of Ala. Code. § 8-19-3(2).

463.    Plaintiffs, class members, Novo Nordisk, Eli Lilly, and Sanofi are "persons" within the meaning of Ala. Code § 8-19-3(3).

464.    Each defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

465.    Pursuant to Ala. Code § 8-19-10, plaintiffs seek monetary relief against defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

466.    Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code. § 8-19-1 *et seq.*

467.    On January 24, 2017, and January 25, 2017, certain plaintiffs sent letters complying with Ala. Code § 8-19-10(e) to defendants.  Because these defendants failed to remedy their unlawful conduct within the requisite time period, plaintiffs seek all damages and relief to which they are entitled.

**COUNT EIGHT**
**VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER
PROTECTION ACT
(ALASKA STAT. ANN. § 45.50.471, *ET SEQ.*)**

468.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

469.     This claim is brought by plaintiffs on behalf of residents of Alaska who are members of the class.

470.     The Alaska Unfair Trade Practices and Consumer Protection Act (Alaska CPA) declared unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "(10) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged."  Alaska Stat. Ann. § 45.50.471.

471.     Pursuant to Alaska Stat Ann. § 45.50.531, plaintiffs seek monetary relief against each defendant measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each plaintiff.

472.     Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. Ann. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

473.     On January 24, 2017, and January 25, 2017, plaintiffs sent letters complying with Alaska Stat. Ann. § 45.50.535(b)(1) to defendants.

**COUNT NINE**
**VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT**
**(ARIZONA REV. STAT. § 44-1521, *ET SEQ.*)**

474.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

475.     This claim is brought by plaintiffs on behalf of residents of Arizona who are members of the class.

476.     The Arizona Consumer Fraud Act (Arizona CFA) provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  Ariz. Rev. Stat. § 44-1522(A).

477.     Defendants, plaintiffs, and class members are "persons" within the meaning of the Arizona CFA, Ariz. Rev. Stat. § 44-1521(6).

478.     Each drug at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

479.     Defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

480.     Pursuant to the Arizona CFA, plaintiffs seek monetary relief against each defendant in an amount to be determined at trial.  Plaintiffs also seek punitive damages because each defendant engaged in aggravated and outrageous conduct with an evil mind.

481.     Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT TEN
## VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### (ARK. CODE ANN. § 4-88-101 *ET SEQ.*)

482.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

- 150 -

483.    This claim is brought by plaintiffs on behalf of residents of Arkansas who are members of the class.

484.    The Arkansas Deceptive Trade Practices Act (Arkansas DTPA) prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, "[e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce, or trade."  Ark. Code. Ann. § 4-88-107(a)(10).  The Arkansas DTPA also prohibits, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." Ark Code. Ann. § 4-88-108.

485.    Defendants, plaintiffs, and class members are "persons" within the meaning of Ark. Code. Ann. § 4-88-102(5).

486.    Each drug at issue constitutes "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

487.    Plaintiffs seek monetary relief against defendants in an amount to be determined at trial.  Plaintiffs also seek punitive damages because defendants acted wantonly in causing plaintiffs' and class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

488.    Plaintiffs also seek an order enjoining defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT ELEVEN
## VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
## (CAL. CIV. CODE § 1750, *ET SEQ.*)

489.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

490.    This claim is brought by plaintiffs on behalf of residents of California who are members of the class.

491.    The California Legal Remedies Act (CLRA) prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"  Cal. Civ. Code § 1770(a).

492.    Each defendant is a "person" under Cal. Civ. Code § 1761(c).

493.    Plaintiffs and class members are "consumers" as defined by Cal. Civ. Code § 1761(d), who purchased one or more prescriptions of each drug at issue.

494.    Plaintiffs seek injunctive relief under the CLRA.  On January 24, 2017, and January 25, 2017, plaintiffs sent demand letters pursuant to the Cal. Civ. Code § 1782(d).

495.    Plaintiffs seek, under Cal. Civ. Code § 1780(a), monetary relief against defendants Novo Nordisk, Eli Lilly, and Sanofi for the harm caused by defendants' violations of the CLRA as alleged herein.

496.    Under Cal. Civ. Code § 1780(b), plaintiffs seek an additional award against each defendant of up to $5,000 for each plaintiff or class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Each defendant knew or should have known that its conduct was directed to one or more plaintiffs or class members who are senior citizens or disabled persons.  Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled

- 152 -

person.  One or more plaintiffs or class members who are senior citizens or disabled persons are substantially more vulnerable to each defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from each defendant's conduct.

497.    Plaintiffs further seek an order enjoining defendants' unfair or deceptive acts or practices, restitution, costs of court, and attorneys' fees pursuant to Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

498.    Plaintiffs have sent letters complying with Cal. Civ. Code § 1780(b) on January 24, 2017, and January 25, 2017 to defendants.

**COUNT TWELVE**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)**

499.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

500.    This claim is brought by plaintiffs on behalf of residents of California who are members of the class.

501.    California Business and Professions Code § 17200 (the Unfair Competition Law, or UCL) prohibits "unlawful, unfair, or fraudulent business acts or practices."  Defendants violated the "unlawful" prong of § 17200 by their violations of the CLRA, Cal. Civ. Code § 1750, *et seq.*, as described above.  Defendants also violated the "fraudulent" prong of § 17200 through their pricing fraud, as described throughout this complaint.  In addition, defendants violated the "unfair" prong of § 17200 because the acts and practices set forth in this complaint, including artificially inflating benchmark prices to offer large rebates to the PBMs caused defendants and the PBMs to profit at the expense of consumers, and the harm caused to consumers greatly outweighs any benefits associated with those practices.

502.     Defendants' actions, as set forth above, occurred within the conduct of their business and in trade or commerce.

503.     Plaintiffs request that this Court enter such orders or judgments as may be necessary, including a declaratory judgment that each defendant has violated the UCL; an order enjoining defendants from continuing their unfair, unlawful and/or fraudulent trade practices; an order restoring to plaintiffs any money lost as result of each defendant's unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits defendants received as a result of their unfair, unlawful, or fraudulent practices, as provided in Cal. Bus. & Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code § 3345; and for any other relief as may be just and proper.

