James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Steve W. Berman
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

*Plaintiffs' Co-Lead Counsel*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE INSULIN PRICING LITIGATION** | Civil Action No. 17-699 (BRM)(LHG) |

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .........................................................................1

II.   ARGUMENT..............................................................................2

      A.    The plaintiffs properly seek final injunctive relief under RICO...........2

            1.    Section 1964 of RICO authorizes final injunctive relief in
                  actions brought by private plaintiffs. .........................................3

            2.    The defendants' interpretation of Section 1964 yields the
                  absurd result that neither the Attorney General nor
                  private plaintiffs may seek the final injunctive relief
                  authorized by subsection (a). .....................................................6

            3.    Legislative history is irrelevant, because the plain
                  meaning of Section 1964 authorizes injunctive relief in
                  this action, and in any event does not support the
                  defendants' argument.............................................................10

      B.    Claims relating to additional insulins should not be dismissed. .........15

      C.    Most of the state-law claims challenged by the defendants
            should not be dismissed.....................................................................18

            1.    Arizona.....................................................................................19

            2.    California .................................................................................21

            3.    Colorado and Utah ...................................................................23

            4.    Georgia.....................................................................................27

            5.    Louisiana..................................................................................29

            6.    Mississippi ...............................................................................31

            7.    West Virginia ...........................................................................33

III.  CONCLUSION..............................................................................36

010646-11/1136848 V1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
483 U.S. 143 (1987)...................................................................................12

*Amin v. Mercedes-Benz USA, LLC*,
301 F. Supp. 3d 1277 (N.D. Ga. 2018).....................................................26

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
480 U.S. 531 (1987).....................................................................................3

*Andren v. Alere, Inc.*,
2017 WL 6509550 (S.D. Cal. Dec. 20, 2017) ..........................................26

*Andretti Sports Mktg. La, LLC v. Nola Motorsports Host Comm., Inc.*,
147 F. Supp. 3d 537 (E.D. La. 2015)....................................................9, 30

*Bd. of Trs. of IBT Local 863 Pension Fund v. C & S Wholesale Grocers, Inc.*,
802 F.3d 534 (3d Cir. 2015) ......................................................................10

*Bowden v. The Med. Ctr., Inc.*,
773 S.E.2d 692 (Ga. 2015) ........................................................................27

*Califano v. Yamasaki*,
442 U.S. 682 (1979).....................................................................................3

*California v. Am. Stores Co.*,
495 U.S. 271 (1990)................................................................................9, 10

*CaseExperts, LLC v. CompStar Sys., Inc.*,
2010 WL 4553926 (W.D. La. Nov. 3, 2010).............................................31

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994 .....................................................................................14

*Chevron Corp. v. Donziger*,
833 F.3d 74 (2d Cir. 2016) ................................................................*passim*

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prod.*
 *Liab. Litig.*,
 295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................................29

*Clayworth v. Pfizer, Inc.*,
 233 P.3d 1066 (Cal. 2010) ...........................................................21, 22

*Cox v. Athens Reg'l Med. Ctr.*,
 631 S.E.2d 792 (Ga. Ct. App. 2006) ............................................27, 28

*Curley v. Cumberland Farms Dairy, Inc.*,
 728 F. Supp. 1123 (D.N.J. 1989) ....................................................7, 8

*David v. Volkswagen Grp. of Am., Inc.*,
 2018 WL 1960447 (D.N.J. Apr. 26, 2018) ........................................26

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
 362 F. Supp. 3d 510 (N.D. Ill. 2019) ................................................25

*Del Greco v. CVS Corp.*,
 354 F. Supp. 2d 381 (S.D.N.Y. 2005), *aff'd*, 164 F. App'x 75
 (2d Cir. 2006) ....................................................................................35

*Diaz v. First Am. Home Buyers Prot. Corp.*,
 541 F. App'x 773 (9th Cir. 2013) ......................................................23

*In re Ditropan XL Antitrust Litig.*,
 529 F. Supp. 2d 1098 (N.D. Cal. 2007) ............................................23

*S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*,
 729 F.3d 248 (3d Cir. 2013) ..............................................................10

*Essex Ins. Co. v. Levy Props., Inc.*,
 2013 WL 12122119 (N.D. Tex. May 7, 2013) ...................................32

*F.T.C. v. Wyndham Worldwide Corp.*,
 799 F.3d 236 (3d Cir. 2015) ..............................................................14

*Falk v. Nissan N. Am., Inc.*,
 2018 WL 2234303 (N.D. Cal. May 16, 2018) ...................................25

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
 355 F. Supp. 3d 582 (E.D. Mich. 2018) ............................................26

*In re Fluidmaster, Inc.*,
  149 F. Supp. 3d 940 (N.D. Ill. 2016)....................................................................20

*Free Speech Coal., Inc. v. Att'y Gen. of U.S.*,
  677 F.3d 519 (3d Cir. 2012) .............................................................................8

*Futterknecht v. Thurber*,
  2015 WL 4603010 (D.N.J. July 30, 2015) .........................................................13

*In re Gen. Motors LLC Ignition Switch Litig.*,
  339 F. Supp. 3d 262 (S.D.N.Y. 2018) ...............................................................25

*In re Generic Pharm. Pricing Antitrust Litig.*,
  2019 WL 653854 (E.D. Pa. Feb. 15, 2019).........................................................36

*HLD Enters., Inc., v. Michelin N. Am., Inc.*,
  2004 WL 2095739 (N.D. Ga. June 29, 2004)......................................................28

*Holmes v. SIPC*,
  503 U.S. 258 (1992).................................................................................9, 10

*Humphrey v. CitiBank NA*,
  2013 WL 5407195 (N.D. Miss. Sept. 25, 2013)...................................................32

*Johnston Dev. Grp., Inc. v. Carpenters Local Union No. 1578*,
  728 F. Supp. 1142 (D.N.J. 1990)......................................................................13

*Kanawha Cty. Pub. Library Bd. v. Bd. of Educ. of Cty. of Kanawha*,
  745 S.E.2d 424 (W. Va. 2013)....................................................................35, 36

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)........................................................................................9

*Knepper v. Rite Aid Corp.*,
  675 F.3d 249 (3d Cir. 2012) ...........................................................................32

*Lawson v. FMR LLC*,
  571 U.S. 429 (2014)..................................................................................13, 14

*Lorraine v. Markel Am. Ins. Co.*,
  241 F.R.D. 534 (D. Md. 2007) ........................................................................35

010646-11/1136848 V1

*Martinez v. Nash Finch Co.*,
  886 F. Supp. 2d 1212 (D. Colo. 2012)..................................................26

*Mayberry v. Bristol-Meyers Squibb Co.*,
  2009 WL 5216968 (D.N.J. Dec. 30, 2009).........................................32

*Miller v. Corinthian Colls., Inc.*,
  769 F. Supp. 2d 1336 (D. Utah 2011)................................................26

*Monroe v. McDaniel*,
  207 So. 3d 1172 (La. Ct. App. 2016)..................................................31

*Morrell v. Wellstar Health Sys., Inc.*,
  633 S.E.2d 68 (Ga. Ct. App. 2006).....................................................28

*Moser v. Navistar Int'l Corp.*,
  2019 WL 977871 (E.D. Tex. Feb. 28, 2019)......................................30

*MSP Recovery Claims v. Sanofi Aventis U.S. LLC*,
  2019 WL 1418129 (D.N.J. Mar. 29, 2019) .......................................19

*Nat'l Org. for Women v. Scheidler*,
  267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S.
  393 (2003).........................................................................2, 5, 9, 11

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel.
  Cybergenics Corp. v. Chinery*,
  330 F.3d 548 (3d Cir. 2003) ..............................................................10

*Patz v. Sureway Supermarket*,
  2018 WL 6651141 (E.D. La. Dec. 19, 2018) .....................................30

*Pontarelli v. U.S. Dep't of the Treasury*,
  285 F.3d 216 (3d Cir. 2002) ..............................................................14

*Prado v. Allstate Tex. Lloyd's*,
  2016 WL 9414132 (W.D. Tex. Nov. 16, 2016)...................................31

*Religious Tech. Ctr. v. Wollersheim*,
  796 F.2d 1076 (9th Cir. 1986) ...................................................2, 7, 11

*Rincon v. Owens Collision & Repair Serv. Ctr., LLC*,
  2018 WL 4520384 (La. Ct. App. Sept. 21, 2018) ..............................30