## COUNT THIRTEEN
## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### (COLO. REV. STAT. § 6-1-101, *ET SEQ.*)

504.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

505.     This claim is brought by plaintiffs on behalf of residents of Colorado who are members of the class.

506.     The Colorado Consumer Protection Act (Colorado CPA) prohibits deceptive practices in the course of a person's business including, but not limited to, "mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;" and "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."  Colo. Rev. Stat. § 6-1-105.

507.     Each defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

508.     Plaintiffs and class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a).

509.     Each defendant's conduct, as set forth above, occurred in the conduct or trade or commerce.

510.     Pursuant to Colo. Rev. Stat. § 6-1-113, plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each plaintiff or class member.

511.     Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

## COUNT FOURTEEN
## VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
## (CONN. GEN. STAT. § 42-110A, *ET SEQ.*)

512.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

513.     This claim is brought by plaintiffs on behalf of residents of Connecticut who are members of the class.

514.     The Connecticut Unfair Trade Practices Act (Connecticut UTPA) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).

515.     Each defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

516.     Defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

010646-11 1006338 V1

517.     Plaintiffs and class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

518.     Defendants acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others.  Therefore, punitive damages are warranted.

**COUNT FIFTEEN**
**VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT**
**(DEL. CODE TIT. 6, § 2513, *ET SEQ.*)**

519.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

520.     This claim is brought by plaintiffs on behalf of residents of Delaware who are members of the class.

521.     The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby."  Del. Code tit. 6, § 2513(a).

522.     Each defendant is a "person" within the meaning of Del. Code tit. 6, § 2511(7).

523.     Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

524.     Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of each defendant's unlawful conduct.  *See*, *e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980).  Plaintiffs also seek an order enjoining

- 156 -

each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

525.    Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT SIXTEEN
## VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT
## (D.C. CODE § 28-3901, *ET SEQ.*)

526.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

527.    This claim is brought by plaintiffs on behalf of residents of the District of Columbia who are members of the class.

528.    The Consumer Protection Procedures Act (District of Columbia CPPA) states: "it shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to," *inter alia*, "(f) fail to state a material fact if such failure tends to mislead;" "(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead;" "(j) make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time;" or "(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices."  D.C. Code § 28-3904.

529.    Each defendant is a "person" under D.C. Code § 28-3901(a)(1).

530.    Plaintiffs and class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased the drugs at issue.

531.    Defendants' actions as set forth in this complaint constitute "trade practices" under D.C. Code § 28-3901.

532.     Plaintiffs and class members are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the court deems proper, under D.C. Code § 28-3901.

533.     Plaintiffs seek punitive damages against defendants because defendants' conduct evidences malice and/or egregious conduct.  Defendants misrepresented the actual prices of these drugs, inflated the benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase their profits at the expense of consumers.  They manipulated the price of their life-saving products without regard to the impact of their scheme on consumers' ability to afford to buy products necessary to sustain their life.  Defendants' conduct constitutes malice warranting punitive damages.

## COUNT SEVENTEEN
## VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
## (FLA. STAT. § 501.201, *ET SEQ.*)

534.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

535.     This claim is brought by plaintiffs on behalf of residents of Florida who are members of the class.

536.     The Florida Unfair and Deceptive Trade Practices Act (FUDTPA) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

537.     Plaintiffs and class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

538.     Each defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

539.    Plaintiffs are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

540.    Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

**COUNT EIGHTEEN**
**VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT**
**(GA. CODE ANN. § 10-1-390, *ET SEQ*.)**

541.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

542.    This claim is brought by plaintiffs on behalf of residents of Georgia who are members of the class.

543.    The Georgia Fair Business Practices Act (Georgia FBPA) declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 101-393(b), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

544.    Plaintiffs and class members are "consumers" within the meaning of Ga. Code. Ann. § 10-1-393(b).

545.    Each defendant engaged in "trade or commerce" within the meaning of Ga. Code. Ann. § 10-1-393(b).

- 159 -

546.    Plaintiffs are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a).

547.    Plaintiffs also seek an order enjoining defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann. § 10-1-399. 547.

548.    On January 24 and 25, 2017, certain plaintiffs sent letters complying with Ga. Code Ann. § 10-1-399(b) to defendants.

### COUNT NINETEEN
### VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (GA. CODE. ANN § 10-1-370, *ET SEQ.*)

549.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

550.    This claim is brought by plaintiffs on behalf of residents of Georgia who are members of the class.

551.    Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include "[m]ak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  Ga. Code. Ann § 10-1-372(a).

552.    Defendants, plaintiffs, and class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

553.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

## COUNT TWENTY
## VIOLATION OF THE HAWAII ACT § 480-2(A)
## (HAW. REV. STAT. § 480, *ET SEQ.*)

554.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

555.    This claim is brought by plaintiffs on behalf of residents of Hawaii who are members of the class.

556.    Hawaii Rev. Stat. § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

557.    Each defendant is a "person" under Haw. Rev. Stat. § 480-1.

558.    Plaintiffs and class members are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1, who purchased the drug at issue.

559.    Pursuant to Haw. Rev. Stat. § 480-13, plaintiffs seek monetary relief against each defendant measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

560.    Under Haw. Rev. Stat. § 480-13.5, plaintiffs seek an additional award against each Defendant of up to $10,000 for each violation directed at a Hawaii elder.  Each defendant knew or should have known that its conduct was directed to one or more plaintiffs who are elders.  Defendants' conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  Plaintiffs who are elders are substantially more vulnerable to defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from each defendant's conduct.

## COUNT TWENTY-ONE
## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
## (IDAHO CODE ANN. § 48-601, *ET SEQ.*)

561.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

562.    This claim is brought by plaintiffs on behalf of residents of Idaho who are members of the class.

563.    The Idaho Consumer Protection Act (Idaho CPA) prohibits deceptive business practices, including, but not limited to, "(11) [m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(17) [e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer;" or "(18) engaging in any unconscionable method, act or practice in the conduct of trade or commerce," Idaho Code Ann. § 48-603.