*Ronnoco Coffee, LLC v. Westfeldt Bros., Inc.*,
2018 WL 902202 (E.D. Mo. Feb. 15, 2018) .......................................................31

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ...................................................25

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)...................................................................................*passim*

*Shersher v. Superior Court*
154 Cal. App. 4th 1491 (2007) .........................................................................22

*Sullivan v. Pulte Home Corp.*,
290 P.3d 446 (Ariz. Ct. App. 2012), *vacated in part on other
grounds*, 306 P.3d 1 (Ariz. 2013) ..............................................................19, 20

*Troyk v. Farmers Grp., Inc.*,
171 Cal. App. 4th 1305 (Cal. Ct. App. 2009)...................................................22

*United States v. Iverson*,
818 F.3d 1015 (10th Cir. 2016) .......................................................................35

*In re Visteon Corp.*,
612 F.3d 210 (3d Cir. 2010) ............................................................................14

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods.
Liab. Litig.*,
349 F. Supp. 3d 881 (N.D. Cal. 2018)..............................................................24

*In re Volkswagen Timing Chain Prod. Liab. Litig.*,
2017 WL 1902160 (D.N.J. May 8, 2017)..........................................................25

*W. Va. Dep't of Transp., Div. of Highways v. Echols*,
827 S.E.2d 45 (W. Va. 2019)...........................................................................35

*Wamsley v. LifeNet Transplant Servs. Inc.*,
2011 WL 5520245 (S.D. W. Va. Nov. 10, 2011).............................................36

*Watts v. Medicis Pharm. Corp.*,
365 P.3d 944 (Ariz. 2016) ...............................................................................20

*White v. Wyeth*,
705 S.E.2d 828 (W. Va. 2010)..........................................................................33

- vi -

## STATUTES

28 U.S.C.A. § 652(a)......................................................................31

18 U.S.C. § 1964(a) ..................................................................5, 11

28 U.S.C. § 652 ....................................................................31, 32

OCGA § 10–1–370 .......................................................................27

OCGA § 10–1–375 .......................................................................27

28 U.S.C. § 2072(b), and (3)..........................................................24

Utah Code Ann. § 13-11-19...........................................................25

Utah Code Ann. § 13-11-19(4)(a)....................................................24

## OTHER AUTHORITIES

Post-Trial Reply Memorandum of Steven R. Donziger, The Law
    Offices of Steven R. Donziger, and Donziger & Associates, PLLC,
    Case No. 11-CIV-0691(LAK) (S.D.N.Y. Jan. 21, 2014) ....................................2

U.S. FOOD & DRUG ADMIN., *Frequently Asked Questions about
    CDER,* https://www.fda.gov/about-fda/center-drug-evaluation-and-
    research/frequently-asked-questions-about-cder#16 (last visited
    June 6, 2019)................................................................................5

## I.    INTRODUCTION

The motion filed by defendants Novo Nordisk Inc. (Novo) and Sanofi-Aventis U.S. LLC (Sanofi) to dismiss the second amended complaint[1] should be denied in its entirety, with three exceptions.[2] In their Second Amended Complaint (Complaint),[3] plaintiffs allege that for over a decade, Novo and Sanofi fraudulently inflated the list prices of their analog insulin medications at the expense of patients whose lives depend on them. In exchange for preferred formulary positions, Novo and Sanofi artificially inflated their list prices so they could offer the nation's largest pharmacy benefit managers (PBMs) bloated "rebates" without reducing their drugs' true, net sales prices.

The defendants' motion to dismiss the RICO claim should be denied, because Section 1964 of RICO authorizes private plaintiffs to seek final injunctive relief, as two of the three Courts of Appeal to address that issue have held. *See*

---

[1] Defs.' Partial Mot. to Dismiss the Second Amended Class Action Complaint (Defs.' Br.), ECF No. 263.

[2] First, the plaintiffs agree that injunctive relief is not available under the Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA). Second, the plaintiffs acknowledge that they cannot be awarded damages for violation of the Minnesota Deceptive Trade Practices Act. (But the plaintiffs may seek damages violation of the Minnesota Prevention of Consumer Fraud Act. *See* Compl. ¶¶ 684–90.) Third, the plaintiffs acknowledge that the Court will dismiss their claim under the Washington Consumer Protection Act, which does not permit claims by indirect purchasers but reserve the right to appeal that dismissal.

[3] *See* Plfs. Second Amended Class Action Compl., ECF No. 255.

*Chevron Corp. v. Donziger*, 833 F.3d 74, 139 (2d Cir. 2016); *Nat'l Org. for Women v. Scheidler*, 267 F.3d 687, 698 (7th Cir. 2001) (*NOW*), *rev'd on other grounds*, 537 U.S. 393 (2003). And apart from the three exceptions noted above, the defendants' myriad challenges to the plaintiffs' state-law claims lack merit.

## II.   ARGUMENT

### A.   The plaintiffs properly seek final injunctive relief under RICO.

The defendants incorrectly argue that "RICO limits the availability of injunctive relief to actions brought by the federal government." Defs.' Br. at 5. Two of the three Courts of Appeals that have decided the issue have held that final injunctive relief is available in RICO actions brought by private plaintiffs. *See Donziger*, 833 F.3d at 139; *NOW*, 267 F.3d at 698. And those courts have explained why the Ninth Circuit erred in holding that final injunctive relief is not available to private plaintiffs. *See Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986).[4]

---

[4] The defendants cite a secondary authority for the erroneous proposition that "the 'trend of decisions … is distinctly negative' on the issue" of whether equitable relief is available under RICO. *See* Defs.' Br. at 5 n.2 (quoting Gregory P. Joseph, CIVIL RICO: A DEFINITIVE GUIDE 261-62 (5th ed. 2018)). The *Donziger* defendants relied on that same quotation, to no avail. *See* Post-Trial Reply Memorandum of Steven R. Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC, Case No. 11-CIV-0691 (LAK) (S.D.N.Y. Jan. 21, 2014), ECF. No. 1857 at 8, 19 (quoting Joseph treatise as stating that "the 'trend of decisions' is 'distinctly negative' on whether injunctive relief is available to private litigants under RICO").

As the Supreme Court has explained, "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979). And "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987) (citation and internal quotation marks omitted).

1.    **Section 1964 of RICO authorizes final injunctive relief in actions brought by private plaintiffs.**

As the Second and Seventh Circuits explain in *Donziger* and *NOW*, Section 1964 of RICO authorizes private plaintiffs to seek final injunctive relief but not interim injunctive relief. Specifically, those courts explain that Section 1964 authorizes the following equitable and legal relief: (1) both the Attorney General and private plaintiffs may seek final injunctive relief; (2) only the Attorney General, not private plaintiffs, may seek interim injunctive relief; and (3) only private plaintiffs, not the Attorney General, may seek damages.

Those conclusions flow from the plain language of subsections (a), (b), and (c) of Section 1964:

> (a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders,

> including, but not limited to: … imposing reasonable
> restrictions on the future activities … of any person, …
> making due provision for the rights of innocent persons.
>
> (b) The Attorney General may institute proceedings
> under this section. Pending final determination thereof,
> the court may at any time enter such restraining orders or
> prohibitions, or take such other actions … as it shall
> deem proper.
>
> (c) Any person injured in his business or property by
> reason of a violation of section 1962 of this chapter may
> sue therefor in any appropriate United States district
> court and shall recover threefold the damages he sustains
> and the cost of the suit, including a reasonable attorney's
> fee.…

As *Donziger* explains, "subsection (a) gives the federal courts jurisdiction to hear
RICO claims and sets out general remedies, including injunctive relief; subsection
(b) makes it clear that the court, on the application of the Attorney General, has
authority to grant temporary injunctive relief even before there is a final
adjudication; and subsection (c) provides a private right of action for any person
injured in his business or property by reason of a violation of § 1962." 833 F.3d at
138.[5]

---

[5] *See id*. ("Subsection (a) itself neither states that any category of persons may
not obtain relief that is within the powers granted to the federal courts nor specifies
the persons in whose favor the courts are authorized to exercise the powers there
granted. In our view, this means that Congress did not intend to limit the court's
subsection (a) authority by reference to the identity or nature of the plaintiff.").