564.    Each defendant is a "person" under Idaho Code Ann. § 48-602(1).

565.    Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

566.    Pursuant to Idaho Code § 48-608, plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each plaintiff.

567.    Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

568.    Plaintiffs also seek punitive damages against defendants because each defendant's conduct evidences an extreme deviation from reasonable standards.  Defendants flagrantly, maliciously, and fraudulently misrepresented the actual cost of their analog insulin products and

the existence, purpose, and amount of the rebates granted to the PBMs; and concealed facts that only they knew.  Defendants' unlawful conduct constitutes malice, oppression and fraud warranting punitive damages.

### COUNT TWENTY-TWO
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILL. COMP. STAT. § 505/1, *ET SEQ*. AND 720 ILL. COMP. STAT. § 295/1A)

569.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

570.    This claim is brought by plaintiffs on behalf of residents of Illinois who are members of the class.

571.    The Illinois Consumer Fraud and Deceptive Business Practices Act (Illinois CFA) prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, tales promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby."  815 Ill. Comp. Stat. § 505/2.

572.    Each defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. § 505/1(c).

573.    Plaintiffs and class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

574.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), plaintiffs seek monetary relief against each defendant in the amount of actual damages, as well as punitive damages because defendants each acted with fraud and/or malice and/or was grossly negligent.

575.    Plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1 *et seq.*

## COUNT TWENTY-THREE
## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
## (IND. CODE § 24-5-0.5-3)

576.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

577.    This claim is brought by plaintiffs on behalf of residents of Indiana who are members of the class.

578.    Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to representations that "a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not." Ind. Code § 24-5-0.5-3(b).

579.    Each defendant is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2), and a "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

580.    Plaintiffs' payments for insulin are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

581.    Pursuant to Ind. Code § 24-5-0.5-4, plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1000 for defendants' willfully deceptive acts.

582.    Plaintiffs also seek punitive damages based on the outrageousness and recklessness of each defendant's conduct.

583.     On January 24, 2017, and January 25, 2017, certain plaintiffs sent letters complying with Ind. Code § 24-5-0.5-5(a) to defendants.  Because each defendant failed to remedy its unlawful conduct within the requisite time period, plaintiffs seek all damages and relief to which they are entitled.

**COUNT TWENTY-FOUR**
**VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER**
**FRAUDS ACT**
**(IOWA CODE § 714H.1, *ET SEQ.*)**

584.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

585.     This claim is brought by plaintiffs on behalf of residents of Iowa who are members of the class.

586.     The Iowa Private Right of Action for Consumer Frauds Act (Iowa CFA) prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection with the advertisement, sale, or lease of consumer merchandise."  Iowa Code § 714H.3.

587.     Each defendant is a "person" under Iowa Code § 714H.2(7).

588.     Plaintiffs and class members are "consumers" as defined by Iowa Code § 714H.2(3), who purchased insulin.

589.     Pursuant to Iowa Code § 714H.5, plaintiffs seek an order enjoining each defendant's unfair and/or deceptive acts or practices; actual damages; and statutory damages up to three times the amount of actual damages awarded as a result of each defendant's willful and

wanton disregard for the rights and safety of others; attorneys' fees; and other such equitable

relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

### COUNT TWENTY-FIVE
### VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### (KAN. STAT. ANN. § 50-623, *ET SEQ.*)

590.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by

reference the allegations contained in the preceding paragraphs of this Complaint.

591.    This claim is brought by plaintiffs on behalf of residents of Kansas who are

members of the class.

592.    The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall

engage in any deceptive act or practice in connection with a consumer transaction."  Kan. Stat.

Ann. § 50-626(a).  Deceptive acts or practices include, but are not limited to, "the willful use, in

any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a

material fact;" "the willful failure to state a material fact, or the willful concealment, suppression

or omission of a material fact;" "making false or misleading representations, knowingly or with

reason to know, of fact concerning the reason for, existence of or amounts of price reductions,"

"whether or not any consumer has in fact been misled."  Kan. Stat. Ann. § 50-626.

593.    Plaintiffs and class members are "consumers" within the meaning of Kan. Stat.

Ann. § 50-624(b), who purchased insulin.

594.    The sale of insulin to plaintiffs was a "consumer transaction" within the meaning

of Kan. Stat. Ann. § 50-624(c).

595.    Pursuant to Kan. Stat. Ann. § 50-634, plaintiffs seek monetary relief against each

defendant measured as the greater of (a) actual damages in an amount to be determined at trial

and (b) statutory damages in the amount of $10,000 for each plaintiff.

596.     Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

## COUNT TWENTY-SIX
## VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
## (KY. REV. STAT. ANN. § 367.110, *ET SEQ.*)

597.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

598.     This claim is brought by plaintiffs on behalf of residents of Kentucky who are members of the class.

599.     The Kentucky Consumer Protection Act (Kentucky CPA) makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ."  Ky. Rev. Stat. Ann. § 367.170(1).

600.     Defendants, plaintiffs, and class members are "persons" within the meaning of Ky. Rev. Stat. Ann. § 367.110(1).

601.     Each defendant engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

602.     Pursuant to Ky. Rev. Stat. Ann. § 367.220, plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining each defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

## COUNT TWENTY-SEVEN
## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW
## (LA. REV. STAT. ANN. § 51:1401, *ET SEQ.*)

603.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

604.    This claim is brought by plaintiffs on behalf of residents of Louisiana who are members of the class.

605.    The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana CPL) makes unlawful "deceptive acts or practices in the conduct of any trade or commerce."  La. Rev. Stat. Ann. § 51:1405(A).

606.    Defendants, plaintiffs, and class members are "persons" within the meaning of La. Rev. Stat. Ann. § 51:1402(8).

607.    Plaintiffs and class members are "consumers" within the meaning of La. Rev. Stat. Ann. § 51:1402(1).

608.    Each defendant engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. Ann. § 51:1402(9).

609.    Pursuant to La. Rev. Stat. Ann. § 51:1409, plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for knowing violations of the Louisiana CPL; an order enjoining each defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. Ann. § 51:1409.

## COUNT TWENTY-EIGHT
## VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### (ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*)

610.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

611.    This claim is brought by plaintiffs on behalf of residents of Maine who are members of the class.

612.    The Maine Unfair Trade Practices Act (Maine UTPA) makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  Me. Rev. Stat. Ann. tit. 5, § 207.