As *Donziger* further explains, "limitations as to who may obtain certain *other* types of relief are, as we interpret § 1964, spelled out in subsections (b) and (c)." *Id*. (emphasis added). For example, "because subsection (b) states that '[t]he Attorney General' may seek restraining orders '[p]ending [a] final' adjudication, we view such interim relief as available only to the United States, not to a private person. In contrast, we interpret § 1964(c) as not authorizing awards of treble damages or attorneys' fees to the United States." *Id*. Thus, "[w]hile subsections (b) and (c) limit the categories of plaintiffs to which the relief they respectively specify may be granted, we do not interpret those subsections as limiting the authorized relief to the types they mention, i.e., as excluding relief that the federal courts are authorized to grant under subsection (a)." *Id*. at 138–39. And the Seventh Circuit similarly explained that subsection (a) of section 1964 "grants the district courts jurisdiction to hear RICO claims and also sets out general remedies, including injunctive relief, that all plaintiffs authorized to bring suit may seek. Section 1964(b) makes it clear that the statute is to be publicly enforced by the Attorney General and it specifies additional remedies, all in the nature of interim relief, that the government may seek. Section 1964(c) similarly adds to the scope of § 1964(a), but this time for private plaintiffs." *NOW*, 267 F.3d at 696.

Therefore, there is no merit to the defendants' argument that the plaintiffs' claim for final injunctive relief under RICO should be dismissed.

**2.    The defendants' interpretation of Section 1964 yields the absurd result that neither the Attorney General nor private plaintiffs may seek the final injunctive relief authorized by subsection (a).**

The defendants' analysis of Section 1964 is based on the flawed premise that in an action brought by the Attorney General, subsection (b) authorizes the court to award the "full range" of orders available to a court under subsection (a). Based on that flawed premise, the defendants contend that a court can grant injunctive relief only in actions brought by the Attorney General, not private plaintiffs. Specifically, the defendants contend:

> Section 1964(a) grants district courts "'jurisdiction to prevent and restrain'" RICO violations "by issuing the full range of 'appropriate orders' available to courts of equity." DOJ RICO Manual at 27 (quoting 18 U.S.C. § 1964(a)). And although section 1964(a) does not state who can seek such orders, section 1964(b) does: "[t]he Attorney General may institute proceedings under this section," and thus a court can enter interim "restraining orders" or take other actions "it shall deem proper" in a case brought by the Attorney General.

Defs.' Br. at 7.[6]

---

[6] The defendants rely on a 2007 manual issued by the Department of Justice. *See* Defs.' Br. at 6 (citing U.S. DEP'T OF JUSTICE, CIVIL RICO: A MANUAL FOR FEDERAL ATTORNEYS 26-33 (2007)). The DOJ's argument pre-dates *Donziger* and cannot withstand scrutiny, for the reasons set forth in *NOW*, *Donziger* and this brief.

The flaw in that argument is that subsection (b) does *not* authorize the Attorney General to seek the full range of injunctive relief—both interim and final—authorized by subsection (a). Instead, subsection (b) authorizes the Attorney General to seek *only* interim injunctive relief. Specifically, subsection (b) states that the "Attorney General may institute proceedings under this section. *Pending final determination thereof*, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper." *Id*. at 6 (emphasis added).

The Ninth Circuit in *Wollersheim* engaged in the same misinterpretation of subsection (b) as the defendants here when it stated that "[i]n contrast to part (b), there is no express authority to *private plaintiffs* to seek the equitable relief available under part (a)." 796 F.2d at 1082 (emphasis in original). To reiterate, subsection (b) does *not* permit the Attorney General to seek all of the equitable relief available under subsection (a) but instead authorizes only interim injunctive relief. And the district court in the 1989 decision cited by the defendants also misinterpreted Section 1964, stating that "[a]lthough § 1964(c) does not expressly limit the plaintiff's remedies, that Congress made an express provision for an equitable remedy in suits brought by the government and simultaneously declined to make a similar provision for private actions carries with it the strong suggestion that no private equitable remedy was intended." *Curley v. Cumberland Farms*

*Dairy, Inc.*, 728 F. Supp. 1123, 1137 (D.N.J. 1989). In fact, subsection (b) suggests only that private plaintiffs may not seek *interim* injunctive relief. But both the Attorney General and private plaintiffs may seek final injunctive relief under subsection (a).

As *Donziger* explained, "[t]o read the subsections after subsection (a) as limiting the nature of the relief that may be granted to the persons identified in those subsequent subsections would mean that although the Attorney General can be granted an injunction '[p]ending' the final adjudication of the case, she could not get any other relief such as a permanent injunction." 833 F.3d at 139. *Donziger* further explained that the "most sensible reading of subsection (b), in our view, is that the interim relief identified in that subsection is available only to the United States, which is relief in addition to that which it may be granted under subsection (a). By parity of reasoning, we read subsection (c) as meaning that only a 'person' may sue for money damages, but that that right is in addition to the relief that the court has power to grant under subsection (a)." *Id*. But under the faulty analysis of the defendants here, subsection (a) would authorize courts to award final injunctive relief, but neither the Attorney General nor private plaintiffs could seek such final relief. As a result, subsection (a) would be mere surplusage in authorizing final injunctive relief. *See Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519,

539 (3d Cir. 2012) ("where possible, courts are to give effect to every clause and word of a statute and be reluctant to treat statutory terms as mere surplusage").

Finally, there is no merit to the defendants' argument that its interpretation of Section 1964 "is bolstered by the fact that Congress modeled RICO's civil remedies provision on provisions of antitrust law that similarly authorize damages, but not injunctive relief, for private litigants." Defs.' Br. at 9. In *NOW*, the Seventh Circuit rejected the defendants' identical argument that "differences between the language of RICO and the language of section 4 of the Clayton Act (on which RICO was based) demand the inference that no private right to injunctive relief exists under RICO." 267 F.3d at 699. The Court first explained that "the mere fact that the Clayton Act spreads its remedial provisions over a number of different sections of the U.S. Code, and RICO does not, adds little to our understanding of either statute." *Id.* at 700. The Court then stated that "[m]ore importantly, the Supreme Court regularly treats the remedial sections of RICO and the Clayton Act identically, regardless of superficial differences in language. *See*, *e.g.*, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188–89 (1997) (applying Clayton Act rule for accrual of cause of action to RICO); *Holmes v. SIPC*, 503 U.S. 258, 267 (1992) (applying proximate cause rule to RICO)." *Id.* Therefore, "[s]ince the Court has already determined that litigants other than the Attorney General may obtain broad injunctive relief under the Clayton Act, *see California v. American Stores Co.*, 495

U.S. 271 (1990), cases like *Klehr* and *Holmes* indicate that we ought to adopt the same interpretation with respect to RICO." *Id*.

> **3.** **Legislative history is irrelevant, because the plain meaning of Section 1964 authorizes injunctive relief in this action, and in any event does not support the defendants' argument.**

The defendants' argument that legislative history supports its reading of Section 1964, *see* Defs.' Br. at 8–9, is incorrect for two independent reasons. *First*, "Legislative history has never been permitted to override the plain meaning of a statute." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist*., 729 F.3d 248, 259 (3d Cir. 2013). Here, the plain meaning of Section 1964 is that private litigants may seek final (but not interim) injunctive relief, and the defendants' argument to the contrary leads to the absurd result that no party could seek final injunctive relief even though it is authorized by subsection (a). And "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 556 (3d Cir. 2003) (en banc) (citation and internal quotation marks omitted).[7]

---

[7] *See also Bd. of Trs. of IBT Local 863 Pension Fund v. C & S Wholesale Grocers, Inc*., 802 F.3d 534, 541–42 (3d Cir. 2015) ("Because we disagree that the statute is ambiguous, we are not at liberty to examine the legislative history and the PBGC letter.") (footnote omitted).

Similarly in *NOW*, the Seventh Circuit stated that "[o]ur study of Supreme Court decisions since the 1986 *Wollersheim* opinion convinces us that the approach of the Ninth Circuit (which relied almost exclusively on the legislative history of RICO to reach its result, as opposed to the actual language of the statute) no longer conforms to the Court's present jurisprudence, assuming for the sake of argument that it was a permissible one at the time." 267 F.3d at 695. As the Seventh Circuit then explained, "[i]n interpreting the remedial provisions of the RICO statute, our inquiry begins with the statute's text, and, if the text is unambiguous, it ends there as well." *Id*. Therefore, the legislative history cited by the defendants cannot override the plain meaning of Section 1964 that private plaintiffs may seek final injunctive relief.