613.    Defendants, plaintiffs, and class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

614.    Defendants are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

615.    Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213, plaintiffs seek an order enjoining each defendant's unfair and/or deceptive acts or practices.

616.    On January 24, 2017, and January 25, 2017, plaintiffs sent letters complying with Me. Rev. Stat. Ann. tit. 5, § 213(1-A) to defendants.  Because these defendants failed to remedy their unlawful conduct within the requisite time period, plaintiffs seek all damages and relief to which they are entitled.

## COUNT TWENTY-NINE
## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### (MD. CODE, COM. LAW § 13-101, *ET SEQ.*)

617.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

010646-11 1006338 V1

618.    This claim is brought by plaintiffs on behalf of residents of Maryland who are members of the class.

619.    The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive;" "false or misleading representation[s] of fact which concern[] . . . [t]he reason of or the existence or amount of a price reduction;" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code, Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code, Com. Law § 13-302.

620.    Defendants, plaintiffs, and class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

621.    Pursuant to Md. Code, Com. Law § 13-408, plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT THIRTY
## VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A)
### (MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*)

622.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

623.    This claim is brought by plaintiffs on behalf of residents of Massachusetts who are members of the class.

624.    Massachusetts law (the Massachusetts Act) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.

625.    Defendants, plaintiffs, and class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

- 170 -

626.     Each defendant engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

627.     Pursuant to Mass. Gen. Laws ch. 93A, § 9, plaintiffs will seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each plaintiff.  Because defendants' conduct was committed willfully and knowingly, plaintiffs are entitled to recover, for each plaintiff, up to three times actual damages, but no less than two times actual damages.

628.     Plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

629.     On January 24, 2017, and January 25, 2017, plaintiffs sent letters complying with Mass. Gen. Laws ch. 93A, § 9(3) to defendants.  Because these defendants fail to remedy their unlawful conduct within the requisite time period, plaintiffs seek all damages and relief to which they are entitled.

## COUNT THIRTY-ONE
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### (MICH. COMP. LAWS § 445.903, *ET SEQ.*)

630.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

631.     This claim is brought by plaintiffs on behalf of residents of Michigan who are members of the class.

632.     The Michigan Consumer Protection Act (Michigan CPA) prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "[f]ailing to reveal a material fact, the omission of which

tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold;" "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. Laws § 445.903(1).

633.   Plaintiffs and class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

634.   Each defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

635.   Plaintiffs seek injunctive relief to enjoin defendants from continuing their unfair and deceptive acts; monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

636.   Plaintiffs also seek punitive damages because each defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants maliciously and egregiously misrepresented the actual price of their analog insulin drugs, inflated the benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase their profits at the expense of consumers.  They manipulated the price of their life-saving products without regard to the impact of their scheme on consumers' ability to afford to buy a product necessary to sustain their life.  Defendants' conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT THIRTY-TWO
## VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (MINN. STAT. § 325F.68, *ET SEQ.*)

637.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

638.    This claim is brought by plaintiffs on behalf of residents of Minnesota who are members of the class.

639.    The Minnesota Prevention of Consumer Fraud Act (Minnesota CFA) prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."  Minn. Stat. § 325F.69(1).

640.    Each purchase of insulin constitutes "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

641.    Pursuant to Minn. Stat. § 8.31(3a), plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

642.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each defendant's acts show deliberate disregard for the rights or safety of others.

## COUNT THIRTY-THREE
## VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT
### (MINN. STAT. § 325D.43-48, *ET SEQ.*)

643.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

644.    This claim is brought by plaintiffs on behalf of residents of Minnesota who are members of the class.

645.     The Minnesota Deceptive Trade Practices Act (Minnesota DTPA) prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."  Minn. Stat. § 325D.44.

646.     Pursuant to Minn. Stat. § 8.31(3a), plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

647.     Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that defendants' acts show deliberate disregard for the rights or safety of others.

### COUNT THIRTY-FOUR
### VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT
### (MISS. CODE. ANN. § 75-24-1, *ET SEQ.*)

648.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

649.     This claim is brought by plaintiffs on behalf of residents of Mississippi who are members of the class.

650.     The Mississippi Consumer Protection Act (Mississippi CPA) prohibits "unfair or deceptive trade practices in or affecting commerce."  Miss. Code Ann. § 75-24-5(1).  Unfair or deceptive practices include, but are not limited to, "[m]isrepresentations of fact concerning the reasons for, existence of, or amounts of price reductions."  Miss. Code Ann. § 75-24-5(2).

651.     Plaintiffs seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

## COUNT THIRTY-FIVE
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010, *ET SEQ.*)

652.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

653.    This claim is brought by plaintiffs on behalf of residents of Missouri who are members of the class.

654.    The Missouri Merchandising Practices Act (Missouri MPA) makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."  Mo. Rev. Stat. § 407.020.

655.    Defendant, plaintiffs, and class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

656.    Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

657.    Defendants are liable to plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining each defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT THIRTY-SIX
## VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION ACT OF 1973
### (MONT. CODE ANN. § 30-14-101, *ET SEQ.*)

658.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

659.     This claim is brought by plaintiffs on behalf of residents of Montana who are members of the class.

660.     The Montana Unfair Trade Practices and Consumer Protection Act (Montana CPA) makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

661.     Defendants, plaintiffs, and class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

662.     Plaintiffs and class members are "consumer[s]" under Mont. Code Ann. § 30-14-102(1).

663.     The sale of each drug at issue occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and each defendant committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

664.     Because defendants' unlawful methods, acts, and practices have caused plaintiffs to suffer an ascertainable loss of money and property, plaintiffs seek from each defendant: the greater of actual damages or $500; discretionary treble damages; reasonable attorneys' fees.

665.     Plaintiffs additionally seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

## COUNT THIRTY-SEVEN
## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
## (NEB. REV. STAT. § 59-1601, *ET SEQ.*)

666.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

667.     This claim is brought by plaintiffs on behalf of residents of Nebraska who are members of the class.

- 176 -

668.   The Nebraska Consumer Protection Act (Nebraska CPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Neb. Rev. Stat. § 59-1602.