*Second*, the legislative history cited by the defendants does not support their argument in any event. The defendants contend that "[i]nitial versions of the legislation expressly authorized a private injunctive remedy" but "Congress dropped those provisions." Defs.' Br. at 8. Those versions would have authorized private plaintiffs to seek *both* interim and final injunctive relief.[8] Therefore, dropping that provision is wholly consistent with the enactment of Section 1964,

---

[8] *See Wollersheim*, 796 F.2d at 1084 ("Representative Steiger's proposal, like those in the rejected Senate bills, provided explicitly for a private injunctive remedy under section 1964(a).").

which authorizes private plaintiffs to seek *only* final injunctive relief, not the full range of injunctive relief authorized by subsection (a).

For the same reason, the defendants' argument is not supported by its assertion that "shortly after enacting RICO, [Congress] considered a bill that would have authorized 'injunctive actions by private persons' under RICO," but it "never became law." Defs.' Br. at 8–9. As the Supreme Court has explained, that bill "would have authorized the United States itself to sue for damages and to intervene in private damages actions, and it would have further permitted private actions for injunctive relief." *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 155 (1987). Once again, the fact that Congress did not pass that bill is wholly consistent with the interpretation of Section 1964 by the *Donziger* and *NOW* courts: (1) Section 1964 does not authorize the United States to sue for damages, but the proposed amendment would have changed that; and (2) Section 1964 allows private plaintiffs to seek only final injunctive relief, but the proposed amendment would have "further permitted private actions for injunctive relief[,]" *id.*, by allowing them to seek both interim and final injunctive relief. Tellingly, neither of the cases relied on by the defendants for their legislative history argument—*Wollersheim* and *Curley*—recognized that Congress's failure to pass

the two bills cited by the defendants here is wholly consistent with Section 1964's authorization for private plaintiffs to seek only final injunctive relief.[9]

Finally, after those decisions were rendered, the Supreme Court and Third Circuit repeatedly have rejected arguments based on legislative history of failed legislation. For example, in *Lawson v. FMR LLC*, 571 U.S. 429, 454 (2014), the defendant argued that "legislative events subsequent to Sarbanes–Oxley's enactment show that Congress did not intend to extend § 1514A's protections to contractor employees." The Supreme Court held that "[w]e can easily dismiss FMR's invocation of a failed bill from 2004, … which would have amended § 1514A explicitly to cover employees of investment advisers and affiliates." *Id*. at 454 n.16. The Court explained that "'[f]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute.'" *Id*. (quoting *United States v. Craft*, 535 U.S. 274, 287 (2002)). The Court then held that "[w]here, as here, the proposed amendment amounted to six lines in a 51–page bill that died without any committee action, its failure is scarcely relevant to

---

[9] The defendants cite two district court decisions that provide no analysis but instead merely cite *Curley*. *See Futterknecht v. Thurber*, 2015 WL 4603010, at *4 (D.N.J. July 30, 2015) ("[T]he federal RICO statutes do not provide a private right of action for injunctive relief. *Curley*.…"); *Johnston Dev. Grp., Inc. v. Carpenters Local Union No. 1578*, 728 F. Supp. 1142, 1146 (D.N.J. 1990) ("Resolution of the instant motions does not involve injunctive relief under RICO, which makes no provision for private equitable relief in any event. *Curley*.…") (dictum).

Congress' intentions regarding a different bill enacted two years earlier." *Id.* Similarly here, rejection of a proposed bill that contained numerous provisions is scarcely relevant to Congress' intentions regarding the bill enacted as RICO two years earlier, in 1970, which by its plain meaning authorizes private plaintiffs to seek final injunctive relief. Numerous decisions by the Supreme Court and the Third Circuit similarly reject the use of failed legislative proposals to interpret a statute.[10] And in any event, as explained above, rejection of the two bills cited by the defendants is fully consistent with Section 1964's authorization of final (but not interim) injunctive relief in RICO actions by private plaintiffs.

---

[10] *See, e.g., Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186–87 (1994) (rejecting argument that § 10(b) of 1934 Securities Act does not cover aiding and abetting because "in 1957, 1959, and 1960, bills were introduced [but not passed] that would have amended the securities laws to make it 'unlawful … to aid, abet, counsel, command, induce, or procure the violation of any provision' of the 1934 Act"); *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 247 n.6 (3d Cir. 2015) ("Wyndham also points to a variety of cybersecurity bills that Congress has considered and not passed. '[S]ubsequent legislative history … is particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns … a proposal that does not become law.'") (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)); *In re Visteon Corp.*, 612 F.3d 210, 231 (3d Cir. 2010) ("the best inference to be drawn from the subsequent legislative history relied on by Appellees is that Congress chose not to act because the 'existing legislation already incorporated the offered change'") (quoting *Pension Benefit Guar. Corp.*, 496 U.S. at 650); *Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 229 (3d Cir. 2002) (rejecting "the notion that Congress's failure to pass the SAFE bill illustrates that it wanted felons to be able to regain their firearms is inconsistent with legislative history of subsequent actions").

**B.**     **Claims relating to additional insulins should not be dismissed.**

The Second Amended Complaint adequately alleges that the defendants'
fraudulent spread-scheme applies equally to their newer products: Tresiba (Novo
Nordisk), Fiasp (Novo Nordisk), and Basaglar (Eli Lilly). Just as the plaintiffs did
for the other medications listed in their Complaint—for which the defendants
concede their factual allegations are sufficient—the plaintiffs provide the list prices
of the new medications and allege that their net prices are far lower.[11] Thus, the
defendants' spread scheme applies equally to Tresiba, Fiasp, and Basaglar, and the
plaintiffs have rightfully included these three new medications in their Complaint.

In the opening paragraph of their Second Amended Complaint, the plaintiffs
explain that the analog insulins at issue in the remainder of the Complaint are
Humalog, Basaglar, Fiasp, Novolog, Levemir, Tresiba, Apidra, Lantus, and
Toujeo.[12] The plaintiffs then describe the fraudulent scheme, alleging at all times
that this scheme applies to all of the defendants' "analog insulins," including
Tresiba, Fiasp, and Basaglar. In their "Claims for Relief," the plaintiffs, again,
specifically define the term "analog insulins" to include Eli Lilly's Humalog and
Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's

---

[11] *See* Compl. ¶¶ 316-334.

[12] *See id.* ¶ 1.

Apidra, Lantus, and Toujeo.[13] Thus, contrary to the defendants' representations,[14] the plaintiffs *do* allege that a spread between list and net price exists for Fiasp, Basaglar, and Tresiba. Every time the Complaint alleges that the defendants' have fraudulently increased the spread between the list and net prices of their analog insulins, that allegation covers Fiasp, Basaglar, and Tresiba.

The defendants argue that their pricing of Tresiba, Fiasp, and Basaglar do not fit the facts of the plaintiffs' alleged scheme. To do so, they point out that the list prices of these new medications have remained "relatively constant" since they entered the market, unlike the list prices of their other medications, which have increased in "lock-step" over the course of the past decade.[15]

This argument also misrepresents the facts in the plaintiffs' Complaint. Figures 10 (p. 82), 13 (p. 86), and 14 (p. 87) demonstrate that the defendants have raised the list prices of Basaglar, Tresiba, and Fiasp—they have not remained constant.[16]  And Figures 19 (p. 94), and 21 (p. 96) show that the defendants have been doing so at roughly the same time and pace as the other insulins.[17] Thus, the

---

[13] *See id.* ¶ 384.

[14] *See* Defs.' Br. at 11-12.

[15] Defs.' Br. at 11-12.

[16] Compl. ¶¶ 317-318.

[17] *Id.* ¶ 321.

defendants are engaging in the exact same unlawful misconduct with the newer insulins as they are with the older ones.

Further, the defendants' argument misses the point. The misconduct alleged here is that the defendants publish list prices that bear no relationship to the true prices of these analog insulins. It does not matter that Fiasp, Basaglar, and Tresiba are newer drugs, without the same decade of list-price increases behind them. The fact that less time has passed since the introduction of these drugs does not make their pricing any less fraudulent. What matters is this: the defendants are reporting vastly inflated list prices for these newer insulins in the exact same way they have for their older analog insulins.