669.   Defendants, plaintiffs, and class members are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

670.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

671.   Because defendants' conduct caused injury to plaintiffs' property through violations of the Nebraska CPA, plaintiffs seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining each defendant's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

**COUNT THIRTY-EIGHT**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
**(NEV. REV. STAT. § 598.0903, *ET SEQ*.)**

672.   The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

673.   This claim is brought by plaintiffs on behalf of residents of Nevada who are members of the class.

674.   The Nevada Deceptive Trade Practices Act (Nevada DTPA) prohibits deceptive trade practices.  Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions;" "[k]nowingly makes any other false representation in a transaction;" "[f]ails to disclose a material fact in connection with the sale or lease of goods or services;" or "[m]akes an assertion of scientific, clinical or quantifiable fact in an

- 177 -

advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion."  Nev. Rev. Stat. §§ 598.0915–598.0925.

675.    Accordingly, plaintiffs seek their actual damages, punitive damages, an order enjoining defendants' deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA.  Nev. Rev. Stat. § 41.600.

**COUNT THIRTY-NINE**
**VIOLATION OF THE NEW HAMPSHIRE**
**CONSUMER PROTECTION ACT**
**(N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.*)**

676.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

677.    This claim is brought by plaintiffs on behalf of residents of New Hampshire who are members of the class.

678.    The New Hampshire Consumer Protection Act (New Hampshire CPA) prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including, "but . . . not limited to" "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  N.H. Rev. Stat.  Ann. § 358-A:2.

679.    Defendants, plaintiffs, and class members are "persons" under N.H. Rev. Stat. Ann. § 358-A:1.

680.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. Ann. § 358-A:1.

- 178 -

681.     Because defendants' willful conduct caused injury to plaintiffs' property through violations of the New Hampshire CPA, plaintiffs seek recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining each defendant's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. Rev. Stat. Ann. § 358-A:10.

**COUNT FORTY**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J.S.A. § 56:8-1, *ET SEQ*.)**

682.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

683.     This claim is brought by plaintiffs on behalf of residents of New Jersey who are members of the class.

684.     The New Jersey Consumer Fraud Act (New Jersey CFA) makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."  N.J.S.A. § 56:8-2.

685.     Defendants, plaintiffs, and class members are "persons" within the meaning of N.J.S.A. § 56:8-1(d).

686.     Defendants engaged in "sales" of "merchandise" within the meaning of N.J.S.A. § 56:8-1(c), (d).

- 179 -

687.     Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining defendants' unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J.S.A. § 56:8-19, and any other just and appropriate relief.

## COUNT FORTY-ONE
## VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*)

688.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

689.     This claim is brought by plaintiffs on behalf of residents of New Mexico who are members of the class.

690.     The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to, "failing to state a material fact if doing so deceives or tends to deceive."  N.M. Stat. Ann. § 57-12-2(D).

691.     Defendants, plaintiffs, and class members are "person[s]" under N.M. Stat. Ann. § 57-12-2.

692.     Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

693.     Because defendants' unconscionable, willful conduct caused actual harm to plaintiffs, plaintiffs seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

## COUNT FORTY-TWO
## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW §§ 349-350
### (N.Y. GEN. BUS. LAW §§ 349-350)

694.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

695.    This claim is brought by plaintiffs on behalf of residents of New York who are members of the class.

696.    The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 349.

697.    Plaintiffs and class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

698.    Each defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

699.    Defendants' deceptive acts and practices, which were intended to mislead consumers who purchased insulin, was conduct directed at consumers.

700.    Because defendants' willful and knowing conduct caused injury to plaintiffs, plaintiffs seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining defendants' deceptive conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT FORTY-THREE
## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS
## AND PRACTICES ACT
## (N.C. GEN. STAT. § 75-1.1, *ET SEQ.*)

701.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

702.     This claim is brought by plaintiffs on behalf of residents of North Carolina who are members of the class.

703.     North Carolina's Unfair and Deceptive Acts and Practices Act (the North Carolina Act) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

704.     Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

705.     Plaintiffs seek an order for treble their actual damages, an order enjoining defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

## COUNT FORTY-FOUR
## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
## (N.D. CENT. CODE § 51-15-02)

706.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

707.     This claim is brought by plaintiffs on behalf of residents of North Dakota who are members of the class.

708.     The North Dakota Consumer Fraud Act (North Dakota CFA) makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in

connection with the sale or advertisement of any merchandise . . . ."  N.D. Cent. Code § 51-15-02.

709.    Defendants, plaintiffs, and class members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

710.    Defendants' engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

711.    Defendants knowingly committed the conduct described above, and thus, under N.D. Cent. Code § 51-15-09, defendants are liable to plaintiffs for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements.  Plaintiffs further seek an order enjoining each defendant's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

**COUNT FORTY-FIVE**
**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT**
**(OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*)**

712.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

713.    This claim is brought by plaintiffs on behalf of residents of Ohio who are members of the class.

714.    Ohio Consumer Sales Practices Act (Ohio CSPA), Ohio Rev. Code Ann. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing that "a specific price advantage exists, if it does not."  Ohio Rev. Code Ann. § 1345.02.

715.    Each defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

716.    Plaintiffs and class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchases of insulin is a "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

717.    As a result of the foregoing wrongful conduct, plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining defendants' deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq*.

## COUNT FORTY-SIX
## VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
## (OKLA. STAT. TIT. 15, § 751, *ET SEQ.*)

718.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

719.    This claim is brought by plaintiffs on behalf of residents of Oklahoma who are members of the class.

720.    The Oklahoma Consumer Protection Act (Oklahoma CPA) declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: making a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person;" "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers;" and making "false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction."  Okla. Stat. tit. 15, §§ 752-753.

721.    Plaintiffs and class members are "persons" under Okla. Stat. tit. 15, § 752.

- 184 -

722.     Each Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

723.     The sale of insulin to plaintiffs was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and each defendant's actions as set forth herein occurred in the conduct of trade or commerce.

724.     Plaintiffs seek punitive damages because defendants' conduct was egregious. Defendants misrepresented the actual prices of insulin, inflated the benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase their profits at the expense of consumers.  They manipulated the price of their life-saving products without regard to the impact of their scheme on consumers' ability to afford to buy products necessary to sustain their life.  Defendants' egregious conduct warrants punitive damages.