Perhaps recognizing that the pricing misrepresentations—not the lock step behavior—is the fraud the plaintiffs allege, the defendants argue that the plaintiffs' factual allegations for the newer drugs are not as robust as their allegations for the older ones.[18] In short, the defendants fault the plaintiffs' Complaint for lacking graphics on the spread between Basaglar, Tresiba, and Fiasp's net and list prices. But, as the defendants well know, the plaintiffs do not have access to these drugs' net prices—*the defendants keep this information secret*. The plaintiffs are able to present such spread graphics only where the defendants themselves release this

---

[18] Defs.' Br. at 12.

information (which they have not). The plaintiffs' Complaint provides a detailed description of the defendants' fraudulent scheme and alleges that the defendants have included their newer insulins in this scheme. The Federal Rules do not require the plaintiffs to depict this allegation graphically.

Finally, the plaintiffs note that the defendants have never objected to the plaintiffs' inclusion of Toujeo in the Complaint. Toujeo is also a newer analog insulin, without the decade-long history of list price increases. The plaintiffs' allegations for Toujeo mirror theirs for Basaglar, Tresiba, and Fiasp.[19] Thus, the defendants' concession that the plaintiffs' allegations with respect to Toujeo are sufficient undermines their position that those for Basaglar, Tresiba, and Fiasp are deficient.

## C.   Most of the state-law claims challenged by the defendants should not be dismissed.

The defendants contend that numerous state-law claims should be dismissed or that certain relief is not available. The defendants' arguments lack merit, with three exceptions. First, the plaintiffs agree that injunctive relief is not available under the Louisiana Unfair Trade Practices and Consumer Protection Law

---

[19] *Compare* Compl. ¶ 317 (Basaglar), *id*. ¶ 318 (Tresiba and Fiasp), *to id*. ¶ 319 (Toujeo).

(LUTPA). *See* Defs.' Br. at 18–19.[20] Second, the plaintiffs acknowledge that they cannot be awarded damages for violation of the Minnesota Deceptive Trade Practices Act. *See id*. at 19.[21] Third, the plaintiffs acknowledge that the Court will dismiss their claim under the Washington Consumer Protection Act (WCPA), which does not permit claims by indirect purchasers.[22]

### 1. Arizona

The defendants incorrectly argue that the claim under the Arizona Consumer Fraud Act (ACFA) must be dismissed "because plaintiffs are indirect purchasers, as this Court held in dismissing similar ACFA claims in the *MSP Recovery* matter." *See* Defs.' Br. at 13. The defendants rely on *MSP Recovery Claims v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129, at *18 (D.N.J. Mar. 29, 2019), in which this Court stated, "[u]nder the ACFA, a 'subsequent purchaser is not within the class of consumers intended to be protected by the implied private cause of action[.]' *Sullivan v. Pulte Home Corp*., 290 P.3d 446, 454 (Ariz. Ct. App. 2012), *vacated in part on other grounds*, 306 P.3d 1 (Ariz. 2013). Plaintiffs do not contest

---

[20] As discussed below, the plaintiffs disagree that their claim for damages under LUTPA should be dismissed.

[21] The defendants, however, do not contend that damages are unavailable for the plaintiffs' claim based on violation of the Minnesota Prevention of Consumer Fraud Act. *See* Compl. ¶¶ 684–90.

[22] The plaintiffs respectfully contend that they are not indirect purchasers and reserve the right to appeal dismissal of the WCPA claim and the RICO damages claim.

Defendants' construction of Arizona law but merely argue they are not 'subsequent purchasers' and that Defendants are 'hid[ing] under the shield of their delivery method.' (ECF. No. 75 at 37.)".

Unlike the plaintiffs in *MSP Recovery*, the plaintiffs here contest the defendants' construction of the ACFA, which in fact allows claims by indirect purchasers. In *Watts v. Medicis Pharmaceutical Corp.*, 365 P.3d 944, 947 (Ariz. 2016), the Arizona Supreme Court held that "the CFA does not require a direct merchant-consumer transaction to support a patient's statutory claim against a drug manufacturer." The Court explained that "the statute does not expressly require a direct merchant-consumer transaction." *Id.* at 953. Thus, the plaintiff "alleged an actionable claim under the CFA" by alleging "that Medicis affirmatively misrepresented Solodyn by stating that '[t]he safety of using [Solodyn] longer than 12 weeks has not been studied and is not known,' even though it knew (as Medicis's full prescribing informational material states) that taking the drug for longer than twelve weeks can cause drug-induced lupus." *Id.* Similarly here, the plaintiffs allege a valid claim, even if they are indirect purchasers.[23]

---

[23] In light of *Watts*, the decision by the court of appeals in *Sullivan* is not good law to the extent it held that indirect purchasers may not recover under the AFCA. And *Sullivan* did not bar the plaintiffs' claims in any event. *See In re Fluidmaster, Inc.*, 149 F. Supp. 3d 940, 960 (N.D. Ill. 2016) ("[*Sullivan*] is not directly on point here. In *Sullivan*, there was a clearly definable transaction that could give rise to a claim under the ACFA: *i.e.*, the home builder's sale of the home to the original home buyer. But that sale was a simple, two-step transaction. Here, the chain of

2.      **California**

The defendants incorrectly argue that the claim for restitution under the

California Unfair Competition Law (UCL) should be dismissed. *See* Defs.' Br. at

13-15. They erroneously contend that restitution is not available because they

"have not 'acquired' the difference between point-of-sale prices and net prices

from plaintiffs. The point-of-sale price is paid to the dispensing pharmacies and

plaintiffs' own allegations confirm that defendants receive only the 'net price' for

their insulins." *Id.* at 14-15.

Contrary to the defendants' argument, a UCL defendant need not *directly*

acquire money from the plaintiff in order for restitution to be awarded. Section

17203 states that the "court may make such orders or judgments … as may be

necessary to restore to any person in interest any money or property, real or

personal, which may have been acquired by means of such unfair competition." In

*Clayworth v. Pfizer, Inc*., 233 P.3d 1066 (Cal. 2010), the California Supreme Court

held that the pharmacy plaintiffs could seek restitution under section 17203 from

manufacturers that did not *directly* acquire money from the pharmacies. As the

Supreme Court stated, "[t]o distribute their pharmaceuticals, Manufacturers depend

on a network of wholesalers and retailers. Pharmacies acted as retailers for

---

sale is more complex, where the manufacturer uses various intermediaries (*e.g.*, home improvement stores, plumbers, etc.) to get the product to its final destination (*i.e.*, consumers).").

Manufacturers' drugs and thus had indirect business dealings with Manufacturers. (*See Shersher v. Superior Court* (2007) 154 Cal.App.4th 1491, 1499–1500, 65 Cal.Rptr.3d 634 [indirect purchases may support UCL standing].) They lost money: the overcharges they paid.… Finally, that loss was the result of an unfair business practice: Pharmacies paid more than they otherwise would have because of a price-fixing conspiracy in violation of state law." *Id*. at 1087.

In *Shersher*, which *Clayworth* cited with approval, the court explained that "in appropriate circumstances, the plaintiff in a UCL action may obtain restitution from a defendant with whom the plaintiff did not deal directly." *Shersher*, 154 Cal. App. 4th at 1499. *Shersher* rejected Microsoft's argument that the plaintiff lacked standing under the UCL because the plaintiff "lost any ownership interest in his money once he used it to purchase Microsoft's product from a retailer." *Id*. at 1500. The court held that the UCL "requires only that the plaintiff must once have had an ownership interest in the money or property acquired by the defendant through unlawful means." *Id*.

Similarly, in *Troyk v. Farmers Grp., Inc*., 171 Cal. App. 4th 1305, 1338 (Cal. Dist. Ct. App. 2009), the court rejected the defendants' argument that "restitution cannot be awarded against them because the service charges were paid *directly* to Prematic and not to either of [defendants]." (emphasis in original). The court held that "although the class members did not pay the service charges

directly to either FGI or FIE, the trial court could have properly inferred from the undisputed facts that FGI and FIE received a benefit from those service charge payments (which FIE and FGI required) even though they did not directly receive money." *Id.* at 1340. *See also Diaz v. First Am. Home Buyers Prot. Corp.*, 541 F. App'x 773, 776 (9th Cir. 2013) ("California courts do not categorically bar the recovery of restitution [under the UCL] by a plaintiff who paid a third party rather than paying the defendant directly.").[24]

### 3. Colorado and Utah

The defendants erroneously contend that the claim under the Colorado Consumer Protection Act (CCPA) should be dismissed "to the extent that plaintiffs seek monetary damages because the CCPA does not permit class action claims seeking such relief." *See* Defs.' Br. at 15. Similarly, the defendants incorrectly argue that the claim under the Utah Consumer Sales Practices Act (UCSPA) should be dismissed to the extent that plaintiffs seek monetary damages "because the UCSPA does not permit class action claims seeking such relief except under narrow circumstances that do not exist here." Defs.' Br. at 20.