725.     Defendants' conduct as alleged herein was unconscionable because (1) defendants, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, defendants knew or had reason to know that price the consumers were charged grossly exceeded the price at which similar products were readily obtainable in similar transactions by like consumers; and (3) defendants knew or had reason to know that the transaction defendants induced the consumers to enter into was excessively one-sided in favor of each defendant.

726.     Because defendants' unconscionable conduct caused injury to plaintiffs, plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under Okla. Stat. tit. 15, § 761.1.  Plaintiffs further seek an order

- 185 -

enjoining each defendant's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT FORTY-SEVEN
## VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
## (OR. REV. STAT. §§ 646.605, *ET SEQ.*)

727.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

728.    This claim is brought by plaintiffs on behalf of residents of Oregon who are members of the class.

729.    The Oregon Unfair Trade Practices Act (Oregon UTPA) prohibits a person from, in the course of the person's business, doing any of the following: "[m]ak[ing] false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions;" "[m]ak[ing] false or misleading representations of fact concerning the offering price or, or the person's cost for . . . goods;" or "[e]ngag[ing] in any other unfair or deceptive conduct in trade or commerce."  Or. Rev. Stat. § 646.608(1).

730.    Each defendant is a person within the meaning of Or. Rev. Stat. § 646.605(4).

731.    Each drug at issue are "goods" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

732.    Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1).  Plaintiffs are also entitled to punitive damages because defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## COUNT FORTY-EIGHT
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW
## (73 PA. CONS. STAT. § 201-1, *ET SEQ.*)

733.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by

reference the allegations contained in the preceding paragraphs of this Complaint.

734.     This claim is brought by plaintiffs on behalf of residents of Pennsylvania who are

members of the class.

735.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law

(Pennsylvania CPL) prohibits unfair or deceptive acts or practices, including: "[m]aking false or

misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions;" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a

likelihood of confusion or of misunderstanding."  73 Pa. Cons. Stat. § 201-2(4).

736.     Defendants, plaintiffs, and class members are "persons" within the meaning of 73

Pa. Cons. Stat. § 201-2(2).

737.     Plaintiffs purchased insulin primarily for personal, family, or household purposes

within the meaning of 73 Pa. Cons. Stat. § 201-9.2.

738.     All of the acts complained of herein were perpetrated by defendants in the course

of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

739.     Defendants are liable to plaintiffs for treble their actual damages or $100,

whichever is greater, and attorneys' fees and costs.  73 Pa. Cons. Stat. § 201-9.2(a).  Plaintiffs

are also entitled to an award of punitive damages given that defendants' conduct was malicious,

wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

- 187 -

## COUNT FORTY-NINE
## VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION ACT
## (R.I. GEN. LAWS § 6-13.1, *ET SEQ.*)

740.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

741.    This claim is brought by plaintiffs on behalf of residents of Rhode Island who are members of the class.

742.    Rhode Island's Unfair Trade Practices and Consumer Protection Act (Rhode Island CPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "[e]ngaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;" "[e]ngaging in any act or practice that is unfair or deceptive to the consumer;" and "[u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. Gen. Laws § 6-13.1-1(6).

743.    Defendants, plaintiffs, and class members are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

744.    Defendants were engaged in "trade" and "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

745.    Plaintiffs purchased insulin primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws § 6-13.1-5.2(a).

746.    Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a).  Plaintiffs also seek punitive damages at the discretion of the Court.

## COUNT FIFTY
## VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10, *ET SEQ.*)

747.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

748.    This claim is brought by plaintiffs on behalf of residents of South Carolina who are members of the class.

749.    The South Carolina Unfair Trade Practices Act (South Carolina UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code Ann. § 39-5-20(a).

750.    Each defendant is a "person" under S.C. Code Ann. § 39-5-10.

751.    Pursuant to S.C. Code Ann. § 39-5-140(a), plaintiffs seek monetary relief to recover their economic losses. Because defendants' actions were willful and knowing, plaintiffs' damages should be trebled.

752.    Plaintiffs further allege that defendants' malicious and deliberate conduct warrants an assessment of punitive damages because defendants carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting plaintiffs to cruel and unjust hardship as a result. Defendants misrepresented the actual prices of these drugs, inflated the benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase their profits at the expense of consumers. They manipulated the prices of their life-saving products without regard to the impact of their scheme on consumers' ability to afford to buy a product necessary to sustain their life. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

753.    Plaintiffs further seek an order enjoining each defendant's unfair or deceptive acts or practices.

## COUNT FIFTY-ONE
## VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES
## AND CONSUMER PROTECTION LAW
## (S.D. CODIFIED LAWS § 37-24-6)

754. The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

755. This claim is brought by plaintiffs on behalf of residents of South Dakota who are members of the class.

756. The South Dakota Deceptive Trade Practices and Consumer Protection Law (South Dakota CPL) prohibits deceptive acts or practices, which include "[k]nowingly act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby;" and "advertising price reductions without . . . including in the advertisement the specific basis for the claim of a price reduction or [o]ffering the merchandise for sale at the higher price from which the reduction is taken for at least seven consecutive business days during the sixty-day period prior to the advertisement." S.D. Codified Laws §§ 37-24-6(1), 37-24-31.

757. Under S.D. Codified Laws § 37-24-31, plaintiffs are entitled to a recovery of their actual damages suffered as a result of the defendants' acts and practices.

## COUNT FIFTY-TWO
## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
## (TENN. CODE ANN. § 47-18-101, *ET SEQ.*)

758. The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

759.     This claim is brought by plaintiffs on behalf of residents of Tennessee who are members of the class.

760.     Tennessee Consumer Protection Act (Tennessee CPA) prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  Tenn. Code Ann. § 47-18-104.

761.     Plaintiffs and class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

762.     Each defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

763.     Each defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

764.     Pursuant to Tenn. Code Ann. § 47-18-109(a), plaintiffs seek monetary relief against each defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

**COUNT FIFTY-THREE**
**VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES**
**CONSUMER PROTECTION ACT**
**(TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)**

765.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

766.     This claim is brought by plaintiffs on behalf of residents of Texas who are members of the class.

767. Plaintiffs are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* Tex. Bus. & Com. Code § 17.41.

768. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading or deceptive act or practice specifically enumerated in Tex. Bus. & Com. Code § 17.46(b); (ii) "breach of an express or implied warranty"; or (iii) "an unconscionable action or course of action by any person." Tex. Bus. & Com. Code § 17.50(a)(2) & (3).