---

[24] *Accord*, *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1103 (N.D. Cal. 2007) (rejecting argument that "because Plaintiffs, as indirect purchasers, did not pay any money *directly* to Alza, Plaintiffs cannot recover restitution under the UCL").

The defendants' arguments should be rejected for three independent reasons. *First*, whether a state-law damages bar applies in federal court should be addressed at the class certification stage. For example, in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*, 349 F. Supp. 3d 881, 920 (N.D. Cal. 2018), Volkswagen argued in its motion to dismiss that "Plaintiffs' claims under Utah's Consumer Sales Practices Act are limited because, although the complaint seeks 'statutory damages,' the Act limits damages that can be sought in class actions to 'actual damages.' Utah Code Ann. § 13-11-19(4)(a)." As the court explained, "[w]hether these state-law limits on class actions apply in federal court depends on (1) whether they conflict with Rule 23, (2) if they do conflict, whether the application of Rule 23 would 'abridge, enlarge, or modify any substantive right' in violation of the Rules Enabling Act, 28 U.S.C. § 2072(b), and (3) if they do not conflict, whether they are part of state substantive law or procedural law." *Id*. (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 398 (2010); *id*. at 417 (Stevens, J., concurring in part)). The court then held that it would "not make these determinations at this stage. VW's arguments focus on whether Plaintiffs can pursue *class* claims under certain state consumer laws, not on whether the claims themselves are well pled. Only the second question is at issue in a Rule 12(b)(6) motion to dismiss. The Court will

therefore wait until the class certification stage to address whether Mississippi's and Utah's class action limits apply." *Id*.[25]

*Second*, the defendants' argument should be rejected even if addressed now, because they do not mention, let alone analyze, *Shady Grove*. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 554 (N.D. Ill. 2019) ("[W]hether the federal procedural rule allowing class actions (*i.e.*, Rule 23) trumps the state-law bar on class actions under the CCPA depends on the two-step analysis

---

[25] *Accord*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, 2018 WL 7197233, at *52 (S.D.N.Y. Dec. 26, 2018) ("Courts that have examined the class action damages bar under the UCSPA have tended to defer the question of whether an action meets the statutory prerequisites until later stages of the case."); *In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 332 n.63 (S.D.N.Y. 2018) ("Similar to its Colorado and Ohio counterparts, the Utah CSPA states that '[a] consumer who suffers loss … may recover, *but not in a class action*, actual damages or $2,000, whichever is greater, plus court costs.' Utah Code Ann. § 13-11-19 (emphasis added). The Court defers to another day whether the provision limits Plaintiffs' relief here."); *Falk v. Nissan N. Am., Inc.*, 2018 WL 2234303, at *7 (N.D. Cal. May 16, 2018) ("Defendant contends that monetary damages are unavailable for class actions under Colorado's CPA.… The Court finds this damages issue to be premature to decide at this early stage. As in *MyFord Touch*, Defendant's concerns can be addressed on a motion for class certification."); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *24 (D.N.J. May 8, 2017) ("Defendant's argument that the Colorado Georgia, and South Carolina Plaintiffs' claims must be dismissed because those states do not recognize classwide claims for damages is unpersuasive.… Defendant does not attack the sufficiency of the class allegations in the Complaint, but rather directs its argument as to whether the action could proceed as a class action in general. Hence, Defendant does not address the sufficiency or insufficiency of the claims it seeks to dismiss.… Hence, the claim may proceed as a class action and any attacks as to whether class certification is appropriate can be raised at the class certification phase.").

established by the Supreme Court in *Shady Grove*.… Without the benefit of thorough briefing on this issue, the Court declines to rule at this time on whether Plaintiffs' CCPA claim for damages is barred under *Shady Grove*.").

*Third*, the defendants are incorrect on the merits. *See Andren v. Alere, Inc.*, 2017 WL 6509550, at *22 (S.D. Cal. Dec. 20, 2017) ("This Court also finds the reasoning in *In re Hydroxycut* persuasive and concludes that a representative action for monetary relief is not barred under Georgia or Colorado law.") (citing *In re Hydroxycut Mktg. & Sales Practicies Litig.*, 299 F.R.D. 648 (S.D. Cal. 2014)). Similarly, courts have held under *Shady Grove* that Georgia's similar bar on class actions seeking damages under its Fair Business Practices Act does not apply in federal court.[26] Finally, two cases cited by the defendants are easily distinguished, because neither even mentions *Shady Grove*. *See David v. Volkswagen Grp. of Am., Inc.*, 2018 WL 1960447, at *7 (D.N.J. Apr. 26, 2018); *Martinez v. Nash Finch Co.*, 886 F. Supp. 2d 1212, 1218–1219 (D. Colo. 2012).[27]

---

[26] *See Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1292 (N.D. Ga. 2018) ("Federal Rule 23 does not 'abridge, enlarge or modify any substantive right' of the parties under the GFBPA."); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d 582, 600 (E.D. Mich. 2018) ("Georgia's statutory class action prohibition for consumer suits falls on the 'procedural' side of the line drawn by Justice Stevens and therefore does not run afoul of the Rules Enabling Act.").

[27] The defendants also cite *Miller v. Corinthian Colls., Inc.*, 769 F. Supp. 2d 1336, 1342 (D. Utah 2011), in which the court had no reason to address *Shady*

4.      **Georgia**

The defendants incorrectly assert that the claim under the Georgia Uniform

Deceptive Trade Practices Act (UDTPA) should be dismissed "because the alleged

pricing 'scheme' is not actionable under that statute." Defs.' Br. at 15. The

defendants rely on a case that they claim is "directly on point." *Id*. at 16 (citing

*Cox v. Athens Reg'l Med. Ctr.*, 631 S.E.2d 792 (Ga. Ct. App. 2006).

But the defendants ignore the Georgia Supreme Court's rejection of *Cox*. In

*Bowden v. The Medical Center, Inc.*, 773 S.E.2d 692, 694 (Ga. 2015), the plaintiff

alleged that her hospital bill "of $21,409.59 was grossly excessive and did not

reflect the reasonable value in the community of her treatment" and sued for

"violation of Georgia's version of the Uniform Deceptive Trade Practices Act

('UDTPA'), OCGA §§ 10–1–370 to 10–1–375." The plaintiff sought discovery as

to the "reasonableness of [the hospital's] charges for her care." *Id*. at 695. The

court of appeals held that she was not entitled to the discovery, "citing a series of

its precedents beginning with *Cox v. Athens Regional Medical Center, Inc*., 279

Ga. App. 586, 631 S.E.2d 792 (2006), which hold—in the summary judgment

context—that charging uninsured patients higher rates than insured patients does

---

*Grove*, because the plaintiffs alleged "that certain practices of Defendant violate
the administrative rules authorized under the UCSPA." (footnote omitted).

not constitute breach of contract, unjust enrichment, or a violation of the UDTPA." *Id*. at 698.

The Supreme Court reversed, stating that the "Court of Appeals appears to have concluded, based on its *Cox* line of cases, that if Bowden signed a contract to pay for her treatment, she would be precluded from challenging the reasonableness of the charges reflected in the hospital's lien." *Id*. The Supreme Court explained that "the general proposition that hospital charges are automatically 'reasonable' whenever the patient (or someone authorized to act on her behalf) has signed a contract agreeing to pay those charges is incorrect, because the contract price for goods and services does not necessarily equal their reasonable value." *Id*. Here, as in *Bowden*, the plaintiffs allege that the insulin prices charged by the defendants are "grossly" inflated and were "not reasonable." *See*, *e.g.*, Compl. ¶¶ 3, 11, 13-14, 338, 491.[28]

---

[28] Two more cases cited by the defendants pre-date and are overruled by *Bowden*. *See Morrell v. Wellstar Health Sys., Inc*., 633 S.E.2d 68, 73 (Ga. Ct. App. 2006) ("The fact that the 'chargemaster' rates for medical care charged to the Morrells pursuant to the contracts exceeded the rates Wellstar Health charged for medical care covered by insurance and Medicare/Medicaid benefits, even assuming the Morrells were unaware of the pricing difference, does not establish a violation of the UDTPA. *Cox*, 279 Ga. App. at 592(2), 631 S.E.2d 792."); *HLD Enters., Inc., v. Michelin N. Am., Inc*., 2004 WL 2095739, at *4 (N.D. Ga. June 29, 2004) (holding that UDTPA was intended only to prevent sellers from "luring customers with dubious representations that prices have been 'slashed' by large percentages" is wrong in light of *Bowden*).