769. An "unconscionable action or course of action," means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5). As detailed herein, the defendants have engaged in an unconscionable action or course of action and thereby caused economic damages to plaintiffs.

770. Defendants knew, or had reason to know, that consumers would rely on defendants' reported benchmark price as the price of insulin, and knew that, given the real benchmark price spread that defendants had created, the insulin benchmark price was not a fair or reasonable approximation of the actual cost of insulin. Defendants therefore engaged in an unconscionable act within the meaning of Tex. Bus. & Com. Code §§ 17.41, *et seq*.

771. Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), plaintiffs seek monetary relief against the defendants measured as actual damages in an amount to be determined at trial, treble damages for defendants knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

- 192 -

772.     Alternatively, or additionally, pursuant to Tex. Bus. & Com. Code § 17.50(b)(3) & (4), plaintiffs who purchased insulin from the defendants in the class period are entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

773.     Plaintiffs are also entitled to recover court costs and reasonable and necessary attorneys' fees under § 17.50(d) of the Texas DTPA.

774.     On January 24, 2017, and January 25, 2017, plaintiffs sent letters complying with Tex. Bus. & Com. Code § 17.505(a) to defendants.

## COUNT FIFTY-FOUR
## VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT
## (UTAH CODE ANN. § 13-11-1, *ET SEQ.*)

775.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

776.     This claim is brought by plaintiffs on behalf of residents of Utah who are members of the class.

777.     The Utah Consumer Sales Practices Act (Utah CSPA) makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not."  Utah Code Ann. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  Utah Code Ann. § 13-11-5.

778.     Defendants knew, or had reason to know, that consumers would rely on defendants' reported benchmark price as the price of insulin, and knew that, given the real benchmark price spread that defendants had created, the insulin benchmark price was not a fair

or reasonable approximation of the actual cost of insulin.  Defendants therefore engaged in an unconscionable act within the meaning of Utah Code Ann. § 13-11-5.

779.     Pursuant to Utah Code Ann. § 13-11-4, plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

## COUNT FIFTY-FIVE
## VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
### (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)

780.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

781.     This claim is brought by plaintiffs on behalf of residents of Vermont who are members of the class.

782.     The Vermont Consumer Fraud Act (Vermont CFA) makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce . . . ." Vt. Stat. Ann. tit. 9, § 2453(a).

783.     Defendants were sellers within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

784.     Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

## COUNT FIFTY-SIX
## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*)

785.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

010646-11 1006338 V1

786.     This claim is brought by plaintiffs on behalf of residents of Virginia who are members of the class.

787.     The Virginia Consumer Protection Act (Virginia CPA) lists prohibited "practices" which include: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  Va. Code Ann. § 59.1-200.

788.     Each defendant is a "supplier" under Va. Code Ann. § 59.1-198.

789.     Defendants' advertisement of the insulin benchmark price was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

790.     Pursuant to Va. Code Ann. § 59.1-204, plaintiffs seek monetary relief against each defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff.  Because defendants' conduct was committed willfully and knowingly, plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

791.     Plaintiffs also seek an order enjoining each defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204, *et seq.*

## COUNT FIFTY-SEVEN
## VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
## (WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ.*)

792.     The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

793.     This claim is brought by plaintiffs on behalf of residents of Washington who are members of the class.

794.   The Washington Consumer Protection Act (Washington CPA) broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code. Ann. § 19.96.010.

795.   Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code. Ann. § 19.96.010.

796.   Defendants are liable to plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code. Ann. § 19.86.090.

**COUNT FIFTY-EIGHT**
**VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT**
**AND PROTECTION ACT**
**(W. VA. CODE § 46A-1-101, *ET SEQ.*)**

797.   The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

798.   This claim is brought by plaintiffs on behalf of residents of West Virginia who are members of the class.

799.   The defendants are "persons" under W. Va. Code § 46A-1-102(31).

800.   Plaintiffs are "consumers," as defined by W. Va. Code §§ and 46A-1-102(12) and 46A-6-102(2).

801.   Defendants engaged in trade or commerce as defined by W. Va. Code § 46A-6-102(6).

802.   The West Virginia Consumer Credit and Protection Act (West Virginia CCPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." W. Va. Code § 46A-6-104.  Without limitation, "unfair or deceptive" acts or practices include:

(I)   Advertising goods or services with intent not to sell them as advertised;

- 196 -

(K)     Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;

(L)     Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M)     The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;

(N)     Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive; W. Va. Code § 46A-6-102(7).

803.    Pursuant to W. Va. Code § 46A-6-106, plaintiffs seek monetary relief against the defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each plaintiff.

804.    Plaintiffs also seek punitive damages against the defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting plaintiffs to cruel and unjust hardship as a result.

805.    Plaintiffs further seek an order enjoining the defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. Va. Code § 46A-5-101, *et seq*., and any other just and proper relief available under the West Virginia CCPA.

806.    On January 24, 2017, and January 25, 2017, plaintiffs sent letters complying with W. Va. Code § 46A-6-106(b) to defendants.  Because these defendants failed to remedy their

unlawful conduct within the requisite time period, plaintiffs seek all damages and relief to which they are entitled.

## COUNT FIFTY-NINE
## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
## (WIS. STAT. § 110.18)

807.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

808.    This claim is brought by plaintiffs on behalf of residents of Wisconsin who are members of the class.

809.    The Wisconsin Deceptive Trade Practices Act (Wisconsin DTPA) prohibits a "representation or statement of fact which is untrue, deceptive or misleading."  Wis. Stat. § 100.18(1).

810.    Each defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

811.    Plaintiffs and class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).  Plaintiffs purchased insulin.

812.    Plaintiffs are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2).  Because defendants' conduct was committed knowingly and/or intentionally, plaintiffs are entitled to treble damages.