5.    **Louisiana**

The defendants erroneously argue that the claim under the Louisiana Unfair

Trade Practices and Consumer Protection Law (LUTPA) should be dismissed

"because plaintiffs do not allege that defendants acted with the requisite 'specific

purpose of harming the competition.'" Defs.' Br. at 17. In *Andretti Sports*

*Marketing Louisiana, LLC v. Nola Motorsports Host Committee, Inc*., 147 F. Supp.

3d 537, 566 (E.D. La. 2015), the court rejected that argument, holding that LUTPA

"does not provide that in order for there to be a violation under LUTPA there must

be an intent to harm competition. Accordingly, the Court denies the motion to

dismiss Andretti's LUTPA claim on the grounds that Andretti has not pled a

specific intent to harm competition." Similarly, in *In re Chrysler-Dodge-Jeep*

*EcoDiesel Marketing, Sales Practices, & Products Liability Litigation*, 295 F.

Supp. 3d 927, 1019 (N.D. Cal. 2018), the defendants "cited to a case in which a

court stated that '[a] defendant's motivation is a critical factor; the actions must

have been taken with the specific purpose of harming the competition.'" (Citation

omitted.) But the court declined to dismiss the LUTPA claim on that basis, because

"that statement regarding motivation or purpose seems to be driving at the point

that the LUTPA does not prohibit sound business practices, the exercise of

permissible business judgment, or appropriate free enterprise transactions." *Id*.

(citation and internal quotation marks omitted). Similarly, numerous other courts

have allowed claims by consumers, without any showing that the defendant's motivation was to harm competitors.[29]

Moreover, as in *Andretti*, the defendants here "have not pointed to any factually analogous cases where courts have dismissed LUTPA claims for failure to allege that the acts were committed with the purpose of causing harm to competition." 147 F. Supp. 3d at 565. The defendants cite *IberiaBank*, in which the plaintiff bank sued a former employee who went to work for a competitor. Because the parties were competitors, the court had no reason to address whether "specific purpose to harm competition" must be shown when the plaintiff is a consumer, not a competitor.[30] And the other cases cited by the defendants do not support their

---

[29] *See, e.g., Moser v. Navistar Int'l Corp.*, 2019 WL 977871, at *1 (E.D. Tex. Feb. 28, 2019) (denying defendants' motion for summary judgment on LUTPA claim where plaintiffs alleged that "the trucks sold or leased by Defendants suffered extraordinary and unacceptable rates of breakdowns"); *Patz v. Sureway Supermarket*, 2018 WL 6651141, at *2 (E.D. La. Dec. 19, 2018) (denying defendant's motion for summary judgment under LUTPA where plaintiffs brought "a housing discrimination claim under the FHA, alleging Defendants terminated their lease because Vivian Patz was pregnant"); *Rincon v. Owens Collision & Repair Serv. Ctr., LLC*, 2018 WL 4520384, at *6 (La. Ct. App. Sept. 21, 2018) ("we find no manifest error in the trial court's conclusion that Owens' act of charging Mr. Rincon for repairs to his vehicle that were not actually performed was done knowingly, rather than negligently, and amounted to an unfair and deceptive trade practice" under LUTPA).

[30] Defs.' Br. at 17-18.

argument, because the defendants in those cases did not engage in wrongful

conduct at all, regardless of whether competition was harmed.[31]

### 6.   Mississippi

The defendants next incorrectly contend that the claim under the Mississippi

Consumer Protection Act (MCPA) should be dismissed "due to plaintiffs' failure

to comply with the MCPA's pre-suit dispute resolution requirement." Defs.' Br. at

19. Mississippi's requirement that the parties avail themselves of specified ADR

programs conflicts with Fed. R. Civ. P. 16 (which empowers district courts to

consider and "take appropriate action" to facilitate settlement discussions and use

of "special procedures" for dispute resolution) and, in a class action, with Rule 23

(which imposes specific procedural requirements to settle proposed class claims).

*See*, *e.g.*, *Prado v. Allstate Tex. Lloyd's*, 2016 WL 9414132 (W.D. Tex. Nov. 16,

2016) (under *Shady Grove*, state-law mediation requirements do not apply in

diversity action, because 28 U.S.C. § 652 and Fed. R. Civ. P. 16 govern dispute

---

[31] *See Monroe v. McDaniel*, 207 So. 3d 1172, 1180 (La. Ct. App. 2016) ("the record does not support a finding that Defendants' conduct in forming a new company constituted fraud, misrepresentation, deception or other unethical conduct"); *Ronnoco Coffee, LLC v. Westfeldt Bros., Inc.*, 2018 WL 902202, at *12 (E.D. Mo. Feb. 15, 2018) ("the Court is left to conclude that Ronnoco was acting simply to protect its own financial interests, as permitted by Louisiana law"); *CaseExperts, LLC v. CompStar Sys., Inc.*, 2010 WL 4553926, at *6 (W.D. La. Nov. 3, 2010) ("The Court cannot find that a customer's decision to hire an expert to develop a software program in response to a large fee increase is 'unethical, oppressive, unscrupulous, or substantially injurious.'") (citation omitted).

resolution)[32]; *Essex Ins. Co. v. Levy Props., Inc.*, 2013 WL 12122119, at *1 (N.D. Tex. May 7, 2013) ("[T]he procedure to mediate pursuant to [Texas Insurance Code] section 541.161 is more procedural in nature than substantive and conflicts with the Federal Rules of Civil Procedure which allow for a court to manage cases and order mediation of a case as determined by the Court.").[33]

The defendants' argument is inconsistent with Third Circuit precedent that interprets *Shady Grove*. In *Knepper v. Rite Aid Corp.*,[34] the defendant argued that allowing an opt-out class action for state-law violations to proceed alongside a separately-filed Fair Labor Standards Act (FLSA) opt-in action would violate the Rules Enabling Act, because section 216(b) of FLSA bars opt-out classes. The Third Circuit disagreed.[35] "Under the plurality's view [in *Shady Grove*], any supposed substantive purpose underlying § 216(b) is irrelevant, and we need only determine whether Rule 23 'really regulates procedure,' which the Court has

---

[32] *See* 28 U.S.C. § 652(a) ("each district court shall, by local rule adopted under section 2071(a), require that litigants in all civil cases consider the use of an alternative dispute resolution process at an appropriate stage in the litigation").

[33] The cases cited by the defendants do not discuss *Shady Grove* and thus do not support dismissal. *See Humphrey v. CitiBank NA*, 2013 WL 5407195, at *6 (N.D. Miss. Sept. 25, 2013); *Mayberry v. Bristol-Meyers Squibb Co.*, 2009 WL 5216968, at *6 (D.N.J. Dec. 30, 2009).

[34] 675 F.3d 249 (3d Cir. 2012).

[35] *Id.* at 265.

already concluded it does."[36] And "[u]nder the concurrence's view [in *Shady Grove*], the regulation of class relief under § 216(b) is procedural, and class certification does not implicate the Rules Enabling Act."[37] As a result, under "either view," the defendant's argument "fail[ed]."[38]

So too here: any supposed, substantive purpose of the state-law requiring pre-suit mediation is irrelevant, because Rule 16 and 28 U.S.C. § 652 really regulate the procedure for alternative dispute resolution (the *Shady Grove* plurality view) and do not implicate the Rules Enabling Act (the *Shady Grove* concurrence view). As a result, the defendants' argument fails.

### 7.   West Virginia

Finally, the defendants incorrectly argue that the claim under the West Virginia Consumer Credit and Protection Act (WVCCPA) should be dismissed "because that statute does not apply to cases involving the purchase of prescription drugs." Defs.' Br. at 22 (citing *White v. Wyeth*, 705 S.E.2d 828 (W. Va. 2010).). The plaintiffs in *White* alleged that "defendants used unfair and deceptive practices in promoting HRT prescription drug products to doctors and patients for treatment of serious menopausal disorders by using misleading statements in advertising,

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

marketing and labeling of the products. The complaint does not allege that any of the named Respondents or their doctors ever received, read or relied upon the alleged misrepresentations." 705 S.E.2d 828, 831 (W. Va. 2010). The Court answered "Yes" to the following certified question: "Does the 'as a result of' language in Section 46A–6–106(a) of the West Virginia Consumer Credit and Protection Act require proof of reliance on alleged affirmative misrepresentations in order to satisfy the element of causation in private causes of action brought pursuant to the Act?" *Id*. at 838.