813.    Plaintiffs also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

## COUNT SIXTY
## VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
## (WYO. STAT. §§ 40-12-105 *ET SEQ.*)

814.    The Novo Nordisk, Eli Lilly, and Sanofi plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

815.    This claim is brought by plaintiffs on behalf of residents of Wyoming who are members of the class.

816.    Pursuant to Wyo. Stat. § 40-12-108(a), plaintiffs seek monetary relief against the defendants measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

817.    On January 24, 2017 and January 25, 2017, plaintiffs sent letters complying with Wyo. Stat. §§ 45-12-109 to defendants.  If defendants fail to remedy their unlawful conduct, plaintiffs will seek all damages and relief to which plaintiffs are entitled.

818.    Pursuant to applicable state statutes, plaintiffs will mail a copy of this action to the Attorney General's office for the states of Connecticut, Illinois, Louisiana, Missouri, New Jersey, Oregon, Texas, Utah, and Washington.

## DEMAND FOR JUDGMENT

WHEREFORE, plaintiffs, on behalf of themselves and the proposed class, respectfully demand that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare plaintiffs as the representatives of the class;

B.    Enter judgments against defendants and in favor of plaintiffs and the class;

C.    Award the class damages (*i.e.*, three times overcharges) in an amount to be determined at trial;

D.    Award plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law; and

E.      Award such further and additional relief as the case may require and the Court

may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, plaintiffs, on behalf of themselves and

the proposed class, demand a trial by jury on all issues so triable.


Dated: December 26, 2017                        Respectfully submitted,

                                                CARELLA, BYRNE, CECCHI, OLSTEIN,
                                                BRODY & AGNELLO, P.C.


                                                By _____/s/ James E. Cecchi_____
                                                James E. Cecchi (NJBA #030861989)
                                                Lindsey H. Taylor
                                                5 Becker Farm Road
                                                Roseland, NJ 07068
                                                Telephone: (973) 994-1700
                                                Facsimile: (973) 994-1744
                                                jcecchi@carellabyrne.com
                                                ltaylor@carellabyrne.com

                                                Steve W. Berman (admitted *pro hac vice*)
                                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                                1918 Eighth Avenue, Suite 3300
                                                Seattle, WA  98101
                                                Telephone: (206) 623-7292
                                                Facsimile: (206) 623-0594
                                                steve@hbsslaw.com

                                                Thomas M. Sobol (admitted *pro hac vice*)
                                                Hannah W. Brennan (admitted *pro hac vice*)
                                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                                55 Cambridge Parkway, Suite 301
                                                Cambridge, MA  02142
                                                Telephone: (617) 482-3700
                                                Facsimile: (617) 482-3003
                                                tom@hbsslaw.com
                                                hannahb@hbsslaw.com

                                                Craig L. Briskin (admitted *pro hac vice*)
                                                MEHRI & SKALET, PLLC

- 200 -

1250 Connecticut Avenue NW, Suite 300
Washington, D.C.  20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cbriskin@findjustice.com

Linda P. Nussbaum (admitted *pro hac vice*)
Bradley J. Demuth (admitted *pro hac vice*)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY  10036-8718
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com
bdemuth@nussbaumpc.com

Michael E. Criden (*pro hac vice* forthcoming)
Lindsey C. Grossman (*pro hac vice*
forthcoming)
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
mcriden@Cridenlove.com
lgrossman@cridenlove.com

Jayne A. Goldstein (admitted *pro hac vice*)
SHEPHERD FINKELMAN MILLER &
SHAH, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL  33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jgoldstein@sfmslaw.com

Natalie Finkelman Bennett (NJBA #033601989)
SHEPHERD FINKELMAN MILLER &
SHAH, LLP
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
nbennett@sfmslaw.com

Roberta D. Liebenberg (admitted *pro hac vice*)
Adam J. Pessin (admitted *pro hac vice*)

FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA  19107
Telephone: (215) 567-6565
Facsimile: (215) 568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

Lynn Lincoln Sarko (*pro hac vice* forthcoming)
Derek W. Loeser (admitted *pro hac vice*)
Gretchen S. Obrist (admitted *pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Michael Critchley (NJBA #251821972)
CRITCHLEY, KINUM & DENOIA, LLC
75 Livingston Avenue, Suite 303
Roseland, New Jersey 07068
Telephone: (973) 422-9200
Facsimile: (973) 422-9700
mcritchley@critchleylaw.com

Ellen Relkin (NJBA #006691985)
WEITZ & LUXENBERG
220 Lake Drive East, Suite 210
Cherry Hill, NJ 08002
Telephone: (212) 558-5500
ERelkin@weitzlux.com

Paul F. Novak (admitted *pro hac vice*)
Diana Gjonaj (admitted *pro hac vice*)
Gregory Stamatopoulos (admitted *pro hac vice*)
WEITZ & LUXENBERG
719 Griswold, Ste. 620
Detroit, MI  48226
Telephone: (313) 800-4170
pnovak@weitzlux.com
dgjonaj@weitzlux.com
gstamatopoulos@weitzlux.com

- 202 -

Todd A. Seaver (admitted *pro hac vice*)
Jessica Moy (admitted *pro hac vice*)
BERMAN TABACCO
44 Montgomery St., Ste. 650
San Francisco, CA  94104
Telephone: (415) 433-3200
tseaver@bermantabacco.com
jmoy@bermantabacco.com

Michelle Rago (*pro hac vice* forthcoming)
47 Merriam Avenue
Bronxville, New York 10708
Telephone: (914) 441-4887
mrago@ragolaw.com

Nyran Rose Rasche (*pro hac vice* forthcoming)
CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP
150 S. Wacker Drive, Suite 3000
Chicago, Illinois 60601
Telephone: (312) 782-4880
nrasche@caffertyclobes.com

Patrick E. Cafferty (*pro hac vice* forthcoming)
CAFFERTY CLOBES MERIWETHER &
SPRENGEL, LLP
220 Collingwood Drive, Ste. 130
Ann Arbor, MI 48103
Telephone: (734)769-2144
pcafferty@caffertyclobes.com

Stephen H. Weil (admitted *pro hac vice*)
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604
Telephone: 312-585-7404
steve@weilchardon.com

*Attorneys for Plaintiffs*