*White* is inapposite. The Court held that "we are simply not convinced that a causal connection exists within the context of prescription drug purchases. Prescription drug cases are not the type of private causes of action contemplated under the terms and purposes of the WVCCPA because the consumer can not and does not decide what product to purchase." *Id*. at 837–38. The Court explained that "the high degree of federal regulation of prescriptive drug products attenuates the effect product marketing has on a consumer's prescriptive drug purchasing decision." *Id*. at 838.

Here, in contrast, the plaintiffs do not allege that the defendants made misleading statements about insulin, causing physicians to prescribe it or plaintiffs to purchase it. Instead, the plaintiffs allege that the defendant manipulated the price of insulin. And there is no federal regulation of the *pricing* of insulin. As the FDA

itself states, "the FDA has no legal authority to investigate or control the prices set by manufacturers, distributors and retailers."[39] *See also Del Greco v. CVS Corp.*, 354 F. Supp. 2d 381, 387 (S.D.N.Y. 2005) ("the FDA does not regulate drug prices, nor does it involve itself with the marketing agreements entered into by pharmaceutical companies—its primary concern is public health and safety"), *aff'd*, 164 F. App'x 75 (2d Cir. 2006). Therefore, *White* does not establish a precedent as to whether consumers may sue for manipulative pricing of drugs, as opposed to suing for fraudulent misrepresentations as to the safety or efficacy of a drug. As the West Virginia Supreme Court has explained, "'[o]biter dicta or strong expressions in an opinion, where such language was not necessary to a decision of the case, will not establish a precedent.'" *W. Va. Dep't of Transp., Div. of Highways v. Echols*, 827 S.E.2d 45, 53 (W. Va. 2019) (citation omitted). *See also*

---

[39] U.S. FOOD & DRUG ADMIN., *Frequently Asked Questions about CDER*, https://www.fda.gov/about-fda/center-drug-evaluation-and-research/frequently-asked-questions-about-cder#16 (last visited June 6, 2019). This Court may take judicial notice of that statement, which is admissible under the hearsay exception in Fed. R. Evid. 803(8). *See United States v. Iverson*, 818 F.3d 1015, 1021–22 (10th Cir. 2016) (taking judicial notice of information on FDIC website and explaining that "government websites fall within the exception for public records"); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 551 (D. Md. 2007) ("Given the frequency with which official publications from government agencies are relevant to litigation and the increasing tendency for such agencies to have their own websites, Rule 902(5) provides a very useful method of authenticating these publications.' When combined with the public records exception to the hearsay rule, Rule 803(8), these official publications posted on government agency websites should be admitted into evidence easily.").

*Kanawha Cty. Pub. Library Bd. v. Bd. of Educ. of Cty. of Kanawha*, 745 S.E.2d 424, 434 (W. Va. 2013) ("it does not follow that an issue neither asserted by the parties nor addressed in this Court's opinions is binding.…").

Finally, the other cases cited by the defendants are inapposite. One case involved drug safety, which is regulated by the FDA, but drug safety is not at issue in this action. *See Wamsley v. LifeNet Transplant Servs. Inc*., 2011 WL 5520245, at *11 (S.D. W. Va. Nov. 10, 2011) ("There is no principled difference between carving out an exception for liability under the WVCCPA for a physician who determines which drug to prescribe and a physician who decides which human blood or tissue products are medically appropriate and safe."). And in the other case, *In re Generic Pharmaceuticals  Pricing Antitrust Litigation*, 2019 WL 653854, at *23 (E.D. Pa. Feb. 15, 2019), the court did not address the distinction between pricing and drug safety as it relates to *White* but instead applied *White* without analysis; therefore, it provides no support for the defendants' argument.

### III.   CONCLUSION

The plaintiffs request the Court deny the partial motion to dismiss the Second Amended Class Action Complaint in its entirety, with the three exceptions noted in footnote 2, above.

Dated: June 14, 2019             Respectfully submitted,

                                 CARELLA, BYRNE, CECCHI,
                                 OLSTEIN, BRODY & AGNELLO, P.C.

                                 */s/ James E. Cecchi*
                                 James E. Cecchi
                                 Lindsey H. Taylor
                                 Donald A. Ecklund
                                 5 Becker Farm Road
                                 Roseland, NJ 07068
                                 Telephone: (973) 994-1700
                                 Facsimile:  (973) 994-1744
                                 jcecchi@carellabyrne.com
                                 ltaylor@carellabyrne.com

                                 HAGENS BERMAN SOBOL SHAPIRO
                                 LLP


                                 */s/ Steve W. Berman*
                                 Steve W. Berman
                                 1301 2nd Avenue, Suite 2000
                                 Seattle, WA 98101
                                 Telephone: (206) 623-7292
                                 Facsimile:  (206) 623-0594
                                 steve@hbsslaw.com

                                 Thomas M. Sobol
                                 Hannah W. Brennan
                                 HAGENS BERMAN SOBOL SHAPIRO
                                 LLP
                                 55 Cambridge Parkway, Suite 301
                                 Cambridge, MA 02142
                                 Telephone: (617) 482-3700
                                 Facsimile:  (617) 482-3003
                                 tom@hbsslaw.com
                                 hannahb@hbsslaw.com

Linda P. Nussbaum
Peter Moran
Zach Shutran
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com

Roberta D. Liebenberg
Adam J. Pessin
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Telephone: (215) 567-6565
Facsimile:  (215) 568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

Michael Critchley
CRITCHLEY, KINUM & DENOIA, LLC
75 Livingston Avenue, Suite 303
Roseland, New Jersey 07068
Telephone: (973) 422-9200
Facsimile:  (973) 422-9700
mcritchley@critchleylaw.com

Ellen Relkin
WEITZ & LUXENBERG
220 Lake Drive East, Suite 210
Cherry Hill, NJ 08002
Telephone: (212) 558-5500
Facsimile:  (212) 344-5461
ERelkin@weitzlux.com

Paul F. Novak
Diana Gjonaj
Gregory Stamatopoulos
WEITZ & LUXENBERG
The Fisher Building
3011 West Grand Boulevard Suite 2150
Detroit, MI 48202
Telephone: (313) 800-4170
Facsimile:  (646) 293-7992
pnovak@weitzlux.com
dgjonaj@weitzlux.com
gstamatopoulos@weitzlux.com

Nyran Rose Rasche
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
150 S. Wacker Drive, Suite 3000
Chicago, Illinois 60601
Telephone: (312) 782-4880
Facsimile:  (312) 782-4485
nrasche@caffertyclobes.com

Michael Criden
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
Telephone: (305) 357-9000
Facsimile:  (305) 357-9050
mcriden@Cridenlove.com
lgrossman@cridenlove.com

Craig L. Briskin
MEHRI & SKALET, PLLC
1250 Connecticut Avenue NW, Suite 300
Washington, D.C. 20036
Telephone: (202) 822-5100
Facsimile:  (202) 822-4997
cbriskin@findjustice.com

Jayne A. Goldstein
SHEPHERD FINKELMAN MILLER &
SHAH, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jgoldstein@sfmslaw.com

Natalie Finkelman Bennett
SHEPHERD FINKELMAN MILLER &
SHAH, LLP
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile:  (866) 300-7367
nfinkelman@sfmslaw.com

Lynn Lincoln Sarko
Derek W. Loeser
Gretchen S. Obrist
Juli Farris
Gabe Verdugo
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile:  (206) 623-3384
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Todd A. Seaver
BERMAN TABACCO
44 Montgomery St., Ste. 650
San Francisco, CA 94104
Telephone: (415) 433-3200
tseaver@bermantabacco.com
jmoy@bermantabacco.com

Stephen H. Weil
WEIL & CHARDON LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604
Telephone: 312-585-7404
steve@weilchardon.com

Joseph H. Meltzer
KESSLER TOPAZ MELTZER &
CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile:  (610) 667-7056
jmeltzer@ktmc.com


*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, James E. Cecchi, certify that, on this date, this document was served by filing it on the court's CM/ECF system and additionally via electronic mail to all counsel of record.

Dated: June 13, 2019                    */s/ James E. Cecchi*
                                        James E. Cecchi